UNTIED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
NORTHERN DIVISION

| | |
|---|---|
| SIOUX RURAL WATER SYSTEM, INC., a Non-Profit Corporation<br><br>                Plaintiff,<br><br>vs.<br><br>CITY OF WATERTOWN, a South Dakota Municipality, and WATERTOWN MUNICIPAL UTILITIES, an agency of the CITY OF WATERTOWN<br><br>                Defendants. | Civ. 15-1023<br><br><br>**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT** |

## <u>INTRODUCTION</u>

People in rural areas need safe, clean, affordable drinking water.  Sioux Rural Water System seeks to protect its ability to provide safe, clean, affordable drinking water by stopping the City of Watertown and Watertown Municipal Utilities' practice of stealing its customers and service territory.

In 1974, people in rural Codington, Clark, Deuel and Hamlin Counties banded together as Sioux Rural Water System, Inc. (hereinafter referred to as "Sioux").  They took out loans from the federal government, built a water system and began to provide safe, clean water to their homes, farms and

small businesses.  They promised to repay the federal government for this necessity.  Each month, the payment was made possible by pooling resources and spreading the cost of the loans among the members of Sioux.  Growth in the water system allowed for more people to receive clean water, while costs for all members stayed reasonable.

Sioux's members realized the benefits from their association.  But they weren't alone.  The City of Watertown realized that small population clusters began to develop in areas where Sioux had customers.  These clusters became targets of opportunity for Watertown to expand its footprint and grow economically.[1]

In 1989, the State of South Dakota passed laws affecting rural water systems' relationships with cities.[2]  There is no evidence the state considered the impact of those laws on a water system's ability to repay its federal loans, nor did it realize the damage those laws could do to the citizens of South Dakota in rural areas.

Each time a customer is lost, Sioux loses the ability to spread costs among its members.  When that happens, the cost goes up for the remaining members.  If the City is not stopped, Sioux will not be able to repay its federal loans.  Defaulting on federal loans jeopardizes the ability to provide safe,

---

[1] Map of Kittleson/KAK's Addition, e.g. Map attached as Appendix 1 showing Watertown encroachment and Sioux's water lines.
[2] Specifically, SDCL 9-47-22 & 23

affordable, clean water to Sioux's members and the people of rural Codington, Clark, Deuel and Hamlin Counties.

## RELIEF SOUGHT

Sioux's  Motion for Partial Summary Judgment requests an injunction pursuant to 7 U.S.C. § 1926(b) and 28 U.S.C. §§ 2201 - 2202, as a matter of law, enjoining and prohibiting the City of Watertown from providing water service to Sioux's current customers.[3]   Second, Sioux requests partial summary judgment on the issue of liability for Watertown's violation of § 1926(b) by providing water service to three prospective customers within Sioux's service territory on the east side of Watertown, and three new potential customers on the west side of Watertown near Pelican Lake, where it is undisputed that Sioux had pipes in the ground and the ability to serve those prospective customers. Third, Sioux requests a partial summary judgment that a federally indebted rural water association, as defined by § 1926(b), is not required to provide fire protection in order to provide adequate service to a customer. Finally, Sioux requests summary judgment as to the Defendants' affirmative defenses of estoppel, laches and waiver.

---

[3]  7 C.F.R. § 1782.14 states (a) 7 U.S.C. 1926(b) was enacted to protect the service area of Agency borrowers with outstanding loans, or those loans sold in the sale of assets authorized by the "Joint Resolution Making Continuing Appropriations for the Fiscal Year 1987," from the loss of users due to actions or activities of other entities in the service area of the Agency financed system.  Without this protection, other entities could extend service to users within the service area, and thereby undermine the purpose of the congressionally mandated water and waste loan and grant programs and jeopardize the borrower's ability to repay its Agency debt. (b) Responsibility for initiating action in response to those actions prohibited by 7 U.S.C. 1926(b) rests with the borrower.

