1          UNITED STATES DISTRICT COURT
2          DISTRICT OF SOUTH DAKOTA
          NORTHERN DIVISION
3

4 SIOUX RURAL WATER SYSTEM, INC., a
   Non-Profit Corporation,
5            Plaintiff,      Civil No.
6    vs.                   15-1023

7 CITY OF WATERTOWN, a South Dakota
   Municipality, and WATERTOWN
8 MUNICIPAL UTILITIES, an agency of
   the CITY OF WATERTOWN,
9
           Defendants.
10

11

12

13

14      DEPOSITION OF STEVEN BURIAN

15

16

17

18

19 DATE:        Tuesday, September 20, 2016
20 PLACE        AE2S, Inc.
             4170 South 28th Avenue
21           Fargo, North Dakota
22 TIME:        1:51 p.m.
23 REPORTED BY:   Deanna L. Sager, R.P.R., R.M.R.
24

25

                           1

---

1          C O N T E N T S
2          W I T N E S S E S
3                            PAGE
4 STEVEN BURIAN
5    Examination by Mr. Cole        4
6

7

8          E X H I B I T S
9
   EXHIBIT NO.    DESCRIPTION          MARKED
10

11           Technical Memorandum
12    6        from Steve Burian, PE      4
             and Richard Wagner, PE
13           8/12/2016
14

15

16

17

18

19

20

21

22

23

24

25

                           3

---

1      A P P E A R A N C E S
2
3 FOR THE PLAINTIFF:
4    Zimmer, Duncan and Cole, L.L.P.
     Attorneys at Law
5    5000 South Broadband Lane
     Suite 119
6    Sioux Falls, South Dakota 57108
     By: Jeff Cole
7         jcole@zdclaw.com

8 FOR THE DEFENDANTS:
9    Richardson, Wyly, Wise, Sauck & Hieb, LLP
     Attorneys at Law
10    1 Court Street
     P.O. Box 1030
11    Aberdeen, South Dakota 57402
     By: Jack H. Hieb
12        jhieb@rwwsh.com
        jstucke@rwwsh.com
13
14

15

16

17

18

19

20

21

22

23

24

25

                           2

---

1      P R O C E E D I N G S
2    (Whereupon, the deposition of STEVEN
3 BURIAN commenced at 1:51 p.m. as follows:)
4      (Whereupon, Deposition Exhibit No.
5      6 was marked for identification by
       the court reporter.)
6            STEVEN BURIAN,
7 HAVING BEEN FIRST DULY SWORN TO TESTIFY THE TRUTH,
   THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, RELATIVE
8 TO THE CAUSE SPECIFIED, TESTIFIED AS FOLLOWS:
9           EXAMINATION
10 BY MR. COLE:
11    Q.    Could you please state your name?
12    A.    Steve Burian.
13    Q.    Have you ever had your deposition taken
14 before?
15    A.    No.
16    Q.    Is it okay today if I refer to you as
17 Steve?
18    A.    Sure.
19    Q.    Steve, if I ask you a question that you
20 don't understand, I want you to tell me that.
21 Otherwise I'm going to assume that you understood the
22 question. Is that agreeable to you?
23    A.    Yes.
24    Q.    And I'll try not to speak over you and
25 you try not to speak over me so we have a clear

                           4

EXHIBIT
2
tabbies

1 either, are they?
2      A.   Not that I'm aware of.
3      Q.   Okay.  And these are recommended
4 standards, as I understand it, from just looking at
5 the cover?
6      A.   Yes.
7      Q.   Are you aware of any ruling by any
8 South Dakota regulatory agency that states that the
9 10 States Standards are the standard that's to be
10 used in the construction of facilities in the state
11 of South Dakota?
12      A.   No.
13      Q.   Are you aware of any regulatory
14 decision by any governmental entity in the state of
15 South Dakota that how Sioux Rural Water provides
16 water is insufficient in any way under South Dakota
17 law?
18      A.   No.
19      Q.   Did you make notes that -- well, strike
20 that.  Let me back up a minute.
21           You did note in your report some areas
22 that you believe that Sioux does not meet the
23 10 States Standards; correct?
24      A.   Yes.
25      Q.   And that was what you put into your

