```
              UNITED STATES DISTRICT COURT
                 DISTRICT OF SOUTH DAKOTA
                    NORTHERN DIVISION

SIOUX RURAL WATER SYSTEM, INC., a
Non-Profit Corporation,

             Plaintiff,       Civil No.
                              15-1023
   vs.

CITY OF WATERTOWN, a South Dakota
Municipality, and WATERTOWN
MUNICIPAL UTILITIES, an agency of
the CITY OF WATERTOWN,

             Defendants.



            DEPOSITION OF RICHARD WAGNER




DATE:         Tuesday, September 20, 2016
PLACE:        AE2S, Inc.
              4170 South 28th Avenue
              Fargo, North Dakota
TIME:         3:17 p.m.
REPORTED BY:  Deanna L. Sager, R.P.R., R.M.R.
```

Page 1

```
           A P P E A R A N C E S

FOR THE PLAINTIFF:

     Zimmer, Duncan and Cole, L.L.P.
     Attorneys at Law
     5000 South Broadband Lane
     Suite 119
     Sioux Falls, South Dakota   57108
     By:  Jeff Cole
          jcole@zdclaw.com

FOR THE DEFENDANTS:

     Richardson, Wyly, Wise, Sauck & Hieb, LLP
     Attorneys at Law
     1 Court Street
     P.O. Box 1030
     Aberdeen, South Dakota   57402
     By:  Jack H. Hieb
          jhieb@rwwsh.com
          jstucke@rwwsh.com
```

Page 2

```
                 C O N T E N T S
                 W I T N E S S E S

                                           PAGE
RICHARD WAGNER

     Examination by Mr. Cole                 4
     Examination by Mr. Hieb                30


                 E X H I B I T S

EXHIBIT NO.    DESCRIPTION              MARKED

               (NONE)
```

Page 3

```
                 P R O C E E D I N G S

          (Whereupon, the deposition of RICHARD
WAGNER commenced at 3:17 p.m. as follows:)
               RICHARD WAGNER,
HAVING BEEN FIRST DULY SWORN TO TESTIFY THE TRUTH,
THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, RELATIVE
TO THE CAUSE SPECIFIED, TESTIFIED AS FOLLOWS:
                  EXAMINATION
BY MR. COLE:
     Q.   Could you please state your name?
     A.   Richard Wagner.
     Q.   Is it okay today if I refer to you as
Richard?
     A.   Richard is fine.
     Q.   Okay. Richard, have you ever had your
deposition taken before?
     A.   I have not.
     Q.   If I ask you a question that you don't
understand, please tell me that. Otherwise I'm going
to assume that you understood the question. Is that
agreeable to you?
     A.   Yes.
     Q.   And I'll try to let you finish your
answer before I ask the next question, and I'd ask
you to let me ask you the question before you give
your answer so the court reporter can get everything
```