# UNDISPUTED MATERIAL FACTS

## Sioux Rural Water System

Sioux is a South Dakota non-profit corporation and rural water association, federally indebted to the United States Department of Agriculture. (Plaintiff's Statements of Undisputed Material Fact (hereinafter cited as "SF" followed by the paragraph number) (¶ 1)  Sioux provides water to 1,435 individual members, and sells bulk water to the South Dakota cities of Bryant, Kranzburg, Hazel, and Hayti.  (SF ¶ 6)  Sioux has two water treatment plants. One is just east of Castlewood and is known as the Castlewood Plant. The Castlewood Plant serves the southern part of Sioux's system. (SF ¶ 9-11)

The other plant is approximately three miles southeast of Watertown and is known as the Sioux Plant.  The Sioux Plant serves the northern part of Sioux's system, the area directly adjacent to the southern and eastern borders of Watertown. (SF ¶ 9-11)  Sioux has served the area directly adjacent to the southern and eastern borders of Watertown since 1974. (SF ¶ 17)

The Sioux plant serves two geographically distinguishable areas that are at issue in this case. One area will be described as the "West Side" and is generally described as the area between Lake Kampeska and Pelican Lake.

Another area will be described as the "East Side" and is generally described as the area immediately east of Interstate 29, generally along Highway 212. (SF ¶ 64)

The maps attached as Appendix 1 to this Brief shows where Sioux has water supply pipes and individual customer hookups adjacent to Watertown, and shows both the "West Side" and the "East Side." Sioux currently serves 464 customers within 3 miles of Watertown. (SF ¶ 16)

## Sioux's Indebtedness to the United States

Sioux has been continuously indebted to the federal government since 1974. (SF ¶ 3) Sioux currently has six loans with USDA Rural Development that will be repaid over the next three decades. (SF ¶ 2)   Sioux pays approximately $139,584.00 yearly to the United States. (SF ¶ 2)  Sioux's total federal indebtedness is approximately $2,029,059.24 as of October 1, 2016. (SF ¶ 2)  Sioux's loans and costs of operation are paid from the sale of water to its members and its bulk customers.  (SF ¶ 4)

## Watertown and Watertown Municipal Utilities

Watertown operates its water system through a municipal utilities board organized under SDCL Chapter 9-39.  (SF ¶ 21)  Under South Dakota law, WMU acts as an agency for the City, and has the legal authority to set

policy, fix prices, and determine long-term municipal water utility plans. (SF ¶ 21)

### Watertown and WMU's Annexations, Incursions, and Curtailment

Watertown has annexed numerous properties into the City that Sioux had either provided service to, or had pipes in the ground available to serve future customers. (SF ¶ 32)  When the City makes an annexation of territory, WMU typically takes all water customers in the annexed area, including any customers of Sioux that request to become WMU customers. (SF ¶ 32-35) This is true regardless of whether Sioux has water supply pipes in the area or not.  WMU justifies this policy by citing to SDCL 9-47-22 and SDCL 9-47-23. (SF ¶ 35)

Watertown and WMU demanded, until December 4, 1996, that Sioux sign a "Municipal Agreement" with WMU if Sioux wanted to serve a customer within 3 miles of the Watertown municipal boundaries.  (SF ¶ 33) There are numerous examples of these Municipal Agreements until December 4, 1996. (SF ¶ 33)  On December 4, 1996, the Watertown City Attorney at the time, Vincent Foley, wrote to Sioux and stated "Rather than execute the agreement, the City of Watertown will elect to be governed by SDCL Chap. 9-47." (SF ¶ 33)  From that point on, Sioux would send lists of customers and prospective customers to WMU that were within the 3 mile

6

boundary. WMU would then "approve" or "deny" Sioux serving customers in that 3 mile area, citing to SDCL 9-47-22 and 23. (SF ¶ 33)

Consistent with this policy, WMU officials testified that "If that customer [Sioux's customer in an annexed area] would ask for our service, I would go down the path that is laid out by state law." (SF ¶ 34)  WMU intends to follow "state law" when any Sioux customer in an annexed area requests service in the future. (SF ¶ 34-35) WMU's General Manager, Steve Lehner, testified that "my understanding is when we annex a customer, or we annex a property, a customer that's being served by Sioux Rural Water, we have an obligation to buy out what system is there providing service to them and pay, I believe its five percent of gross revenues for a year." (SF ¶ 35)  Despite Lehner's assertions, there are numerous examples of the Defendants taking Sioux's service territory without any discussion or compensation.