25

1 understand it.
2      A.   Yes.
3      Q.   Go ahead if you want to.
4      A.   For instance, on the treatment plant,
5 though, when we looked at that, that large part of
6 the treatment plant capacity was based on DGR's
7 assessment of the treatment plant, and 10 States
8 Standards were referenced in that case, but it
9 was -- the information that we received from DGR was
10 probably more influential in drawing those opinions
11 than 10 States Standards were.
12      Q.   Let me ask you, do any of your rural
13 water customers provide fire protection?
14      A.   Not directly.
15      Q.   And I understand if they provide water
16 to a municipality that municipality may provide water
17 protection.
18      A.   That wasn't my point in saying not
19 directly.
20      Q.   What was your point?  I didn't mean to
21 put words in your mouth.
22      A.   We have some rural water districts in
23 North Dakota that have become heavily urbanized and
24 they've developed cooperative agreements with their
25 adjacent municipalities.  And so they may own the

27

1 opinion in this case.
2      A.   That was a part of our opinion.  We
3 also had the benefit of the DGR analysis which that
4 was really the first thing we started with was DGR's
5 work.  And many of the solutions that DGR drew, in
6 terms of capacity of different elements, were
7 utilized as part of the assessment in addition to the
8 10 States Standards.
9      Q.   Okay.  But as I looked at the
10 conclusions in your report and throughout your
11 report, you noted that there were insufficient
12 capacities in several areas.  True?
13      A.   Yes.
14      Q.   And those were based upon failure to
15 meet the 10 States Standards.
16      A.   In most cases they were.
17      Q.   Did you make notes of what particular
18 section of the 10 States Standards that you found in
19 your report Sioux did not meet?
20      A.   I did not.  Richard would have to help
21 with that.
22      Q.   So I guess I just looked at it, and
23 there are various sections in these recommended
24 standards for water works.  And he would have the
25 specific section that Sioux fell short on as I

26

1 asset and provide fire protection through that asset,
2 but it's all been designed to municipal standards and
3 the system is actually operated by the municipality
4 and the fire protection is provided by the
5 municipality.  And Cass Rural Water would be a prime
6 example of that.
7      Q.   That's the county surrounding the Fargo
8 area?
9      A.   Yes.
10      Q.   The typical rural water system does not
11 provide fire protection; is that fair to say?
12      A.   Yes.
13      Q.   And as part of your work with rural
14 water systems, typically you don't include design
15 that includes fire protection; is that correct?
16      A.   No.  Unless we were asked to provide
17 that capacity.
18      Q.   Okay.  And one of the things I noted in
19 your opinion, you talk about the inability to provide
20 fire protection by Sioux.
21           MR. HIEB:  Can you reference where in
22 the opinion?
23      Q.   Well, I'm talking about page 13.  You
24 say fire flow demands in Table 7?
25      A.   What page are you on, Jeff?

28

1    Q.    Page 13.

2         A.    I heard 7.  So the reason that we

3    looked at that was because these systems are

4    currently afforded fire protection.  That was the

5    reason that we looked at that.

6         Q.    Explain your answer.  I don't

7    understand it.

8         A.    All of these users that are

9    current -- that we currently looked at in the west

10   side that are served by Watertown and served by the

11   east side currently, are served with fire protection.

12        Q.    Okay.  But you know that rural waters

13   are not required to provide fire protection; correct?

14             MR. HIEB:  Object to the form of the

15   question.  It calls for a legal conclusion, but go

16   ahead.

17        A.    I guess we didn't really look at the

18   capacity from that perspective.  We looked at it from

19   the standpoint that this system was receiving a

20   domestic service -- these users were receiving

21   domestic service and they were currently serving fire

22   protection.  We were very careful to bifurcate our

23   analysis so as to not overlap those two things.  So

24   in the memorandum that we developed we drew

25   conclusions on the domestic side.  But then, because

                                             29

1    they were currently receiving fire flow, we drew

2    separate conclusions on the fire flow without judging

3    who was supposed to be providing it.

4         Q.    Okay.  If Watertown provides the fire

5    flow as they are now, there's sufficient fire

6    protection for those customers; true?

7         A.    Assuming the current service is

8    adequate, yeah.

9         Q.    Now these 10 States Standards, just

10   from what I read, looks like they've been amended

11   many times.  They were first published in 1962 and

12   amended in 1968, 1976, 1982, 1987, 1992, 1997, 2003,

13   2007, and 2012.  Does that sound right?

14        A.    Yes.

15        Q.    Which -- in coming to your opinions

16   here in the 10 States Standards, which ones of those

17   did you use in coming to your opinion?

18        A.    I don't know.

19        Q.    Did you use the most current 2012

20   10 States Standard?

21        A.    I don't know.

22        Q.    Would it be important to note that in

23   your report?

24             MR. HIEB:  Objection.  Argumentative,

25   but go ahead, answer.

                                             30

1         A.    I can see a point that if we were more

2    thorough that would have been something we could have

3    added.  Or could add.