Page 4



tabbies® EXHIBIT 4

```
 1   just annotate your report for him after we're done
 2   today with the sections that you're referring to on
 3   the 10 States Standards?
 4              THE WITNESS:  I would think -- I would
 5   think we could do it in a couple hours.
 6              MR. HIEB:  All right, fine, we'll do
 7   it.
 8        Q.   (Mr. Cole continuing)  Okay.  Did you
 9   read, as part of your analysis in this case, did you
10   read Darin Schriever's deposition?
11        A.   Not thoroughly, but I did skim it.
12        Q.   Did you read Darin Schriever's report?
13              MR. HIEB:  That's it.
14        A.   This one?  Yes.
15        Q.   Do you have any specifics where you
16   disagree with what Darin put in his report?
17        A.   I guess I should back up.  I read the
18   report, but I did not necessarily go through the
19   financial data in here.  As far as your other
20   question about any areas I disagreed with his report,
21   I did not disagree with it.  I used his report
22   primarily as information source.  And that's what I
23   used when I prepared my document.
24        Q.   Darin has the opinion or had the
25   opinion that Sioux could add customers on what we're
                                                      17
```

```
 1   referring to here as the west side.  Do you agree or
 2   disagree with that?
 3        A.   Based on the -- based on the treatment
 4   capacity that I was led to believe in this report,
 5   they are -- would be short of water during
 6   peak -- instantaneous peak demand periods.
 7        Q.   Okay.  Are you aware of the pipeline
 8   improvements that Sioux was going to make on the west
 9   side?
10        A.   There was some reference to those
11   improvements, but I did not look at the improvements
12   that they were proposing.  I looked at the existing
13   or current system as it sits now.
14        Q.   And I'll tell you that it's been
15   represented to me that those improvements, as far as
16   the pipelines and the pumping stations, have been
17   completed on the west side.  Okay?  You didn't do any
18   analysis of what the ability to serve would be once
19   those improvements were made.
20        A.   I did not.
21        Q.   And one of the things that's noted in
22   your report is pressure problems on the west side.
23        A.   Correct.
24        Q.   With these improvements, you can't say
25   one way or the other whether those pressure problems
                                                      18
```

```
 1   are still there; correct?
 2        A.   That's correct.
 3        Q.   Which means that Sioux may very well,
 4   even in your opinion, be able to serve new customers
 5   on the west side with these improvements being made;
 6   correct?
 7        A.   With proper improvements they could add
 8   users on the distribution system.
 9        Q.   Do you have any facts that have been
10   brought to your attention or do you know any facts
11   that suggest that Sioux hasn't been able to serve any
12   of its current customers on the west side?
13        A.   I don't have any of that information.
14        Q.   Do you have any information that
15   Sioux's not been able to serve its customers on the
16   east side of Watertown?
17        A.   I don't have any of that information.
18        Q.   One of the things that was discussed in
19   this report was fire flow.  You understand that?
20        A.   I do.
21        Q.   Who told you to include fire flow as a
22   consideration?
23        A.   The fire flow is -- well, was factored
24   into the users on the east side of Watertown.  And
25   because they -- because I was under the impression
                                                      19
```

```
 1   that since they currently have fire flow, the fire
 2   flow discussion should be included.
 3        Q.   Do you know, with the rural water
 4   systems that you work with, is it your understanding
 5   that they're required to provide fire flow?
 6        A.   No.
 7        Q.   It's your understanding that they're
 8   not required to provide fire flow; correct?
 9        A.   Correct.
10        Q.   But in this report you included fire
11   flow.  True?
12        A.   Correct.
13        Q.   Why did you do that?
14        A.   There are current users -- or there are
15   users that Sioux Rural Water is looking to add to
16   their system, and those users who are getting water
17   from Watertown do have a fire flow demand or
18   requirement.  So if those users are being -- are to
19   be served by Sioux Rural Water, it should be a
20   consideration or at least allow Sioux Rural Water the
21   option to inform those potential new users that they
22   will not be getting fire flow from Sioux Rural Water.
23        Q.   Don't you agree that those customers
24   that you've identified on the east side, or potential
25   customers, that are actually being served by
                                                      20
```

```
 1            MR. COLE:  Can you go back and read the
 2   question that we're at issue here?  I'm sorry to make
 3   you do that.
 4            MR. HIEB:  I think the question is, "Do
 5   you think that's fair?"  That's the question.
 6            THE COURT REPORTER:  "Do you think
 7   that's fair?"
 8       A.   I don't know if I have an opinion on if
 9   it was fair or not.  All I can say is that I was
10   asked to do a specific task, and that's what I did.
11       Q.   (Mr. Cole continuing)  Well, you're
12   analyzing Sioux's capacity to serve; right?
13       A.   We reviewed the ability to serve, yes.
14       Q.   And Sioux's made some improvements to
15   their facilities in that area; true?
16       A.   According to you, they have.  I don't
17   know that for a fact.
18       Q.   That's true according to me.  But I've
19   been told that they've been made and they're actually
20   using it right now.
21       A.   Okay.
22       Q.   That's relevant to the issue of the
23   ability to serve customers in that area, isn't it?
24            MR. HIEB:  I object.  That calls for a
25   legal conclusion.  Go ahead.
                                                       25
```

```
 1       Q.   Then how about the one underneath that
 2   says it starts with 400 gpm.
 3       A.   The -- yeah, I do reference 10 States
 4   Standards there.  And in that case they -- in that
 5   case the water treatment plant is not sized to meet
 6   10 States Standards -- excuse me, not sized to meet
 7   maximum day demand.
 8       Q.   Per the 10 States Standards?
 9       A.   I believe so.  I would have to
10   re-review that to verify that.
11       Q.   And then the next one is 450 gpm.
12   "Capacity appears deficient.  Exceeds filter loading
13   rate of 400 gpm.  Manganese breakthrough per WSAR."
14   What's that one based on?
15       A.   That's based on treatment objectives.
16   Assumed treatment objectives of Sioux Rural Water.
17       Q.   And manganese, as I understand it,
18   you've noted in your report is a cosmetic issue.
19       A.   That's correct.
20       Q.   It doesn't affect the safety of the
21   drinking water.
22       A.   It does not.
23       Q.   Then we go to page 13.  West side.
24   Capacity appears deficient.  That's also based on the
25   10 States Standards?
                                                       27
```

```
 1       A.   If they made improvements, those
 2   improvements would affect the ability to serve those
 3   users.
 4       Q.   Okay.  And Darin Schriever has opined
 5   that he believes that with these improvements Sioux
 6   would be able to serve 200 additional customers in
 7   that west side area.  Do you agree or disagree with
 8   that?
 9       A.   I have no opinion on that.
10       Q.   Okay.  When you, in your report in
11   Table 7 here on page 12 and 13, when you say capacity
12   appears to deficient, is that based on the
13   10 States Standards?
14       A.   In some cases.
15       Q.   Okay.  Which cases?
16       A.   So, let's see, the first one is the
17   filters it looks like.  That one references 10 States
18   Standards in the fact that 10 States Standards says
19   that if you only have two filters, each filter needs
20   to be able to meet the maximum day demand.  In this
21   case it requires both filters to meet the maximum day
22   demand.
23       Q.   So that one's based on the 10 States
24   Standards.
25       A.   Yes.
                                                       26
```

```
 1       A.   Yes.
 2       Q.   Then on the east side it says,
 3   "Acceptability of capacity is unknown."
 4       A.   Correct.
 5       Q.   And on the fire flow demands you say
 6   the capacity appears deficient, but that's not based
 7   on the 10 States Standards, is it?
 8       A.   No.
 9       Q.   That's based on what you were told to
10   analyze; correct?
11       A.   That -- yeah, that was based on the
12   ability to provide an assumed fire flow.  I don't
13   know how much fire flow they would be able to provide
14   so it's...
15       Q.   And same thing with regard to the east
16   side.  True?
17       A.   Correct.
18       Q.   The filtration capacity issue that
19   you've identified here, that's an issue that can be
20   addressed by a rural water provider, isn't it?
21       A.   With improvements?
22       Q.   Yeah.
23       A.   Yeah, you can make improvements and you
24   can -- yeah.
25       Q.   And it's a pretty quick fix, isn't it?
                                                       28
```