## Incursion and Curtailment: Examples and Threats

### The West Side

### Cenex Harvest States and Terry Ingalls

In August 2012, Sioux had a pipeline on the southwest border of Watertown that went to a lot that had been annexed into Watertown for a new Cenex Harvest States facility. Watertown "denied" Sioux's request to

serve the new Cenex Harvest States facility, along with Sioux's attempt to serve an individual hookup, on the east side of Watertown, Terry Ingalls. Watertown stated in an e-mail that, "We have a water main adjacent to both of these properties and CHS is in city limits." Sioux could have served both of these potential customers. Watertown paid nothing to Sioux. (SF ¶ 36)

## Kak's Addition [4]

"Kak's Addition" is a housing development on the north side of Pelican Lake that has been annexed by Watertown. (SF ¶ 49)  Sioux has long served water to housing lots next to Pelican Lake, and has a supply pipeline approximately 100 feet from the boundary of Kak's. (SF ¶ 50) Watertown has already served 20 house lots in Kak's Addition with water, and is now in the process of serving an additional three houses being built in the addition.  (SF ¶ 49-51)  Sioux could serve each of the 20 houses constructed in Kak's Addition with potable domestic water, and can serve the three houses currently being built. (SF ¶ 49-51) Watertown never asked or received permission from Sioux to serve the Kak's Addition.  (SF ¶ 50)

## Kittleson's Addition[5]

Watertown has continued to assert its "right" to take Sioux's

---

[4] Map Kak's Addition, Appendix 1.
[5] Map of Kittleson's Addition, Appendix 1

customers and service territory at will using SDCL 9-47-22 and 23. (SF ¶ 33-36)  One recent example is a development on the north side of Pelican Lake known as "Kittleson's Addition."  (SF ¶ 45)  Sioux has pipes adjacent to Kittleson's Addition and serves customers in and adjacent to Kittleson's Addition. (SF ¶ 45)  In August 2014, four potential customers were inquiring to hook up to Sioux.  Sioux asked Watertown what its position was on the four potential customers.  (SF ¶ 46)

On September 26, 2014, Jeff DeVille, WMU's Water Superintendent, sent an e-mail to Sioux, stating that "The City has been approached by the people along this stretch of lake [Kittleson's Addition] asking to be annexed into the City.   I am waiting to see what the outcome of that is. I will let you know as soon as I can."  (SF ¶ 46)  On October 21, 2014, DeVille sent an e-mail to Sioux and stated that "we do not intend on hooking this lot to our water system. If the annexation happens it will take a considerable amount of time to get this completed and they should not have to wait for water. How this area will be served with water will have to be worked out during the annexation process." (SF ¶ 47)

Sioux took this e-mail to mean that WMU wanted Sioux to provide water to the four customers until such time as Watertown annexed the sites

9

and WMU chose to serve them.[6] (SF ¶ 48)

## East Side Businesses[7]

## Titan Machinery

On September 19, 2013, Sioux's corporate counsel wrote to the Watertown City Attorney at the time, Stanton Fox, regarding an annexation Watertown had made on the east side of the City for a Titan Machinery building. (SF ¶ 38)  Before Titan Machinery purchased the property, the property was a farmstead served by Sioux.  Sioux asked Watertown to reimburse it under SDCL 9-47.  Watertown refused to pay Sioux, claiming that the City had no obligation to pay Sioux because Titan Machinery had never been served by Sioux. (SF ¶ 38)

Sioux's counsel then wrote the Watertown City Attorney and advised him that Sioux had loans from the federal government that were protected by 7 U.S.C. § 1926(b).  Watertown then took the position that unless a federal loan was taken to directly serve the specific location at issue—here the Titan Machinery site—there was no §1926(b) protection.[8]  (SF ¶ 39)

---

[6] This example is at the core of why Sioux asks for § 1926(b) protection. Under this scheme, WMU essentially asks Sioux to serve these four customers until Watertown completes its annexation and until WMU decides to take them.