4         Q.    Do you know what has been amended or

5    changed in the 10 States Standards from 1962 until

6    2012?

7         A.    I don't.

8         Q.    Is it fair to say that a system, a

9    water system, that met 10 States Standards in 1987,

10   I'm just picking that as a year, might not meet those

11   standards today?

12        A.    It's possible I would think.

13        Q.    You didn't do any analysis to determine

14   that in this case in coming to your opinions.

15        A.    Not at this point.

16        Q.    Now the 10 States Standards are not

17   applied retroactively, are they?

18        A.    Explain.

19        Q.    Well, if you get a 2012 10 State

20   Standard -- and I understand, just incidentally, that

21   they amend them about every five years so we should

22   be coming up on a new one here, but if you have a

23   2012 edition of the 10 States Standards, you don't

24   use those 2012 standards to go back and judge

25   something that was done in 1987 under the standards

                                             31

1    in place at that time, do you?

2         A.    I don't mean to pause, but it depends

3    on what we were asked to do.  If we were asked to

4    look at the adequacy of that system in terms of

5    regulatory compliance versus looking at the adequacy

6    in current situation, if they were going to move

7    forward we would probably use the current standard

8    because that was the current industry practice.  If

9    somebody asked us to say was this okay in 1987, then

10   I would likely go back to the one that was available

11   at the time.

12        Q.    Watertown never asked you to do that in

13   this case, did they?

14        A.    Not to that level of specificity.

15        Q.    You were asked to use the most current

16   2012 standard.

17        A.    We weren't asked to use any standard.

18   We were asked to use our judgment in terms of what

19   the most widely accepted standards were to judge

20   capacity so that all of our analysis would be

21   objective and defendable.

22        Q.    Are the 2012 edition standards the most

23   widely accepted ones today?

24        A.    That I'm professionally aware of.

25        Q.    And so were the 2012 standards the one

                                             32

**Page 49**

```
 1        A.    If you operate at 400 gallons per
 2  minute for either 20 or 24 hours of operation, you
 3  don't get 600,000 gallons per day in either
 4  situation.
 5        Q.    Do you have any facts that suggest
 6  because of this deficiency that Sioux hasn't been
 7  able to serve any of its existing customers?
 8        A.    I don't.
 9        Q.    Then you've got 450 gallons per minute
10  capacity appears deficient; exceeds filter loading
11  rate of 400 gallons per minute.  Do you see that?
12        A.    I do.
13        Q.    Explain what that means.
14        A.    So at the smaller time frame there
15  wasn't enough capacity.  At the larger time frame you
16  would have enough hydraulic water, but it was stated
17  in the DGR report that that exceeds the design
18  standard because of manganese breakthrough.
19        Q.    And as I understand it, you've noted
20  this in your report, manganese breakthrough is a
21  cosmetic issue, it's not a safe drinking water issue.
22        A.    Correct.
23        Q.    Do you know of any facts to suggest
24  that because of this shortcoming that you've
25  identified that Sioux has not been able to serve any
```

**Page 50**

```
 1  of its customers?
 2        A.    I do not.
 3        Q.    Were you ever asked to determine
 4  whether Sioux couldn't serve its current customers
 5  based upon these deficiencies?
 6        A.    These deficiencies meaning the
 7  treatment plant?  Or the entire analysis.
 8        Q.    The entire analysis where you say
 9  capacity appears deficient.
10              MR. HIEB:  Object to the form of the
11  question.  I believe it's vague.  I don't know what
12  you mean by unable to serve their customers.  That
13  was the analysis we asked them to perform.  Are you
14  talking about whether a customer complained that they
15  had bad water or not enough water?
16        Q.    Did you understand the question?
17        A.    I didn't.
18        Q.    Okay.  Do you have any facts that
19  suggest that because of these deficiencies Sioux's
20  customers didn't get water?
21        A.    I don't.
22        Q.    Finished water storage capacity appears
23  adequate.
24              MR. HIEB:  That's a question?
25        A.    A question?
```

**Page 51**

```
 1        Q.    Do you agree with that?
 2        A.    Yes.
 3        Q.    Then on the west side we've already
 4  talked about this where capacity appears deficient.
 5  Are you willing to at least concede that your
 6  analysis might be incorrect now that this
 7  improvement's been made?
 8        A.    I don't know.
 9        Q.    Okay.  And then on the east side you
10  just say you don't know.
11        A.    That's not exactly what we said.  We
12  said that there appears to be unique users that we
13  would need to complete additional modeling to draw
14  that conclusion.  Or somebody would need to do
15  further modeling.
16        Q.    Is that the modeling that you've talked
17  about before?
18        A.    Yes.
19        Q.    I'm just reading it, and it says,
20  "Acceptability of capacity is unknown."  That's your
21  opinion.
22        A.    Because we weren't asked to replicate
23  the modeling, we were asked to interpret the adequacy
24  of the modeling, we felt the modeling on the west
25  side was adequate and drew conclusions that we
```