[7] See Map attached as Appendix 1 for all three sites.

[8] Sioux's counsel then wrote to the City Attorney and stated Sioux would make no claim to serve Titan Machinery. At that time, Sioux had hired a new manager, its current manager, Heath Thompson. A forensic audit after Heath was hired showed that the former office manager, the wife of the ex-manager, had embezzled a large sum of money. The forensic audit determined that $1,151,745.69 was missing. The former office manager was criminally prosecuted and sentenced to prison. Sioux's management had its hands full at that time.

## Jim Aesoph—Watertown Auto Auction

Sioux has a 6-inch pipeline that runs parallel to I-29 north and south through Watertown. (SF ¶ 40)  East of I-29, Watertown has provided water to a business location that was known as "Watertown Auto Auction", and owned by Jim Aesoph. (SF ¶ 41-42)  Sioux's 6-inch line is approximately 300 feet from the Aesoph property.  Sioux has the supply capacity to serve the Aesoph property.  (SF ¶ 57, 61-62)  Watertown never asked or received permission from Sioux to serve Aesoph, nor did it pay Sioux.  (SF ¶ 42)

## Federal Express

WMU connected a Federal Express building to WMU's waterline. Sioux's 6-inch line is adjacent to the Federal Express building, approximately 200 feet away. (SF ¶ 43)  Sioux has the capacity to serve the Federal Express building. (SF ¶ 57, 61-62)  Watertown never asked or received permission from Sioux to serve Federal Express, nor did it pay Sioux.  (SF ¶ 43)

## McFleeg Feeds

WMU connected a business known as "McFleeg Feeds" to WMU's waterline. Sioux's 6-inch line is adjacent to the McFleeg Feeds building, approximately 200 feet away. (SF ¶ 44)  Sioux has the capacity to serve the McFleeg Feeds building. (SF ¶ 57, 61-62)  Watertown never asked or

received permission from Sioux to serve McFleeg Feeds nor did it pay

Sioux. (SF ¶ 44)

## ARGUMENT

### I.  7 U.S.C. § 1926(b) protects federally indebted rural water associations from municipal theft of customers and service territory.

7 U.S.C. § 1926(b) protects federally indebted rural water

associations from municipal curtailment, or threats of curtailment, to

customers and service territory.  7 U.S.C. § 1926(b) states in relevant part

that:

> The service provided or made available through any such association shall not be curtailed or limited by inclusion of the area served by such association within the boundaries of any municipal corporation or other public body, or by the granting of any private franchise for similar service within such area during the term of such loan.

The Eighth Circuit has held that "[s]ection 1926(b) prevents

municipalities from curtailing the service area of rural water service

providers who are indebted to the United States."  Rural Water System # 1

v. City of Sioux Center, 202 F.3d 1035, 1036 (8th Cir. 2000) ; see also Public

Water Supply Dist. v. City of Lebanon, Mo., 605 F.3d 511, 515, (8th Cir.

2010).  "Congress enacted section 1926(b) to encourage rural water

development and to provide greater security for FmHA loans . . ." and "any

[d]oubts about whether a water association is entitled to protection from

competition under § 1926(b) should be resolved in favor of the FmHA-indebted party seeking protection for its territory."  Rural Water System # 1. at 1038.

In order for a rural water service provider to be entitled to the protection of § 1926(b) it must meet "the well established test" of three elements:  (1) the rural water service provider must be an "association" under the statute; (2) have a qualifying federal loan; and (3) that it has provided or made water service available in the disputed area. The "making service available" element has two components: (1) the physical ability to serve an area—the "pipes in the ground test" and (2) the association has a legal right to serve the disputed area. Public Water Supply Dist., 605 F.3d at 521; see also Rural Water System #1, 202 F.3d at 1036.

The first two elements necessary for § 1926(b) protection are nearly self-evident from reading the statute: an association includes a non-profit corporation that provides water, and the association must have a qualifying federal loan.