**Page 52**

```
 1  thought made sense.  In this case, because the user
 2  base was sufficiently different than what the typical
 3  domestic customers are, we felt it would warrant
 4  putting real user data in there in order to draw that
 5  conclusion.
 6        Q.    Have you done that?
 7        A.    As I pointed out earlier, we weren't
 8  asked to actually replicate the modeling so somebody
 9  would have to do that work.
10        Q.    Fair enough.  But --
11        A.    But no.
12        Q.    Getting at a simple point is, at this
13  point whether the capacity is acceptable or not is
14  unknown according to your opinion.
15        A.    Yes.
16        Q.    And did anyone tell you not to take
17  into account the improvements made on the west side
18  in coming to your analysis?
19        A.    No.
20        Q.    Is part of your opinion here in Table 7
21  including a requirement that Sioux provide fire flow
22  to both of those -- both the west side and the east
23  side?
24        A.    Are we suggesting that that's
25  mandatory?  Is that your question?
```

1  MR. COLE:  No.  Could you read the
2  question back, please?
3  MR. HIEB:  Well, he just told you he
4  didn't understand the question so what would reading
5  it back be?
6  MR. COLE:  Go ahead and read it back,
7  please.
8  THE COURT REPORTER:  "Is part of your
9  opinion here in Table 7 including a requirement that
10  Sioux provide fire flow to both of those -- both the
11  west side and the east side?"
12  A.  We weren't responsible for determining
13  the requirements.
14  Q.  (Mr. Cole continuing)  I guess what I'm
15  asking is, and I'll concede maybe the question wasn't
16  clear, but in coming to your opinion as stated in
17  Table 7, was fire flow and the ability to provide
18  fire flow part of the analysis?
19  A.  Part of our analysis?
20  Q.  Yes.
21  A.  Yes.
22  Q.  In terms of the capacity to serve, was
23  fire flow part of your analysis?
24  A.  It was done independently from both a
25  domestic perspective and a fire flow perspective.

53

1  A.  I don't recall the specifics.  It was
2  84 pages.
3  Q.  You're aware generally, aren't you,
4  that Darin Schriever had given the opinion that with
5  these improvements Sioux can serve a number of new
6  customers on the west side.
7  A.  And we just didn't do the analysis with
8  that information in hand.
9  Q.  So you don't know one way or the other
10  whether you can agree or disagree with that then.
11  A.  Right.
12  Q.  And on the east side, if you take out
13  the fire flow requirement and you just look at, you
14  know, domestic demands, you don't know whether or not
15  Sioux has the capacity to serve those particular
16  customers identified.
17  A.  Right.
18  Q.  But would you agree with me, then, that
19  some of those customers who have lower demands, as
20  set forth in your report, Sioux could certainly serve
21  those folks, couldn't they?
22  A.  We weren't asked to look at users on an
23  individual basis.  We were asked to look at them
24  collectively.  And so until we knew what the impact
25  of the larger ones would be, you have to be able to

55

1  And so, yes, that was one element of what we
2  analyzed.  What really warranted that in our opinion
3  is that when we dug into the service size of those 13
4  customers, some of those service lines are greater
5  than the biggest pipe that Sioux Rural Water has in
6  that vicinity.  And so if service lead is bigger then
7  the entire transmission system, it created technical
8  questions on our part on how -- what did that user
9  really need if they had that big a pipe service lead
10  going into their building.
11  Q.  If you take fire flow out of your
12  analysis on the west side, do you agree with me that
13  with the improvements Sioux has the capacity to
14  serve?
15  A.  We were never given any information
16  on -- if you read all the reports, there's nowhere is
17  it stated what the impacts are going to be of the
18  improvements.
19  Q.  Did you read Darin Schriever's
20  deposition?
21  A.  Yes.
22  Q.  Do you recall in his deposition that he
23  talked about additional customers that could be
24  served on the west side after the improvements were
25  made?