The third element is a bit more complex. The "pipes-in-the-ground" test asks whether the water provider has "in fact" made water service available to an area or a customer.  "Under the 'pipes in the ground test' used in water service cases courts examine 'whether a water association has

adequate facilities within or adjacent to the area to provide service within a reasonable amount of time after a request for service is made.'" <u>Public Water Supply Dist.</u>, 605 F.3d at 523; <u>see</u> <u>also</u> <u>Sequoyah</u>, 191 F.3d at 1203 *quoting* <u>Bell Arthur</u>, 173 F.3d at 526; <u>Moongate Water v. Butterfield Park Mut. Domestic</u>, 291 F.3d 1262, 1267-68 (10th Cir. 2002); <u>Le-ax Water Dist. v. City of Athens, Ohio</u>, 346 F.3d 701, 707 (6th Cir. 2003); <u>Village of Grafton v. Rural Lorain County Water</u>, 419 F.3d 562, 566 (6th Cir. 2005); <u>Chesapeake Ranch Water v. Bd. of Com'rs</u>, 401 F.3d 274, 279 (4th Cir. 2005).

The "legal right to serve" prong of the making service available element requires the rural association to prove that it was legally entitled to serve an area under state law at the time the association first became indebted to the United States. Once that legal right to serve is established, and the rural association has federal indebtedness, § 1926 (b) protects the rural association from curtailment. <u>Public Water Supply Dist.</u>, 605 F.3d at 523; <u>Pittsburg County Rural Dist. v McAlester</u>, 358 F.3d 694, 716 (10th Cir. 2004).

## II. 7 U.S.C. § 1926(b) protects all of Sioux's existing customers within 3 miles of Watertown from curtailment by Watertown as a matter of law.

The undisputed facts demonstrate that Sioux is entitled to Summary

Judgment as to each of its 464 current customers within 3 miles of Watertown's municipal borders. Each of the elements necessary for § 1926(b) protection is met.

### 1. Sioux is a federally indebted "association" as defined in § 1926(b).

Sioux meets the definition of an "association" found in § 1926(a), which states in material part that "associations" as defined by the statute, include "corporations not operated for profit, . . . and public and quasi-public agencies to provide for the application or establishment . . . the development, use, and control of water ...."  It's undisputed that Sioux is a South Dakota non-profit corporation that supplies water to rural customers. (SF ¶ 1, 5-6)

### 2. Sioux has been continuously and uninterruptedly indebted to the United States.

Sioux currently has six outstanding loans.  (SF ¶ 2) It's undisputed that Sioux's current total federal indebtedness is approximately $2,029,059.24 as of October 1, 2016. (SF ¶ 2) Sioux has been continuously indebted to the United States since 1974. (SF ¶ 2-3)

### 3. Sioux has made service available to its current customers.

It is also undisputed, and frankly self-evident, that Sioux has made service available to its 464 current customers within three miles of

Watertown. Sioux has "pipes in the ground" that serve those current customers. (SF ¶ 16-18)  In fact, Watertown's and WMU's expert witnesses concede that there are no facts to suggest that Sioux can't serve its current customers. (SF ¶ 53)  Sioux has "made service available" to its current customers as a matter of law.   Rural Water System # 1, 202 F.3d at 1037.

### 4.   Sioux has a legal right to serve its current customers under state law.

It's undisputed that Sioux has, and has always had, the legal authority to serve its current customers under South Dakota law. In fact, Watertown and WMU have not argued, or plead so far anyway, that Sioux is acting "illegally" by serving its current customers adjacent to Watertown.  This is important, because § 1926(b) protection "vests" at the time of the earliest federal loan, and creates a federally protected service territory as long as the rural association has the federal loan. Rural Water System #1, 967 F. Supp. at 1529; Pittsburg, 358 F.3d at 716.