54

1  serve the branch, not just an individual customer.
2  Q.  Well, let's look at page 9, Table 4.
3  And let's just go through these.  Taking fire flow
4  out of the equation.  Based on the infrastructure
5  that Sioux has, Sioux could serve Big Shot Fireworks,
6  couldn't it?
7  A.  We didn't know when we did the report,
8  and I'm not going to be able to know as we answer the
9  questions until we were able to assess that in
10  totality.  That customer is less than the assumption
11  they use in the modeling effort, and so provided all
12  of the customers also did that, then I think that
13  particular customer could be served.
14  Q.  Okay.  And let's just go to Dakota
15  Automation.  That one's below the usage amount too,
16  isn't it?
17  A.  2013 they used 35,000 gallons; right?
18  Q.  You're right.  They might have a well
19  there.  I don't know what they've got.
20  A.  I would hope they wouldn't run their
21  well through the meter in Watertown.  That would get
22  really pricey.
23  Q.  I don't know what they're doing, but
24  something changed from 35,000 to --
25  A.  Right.  And I'm not being

56

1  argumentative.  It's just that would be a suspect --
2        Q.    You made your point.  You're right
3  about that.  I missed it.  Fed Ex, though, is within
4  that range, isn't it?
5        A.    Similar to my answer for Big Shot
6  Fireworks, yes.
7        Q.    So it looks, as we sit here today, like
8  Sioux could serve Fed Ex if you take fire flow out of
9  it; true?
10       A.    And if you had the luxury to look at an
11  isolated customer.
12       Q.    Okay.  And same question for Randy
13  Hartley.
14       A.    That one's right on the bubble, but...
15  A little bit more than -- I think 5,500 was the
16  standard that DGR used.
17       Q.    But it's within the realm of
18  possibility, isn't it?
19       A.    As an individual customer.
20       Q.    And Lew's Fireworks is also; correct?
21       A.    Yes.
22       Q.    And -- oh, I see what they've done
23  here.  Okay.  So at least for those customers,
24  potentially you have to concede that Sioux could
25  serve them if you take out fire flow.

57

1        Q.    You could go one by one.
2        A.    Within the model I guess you could take
3  the model and then you could look to add one user at
4  a time incrementally and remodel it.  That would be
5  technically possible.
6        Q.    In fact, that's what rural water
7  systems do, isn't it, they go one by one to decide
8  whether or not they can add a particular customer.
9        A.    That's not been my experience, Jeff.
10  They're going to go into an area where they think
11  they need to serve, and they usually go into a
12  sign-up campaign and they look at all the users
13  they're going to serve and then they try to have the
14  ability to put the right pipe in the first time.
15       Q.    Right.  That's when they're doing a
16  service expansion.  Fair?
17       A.    Yes.
18       Q.    But when they have a pipe that's in the
19  ground and they're determining whether or not that
20  pipe can serve particular customers who want to come
21  on, they do a customer by customer analysis, don't
22  they?
23       A.    If they came in over time they would
24  take them in the order they were received.
25       Q.    And if that was done in this case, you

59

1        A.    So -- we're talking about treatment in
2  totality, or are we talking about do they fit within
3  the modeling assumptions that DGR used.  Because if
4  they fit within the modeling that DGR used, the
5  analysis looked at treatment, the analysis looked at
6  all aspects of those things, those customers do fit
7  within the modeling assumptions that DGR used.
8        Q.    Are you finding fault or do you find
9  fault with any of the modeling assumptions that DGR
10  used?
11       A.    We feel that for the east side, given
12  these water use dynamics and given those service
13  leads, that they should have looked at special class
14  customers for these larger users when they did the
15  modeling.
16       Q.    Fair enough.  But the ones now we've
17  got some information on; true?  The ones we've talked
18  about you've got some information on.
19       A.    For better or worse, we would
20  have -- we would look at it in totality of serving
21  that branch.  We didn't -- we weren't thinking of it
22  as a discrete customer.
23       Q.    You didn't do it one by one, you went
24  as a whole.
25       A.    Right.

58

1  agree with me that certain of these customers Sioux
2  certainly could have served.
3        A.    They would be consistent with the
4  modeling assumptions that DGR used.
5        Q.    I'm going -- I'm jumping around here
6  because I'm just about done believe it or not.  I
7  don't know what time it is.
8        A.    I'm good.
9        MR. HIEB:  It's 3:00.  You're doing
10  fine.
11       Q.    In your website you talk about a
12  realistic design approach for rural waters.  What
13  does that mean?
14       A.    I'm not sure.
15       Q.    I'll just show you the -- I'm not going
16  to mark it as an exhibit.  It's your website.
17       A.    The website is done by the marketing
18  department, and I'm not exactly sure what they
19  intended by that.
20       MR. HIEB:  Want me to get your website
21  out, Jeff?
22       MR. COLE:  Let's go off the record here
23  a minute.
24       (Off the record.)
25       MR. HIEB:  Back on the record.

60