Watertown and WMU have claimed SDCL 9-47-22 and SDCL 9-47-23 allow it to take Sioux's customers as long as WMU follows the two state statutes. (SF ¶ 34-35)  WMU may well claim that those two statutes allow Watertown to take Sioux's customers and concurrently "take away" Sioux's authority under state law to provide service to its customers—hence the argument will go, once Watertown elects to utilize SDCL 9-47-22 and 23

16

Sioux no longer has authority under state law to serve its customers in the disputed area and thus fails the "legal authority" test and thus no § 1926(b) protection.

This is wrong for at least two reasons. First, Sioux has, and always has had, the authority under South Dakota law to serve each of its current customers.  Sioux has permits granted under the authority of the State of South Dakota to serve its customers and it meets all State drinking water standards. (SF ¶ 5) In fact, the Defendants have never suggested, as far as Sioux can tell, that Sioux lacked the legal authority under South Dakota law to serve its current customers.

Second, once Sioux was federally indebted, federal law, and not state law, determined Sioux's service territory. Simply put, no state law can purport to override federal law. Arguing that a state law can trump federal rights created under § 1926(b) "misses the mark" and was specifically rejected by the district court in Rural Water System #1 v. City of Sioux Center, 967 F. Supp. 1483, 1529 (N.D. Iowa, 1997), the underlying decision in the Eighth Circuit's Rural Water System decision.[9]

In the district court case, the municipality argued that an Iowa statute

---

[9] This argument was also rejected in B-Y Water District v. City of Yankton, 2008 WL 5188840, an unpublished opinion by the Honorable Lawrence L. Piersol. Judge Piersol quoted the Rural Water System opinion cited above when the City of Yankton argued that SDCL 9-47-22 and 23 took away the B-Y Water District's legal right to serve areas after Yankton annexed areas served by B-Y.

prohibited the rural association from providing service within two miles of the municipal boundary. Id.  The district court reasoned that state law can certainly define or limit a rural association's legal right to serve a particular area, *as long as the rural association had no federal loan*. Id. at 1528-29. Once the rural association had a qualifying federal loan, however, a state law could not curtail the association's right to serve the area.  Id.  at 1529. If the Defendants seek to use SDCL 9-47-22 and 23 as an "after the fact" justification to claim there is no legal right for Sioux to serve its current customers after the United States loaned Sioux money, the statutes are clearly preempted.

The District Court stated in Rural Water System #1 that:

[T]he court is not saying that state law can be used to justify a municipality's encroachment upon disputed areas in which an indebted association is legally providing service under state law. The state law used to justify the encroachment would clearly conflict with or stand as an obstacle to, the non-encroachment provisions of § 1926(b), and consequently would be preempted by superior federal law in the form of § 1926(b).  (Citations omitted).  Therefore, ***there is express and conflict preemption of any state law that purports to take away from an indebted association any territory in which the association has both a legal and physical ability to provide service at the time the association is first entitled to invoke the protection of § 1926(b).***

967 F. Supp. at 1529 (emphasis added).

This result simply makes sense and complies with the long recognized

purposes of § 1926(b)—to protect the United States' security in the rural association's federal loan. Any other result would imperil, and in fact eviscerate, the government's security in the loan. Indeed, if a municipality could use a state law to take away service territory or customers *after* a federal loan had been made, there would be no security at all in the federal loan. This would defeat the entire purpose of § 1926(b).

In <u>Pittsburg</u>, the Tenth Circuit held that the extent of a federally indebted rural water association's service territory is determined by federal law. The <u>Pittsburg</u> court held that "Federal, not state law, controls the geographic scope of § 1926 protections, which attach as of the entry into the loan agreement and remain as long as the conditions for § 1926 protection discussed above − FmHA indebtedness and service 'made available' − are met." <u>Id</u>. at 716, n.6.  The court further noted that:

> When § 1926 protection attaches for a water district's service to a property within the water district's territory under the two-part test from <u>Sequoyah</u>, the water district has *exclusive* water service rights over that property until the water district's loan to the FmHA is paid off or the water district fails to make service "available" to the property in question.  We thus hold that *if* Pitt-7 was entitled to § 1926 protection, the deannexation order is no bar to McAlester's liability and that McAlester's conduct falls within the conduct prescribed by § 1926.

<u>Id</u>.  These cases are directly on point in this case. Any claim by the Defendants that state law can override § 1926(b) fails.

19

### III.   Section 1926(b) entitles Sioux to serve the three new customers in Kak's Addition on the "West Side" and the Jim Aesoph, Federal Express, and McFleeg Feeds sites on the "East Side" of Watertown.

Sioux has made service available to each of the three new house sites on the West Side in Kak's Additon, and to three businesses on the East Side, the Jim Aesoph property, Federal Express, and McFleeg Feeds. (SF ¶ 51, 56, 58, 60, 61)  Each of the three elements necessary for Sioux to receive § 1926(b) protection discussed above in Section II. of this Brief are present as to these six potential customers. [10]

The Eighth Circuit has made clear that under the "pipes in the ground test" the Court reviews whether the water provider "has adequate facilities within or adjacent to the area to provide service to the area within a reasonable amount of time after a request for service is made." Public Water Supply Dist., 605 F.3d at 523. Furthermore, a water recipient's "preference" for a particular water provider—a city for example—is not relevant for the purposes of analysis under § 1926(b). Id. at 522.

Sioux has made service available to all of these potential customers because it is undisputed that Sioux has facilities—pipes in the ground— available to serve those customers within a reasonable amount of time. Sioux has pipes in the ground approximately 100 feet from the boundary of

---

[10] In the interest of brevity those elements will not be discussed again in this section of the Brief.

Kak's Addition on the north side of Pelican Lake. (SF ¶ 50)  The three new houses could be served within a matter of several weeks, or even less.  (SF ¶ 51)

The same is true of three sites on the east side of Watertown. Jim Aesoph's lot is approximately 300 feet from Sioux's 6-inch line. (SF ¶ 42, 61)  Federal Express and McFleeg Feeds are approximately 200 feet away from Sioux's 6-inch line. (SF ¶ 42-43)  These sites could be hooked up in a matter of several weeks or less. (SF ¶ 65)

Indeed, Watertown and WMU's two expert witnesses, Steve Burian and Richard Wagner, acknowledge, in their report, that of 13 businesses identified on the east side of Watertown adjacent to Sioux's 6-inch line[11] that Sioux's ability to serve is "adequate for all of these users except two, Watertown Truck and Trailer and Rising Star."[12] (SF ¶ 52) This concession binds the Defendants.

Sioux can serve these six new customers without making any improvements in its system.[13]  (SF ¶ 61)  Sioux's expert witness and long-

[11] Big Shot Fireworks, Cross Country Couriers, Dakota Automation, Fed Ex, Randy Hartley, Watertown Truck &Trailer, Lew's Fireworks, McFleegs, Rising Star, Jim Aesoph—car wash, Jim Aesoph, Wheelco, and Wayne Weelborg.

[12] Wagner qualified that statement, however, claiming that he needed more information on individual water demand of each customer.

[13] Sioux believes it could serve 30-35 new customers without making any improvements to its water production facilities. The Defendants may well dispute the 30-35 number, but that is not relevant for the purposes of this Motion. It's undisputed that Sioux can provide water for the six new customers involved

time consulting engineer has opined that Sioux can serve the three new customers in Kak's Addition. (SF ¶ 61)  Furthermore, the Defendants' experts conceded at their depositions they have "no opinion" on whether Sioux can serve additional customers on the West Side in Kak's Addition following the improvements made in 2016. (SF ¶ 60)

## IV.   Sioux is not required to provide water for fire protection in order to have § 1926(b) protection.

Sioux anticipates that the Defendants will claim that because Sioux does not provide fire protection it doesn't provide adequate service to its current customers or to the six property sites Sioux seeks summary judgment on. Watertown and WMU's experts' report included an analysis of whether Sioux could provide fire protection to its customers.[14] Their conclusion was that Sioux lacked capacity for fire protection. Sioux agrees on that point—Sioux is a rural water provider and does not provide fire protection to individual customers. However, the ability to provide fire protection is not relevant to the issue of § 1926(b) protection.

In one of the District Court's decisions in the Rural Water System # 1 case, the court rejected the municipalities' claim that the rural water

in this Motion.

[14] Interestingly, Watertown's and WMU's expert witness Wagner testified that it was his understanding that Sioux was not required to provide fire flow to its customers.  Despite that, he included one "method" of determining water capacity that included fire protection in his expert report. (SF ¶ 58)

provider didn't provide adequate service because it couldn't provide fire protection, stating that the fire protection claim was "a red herring." <u>Rural Water System #1</u>, 29 F.Supp.2d at 993. This issue was not appealed or discussed in the Eighth Circuit case, but case law from other circuits has uniformly held that "It is well established that a water district's ability to provide water for fire protection is not a factor that the court should analyze when determining whether the district has made service available." <u>Rural Water District #1 v. City of Endora, Kan.</u>, 659 F.3d 969, 982 (10th Cir. 2011); <u>citing</u> <u>Rural Water Server</u>, 659 F.3d at 1966; <u>Sequoyah Cnty.</u>, 191 F.3d at 1204 n. 10.

There is a federal regulation, 7 C.F.R. § 1780.57 stating USDA financed facilities "should have sufficient capacity to provide reasonable fire protection to the extent practicable." But this regulation has never been construed to *require* a rural water provider to provide fire protection. For example, in <u>Rural Water Sewer & Solid Waste v. City of Guthrie</u>, 654 F.3d 1058 (10th Cir. 2011), the Tenth Circuit rejected just such an argument noting that regulation only applies to those systems that *choose* to provide fire protection, and the regulation merely requires fire protection "to the extent practicable." <u>Id.</u> at 1066-67. Under § 1926(b) rural water providers that choose not to provide fire protection, such as Sioux, do not fail to

23

provide adequate service by not providing fire protection. Id. at 1066-67.
The ability to provide fire protection is simply "not relevant" for the
purposes of § 1926(b). Id. at 1066.

Any claim by the Defendants that Sioux is not providing adequate
service under § 1926(b) because it does not provide fire protection is indeed
a "red herring." Sioux requests summary judgment on this issue.

### V. Affirmative defenses such as estoppel and waiver are not permitted as a matter of law because 7 U.S.C. § 1926(b) is a statute enacted to protect the public's interest in the repayment of loans from the United States.

Watertown has asserted the equitable defenses of waiver, laches, and
estoppel.  Equitable defenses are not available in this case, and as a matter
of law the affirmative defenses of waiver, estoppel, and laches are not
available to preclude the enforcement of § 1926(b).  Jennings Water, Inc. v.
City of North Vernon, 682 F. Supp. 421, 426 (S.D. Ind. 1988), aff'd, 895
F.2d 311 (7th Cir. 1989).   In Jennings, the district court held that § 1926(b)
is a statute that was enacted to protect the public interest in securing the
repayment of loans from the United States to federally indebted rural water
associations.   Id. at 426-27.

The Supreme Court has held that a private party may not waive the
operation of a statute enacted to benefit the public, stating that "equitable

24

estoppel cannot apply to block the application of a statute enacted to protect the public interest." <u>Scott Paper Co. v. Marcalus Mfg. Co.</u>, 326 U.S. 249, 257, 66 S.Ct. 101, 105, 90 L.Ed. 47, 52 (1945). § 1926(b) is a statute enacted to benefit the public. <u>Pittsburg</u>, 346 F.3d at 1277; <u>Jennings</u>, 682 F.Supp. at 426.  Therefore, Sioux is entitled to summary judgment on the Defendants' equitable defenses.

## <u>CONCLUSION</u>

WHEREFORE, for the forgoing reasons, Sioux Water respectfully requests the Court grant it Summary Judgment, and Partial Summary Judgment, as prayed for in its Motions to this Court.

Respectfully submitted this 7th day of November, 2016.

*/s/ Jeff Cole*
Jeff Cole
William D. Sims
ZIMMER, DUNCAN AND COLE, L.L.P.
5000 S. Broadband Lane, Suite 119
Sioux Falls, SD 57108
(605) 361-9840
E-mail: jcole@zdclaw.com
*Attorneys for Plaintiff*