UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
NORTHERN DIVISION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| SIOUX RURAL WATER SYSTEM, INC., | \* | 1:15-CV-01023-CBK |
| A NON-PROFIT CORPORATION, | \* | |
| | \* | |
| Plaintiff, | \* | |
| | \* | |
| -vs- | \* | |
| | \* | **BRIEF IN SUPPORT** |
| CITY OF WATERTOWN, A SOUTH | \* | **OF DEFENDANTS' MOTION** |
| DAKOTA MUNICIPALITY; AND | \* | **FOR SUMMARY JUDGMENT** |
| WATERTOWN MUNICIPAL UTILITIES, | \* | |
| AN AGENCY OF THE CITY OF | \* | |
| WATERTOWN, | \* | |
| | \* | |
| Defendants. | \* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

The defendants, City of Watertown ("City") and Watertown Municipal Utilities ("MU"), respectfully submit this brief in support of their motion for summary judgment.

## INTRODUCTION

The federal statute at issue in this case, 7 U.S.C. §1926(b), prevents local governments from expanding into a rural water association's area and taking its customers. The legislative history states that the statutory provision was intended to protect "the territory served by such an association facility against [other] competitive facilities" such as local governments, as otherwise rural water service might be threatened by "the expansion of the boundaries of municipal and other public bodies into an area served by the rural system." S. Rep. No. 87-566, at 67 (1962), reprinted in 1961 U.S.C.C.A.N.

1

2243, 2309.  The legislative history makes it clear that the statute was only meant to *protect* rural water associations from the outside threat of local governments taking their customers -- not as a weapon for water associations to use to create monopolies by laying claim to customers already being served by a municipality.

While the intentions behind 7 U.S.C. §1926(b) are noble, problems arise when a rural water association attempts to use it offensively.  Those problems are magnified here, since the boundaries of Sioux Rural Water System, Inc.'s ("Sioux") service territory are *completely undefined*.  If Sioux's view of its service territory is accepted, the territory is *without boundaries*, and it is limited only by the ambition of its principals.

Sioux is attempting to use 7 U.S.C. §1926(b) as a sword, rather than as a shield.  Although Sioux is operating in the black with its current system and customers, it is seeking additional federal money to allow it to grow its system.  Its sights are set on new customers located within and on the outskirts of the City of Watertown.  And it is using federal money and this lawsuit as the means to its end.

Sioux is not seeking to use §1926(b) to protect its users or territory from municipal incursion in this case. Indeed, discovery has revealed that there is a complete void of evidence that defendants have improperly converted Sioux's

customers.  Instead, Sioux is seeking to use §1926 and this lawsuit to foist an incursion of its own.  It doesn't want to protect existing customers.  It wants monopoly status over customers that it does not (and cannot) currently serve, but could serve in the future if it gets more federal money, grows its infrastructure, and this Court provides it with injunctive relief.  This use of §1926(b) is wholly inconsistent with the statute's text and legislative history, as well as the case law. For the reasons that follow, defendants' motion for summary judgment should be granted and Sioux's case should be dismissed.

**FACTUAL BACKGROUND**

**A.  Sioux's claimed territory.**

Sioux is a rural, non-profit water supply corporation, which was created in 1974.  (Doc. 1, ¶¶10-11; Thompson 18.) Rural water systems in South Dakota either take the form of: (1) 501(c) not for profit corporations; or (2) Water User Districts created pursuant to state law.  (Thompson 10-11.)  Water User Districts created under state law submit a map of their territory to the state for approval.  (Thompson 11; 102.)  Their geographic boundaries are approved by and on file with the State of South Dakota. (Thompson 102.)

Conversely, as a 501(c) not for profit corporation, Sioux does not have a territory map that sets geographic boundaries.  (Thompson 11-12; 94; 102.)  While Sioux has maps showing the location of its pipes, it has not gone a step

further to establish its boundaries.  (Thompson 12.)  Sioux does not believe its service territory is limited by where it currently has "pipes in the ground"; rather, its general manager testified that Sioux's service territory includes any area where Sioux may be willing to put pipes in the ground based upon a customer request.  (Thompson 94-96.)  Since there is no defined geographical boundary, Sioux's service area changes every time it puts a new line in the ground. (Thompson 99.)

In spite of Sioux's appetite for more customers, it is significant to note that, without making any capital improvements, Sioux could continue to serve its current customer base at current demands, and it would continue to generate sufficient cash flow to pay its bills and operate.  (Schriever 84-85.)

**B.   Sioux's claims in this lawsuit.**

Sioux identifies three categories of customers upon which its claims are based: (1) customers that were once Sioux customers but are now MU customers; (2) customers that are currently Sioux customers, but could potentially become MU customers if annexations are completed; and (3) customers that were never hooked up by Sioux, are now MU customers, but fall within some geographic proximity of Sioux's existing water lines.

**1.   Customers allegedly taken.**

In its Complaint, Sioux alleges that the City and MU

have taken certain customers from Sioux's service territory.
(Doc. 1, ¶14; Thompson 75-76.)   In discovery, Sioux identified
three customers within its service territory that were previous
Sioux customers that Sioux alleges were taken by the City/MU:
(1) Lew's Fireworks; (2) CHS; and (3) Titan.  (Thompson 76;
Sioux 121.)  Further examination of these three customers
reveals that they each had their own unique circumstances, and
the claim that the defendants have improperly "taken" these
customers rings hollow.

        Lew's Fireworks wanted to be annexed into the City of
Watertown in order to receive water service from the City in
order to provide for its unique fire protection needs.
(Thompson 62-63.)  Sioux does not provide fire protection.
(Thompson 63.)  Sioux invoiced the City, and the City paid Sioux
for amounts associated with the infrastructure Sioux had
invested into Lew's as well as a figure for income Sioux would
have received on the Lew's account.  (Thompson 60-62, Sioux 122-
127.)

        The CHS fertilizer plant exists within the Watertown
city limits, and Sioux was advised of this.  (Deville 9; Sioux
570.)  Its general manager does not dispute that CHS is within
the city limits.  (Thompson 64.)

        When Titan Machinery was putting up its new building,
Sioux conceded that it made "no claim for the water service to
the new Titan building."  (Mack 36; Thompson 70-72; Sioux 546.)

In fact, Sioux conceded that it does not have sufficient capacity to supply Titan with its water needs.  (Thompson 72.)

**2.  Customers Sioux is worried about.**

Sioux specifically identified the Kittelson Addition as an area where it had concerns about customers potentially becoming MU customers in the future.  (Thompson 78; Sioux 121.) MU does not currently supply water to anyone within Kittleson's addition.  (Thompson 74.)   Upon further questioning, Sioux's concerns about existing customers are not confined to the Kittelson Addition.  Rather, all of Sioux's customers within the 3-mile radius of the City of Watertown would fall in the category of customers it is concerned about losing through annexation.  (Thompson 81.)

While Sioux claims to be concerned over these customers now, correspondence between Sioux and MU produced in discovery establishes Sioux's historical practice of recognizing the three-mile area around Watertown city limits as being territory where defendants have a right of first refusal. (Thompson 107-108; Sioux 141-142.)  Also, MU does not require annexed property owners to make the switch over to MU.  MU's water superintendent, Jeff Deville, testified that MU's policy is that, when the City annexes property, it does not and will not require a Sioux customer within the city limits to become an MU customer.  (Deville 13-14.)  If an annexed customer requests

to go from Sioux to MU, MU follows state law by buying out the customer from Sioux.  (Deville 14.)

**3.   Customers Sioux would like.**

Because of the lack of any definable geographic boundaries on Sioux's territory, Sioux's third category generates more questions than answers.  Essentially, Sioux believes that anyone that it is willing to serve with water is in its territory, even if that person is miles from its nearest line!  (Thompson 94-96.)[1]

To be sure, these are not areas where Sioux has actually provided service.  Rather, Sioux looked at new development around Watertown that was within a certain, imprecise distance from its pipes, and claims an entitlement to serve that list of customers:

> Q.   (BY MR. HIEB) What did you do to compile that list?
>
> A.   We took a look at where our existing lines lay and used a distance from them, you know, a quarter mile, half mile, whatever that may be to compile that list.
>
> Q.   Well, and that's going to be my first question. What was the number, quarter mile, half mile? How did you --
>
> A.   Within a general distance. I --

---

[1]Incredibly, Sioux is also amenable to running lines right into the City of Watertown, which means that, in its view, its "service territory" is not even restrained by the city limits. (Thompson 99-100.)

Q.    Were you part of the group or the -- did you
      assist in putting together that list?

A.    Yes.

Q.    Do you remember what the distance was you used in
      order to compile that list? And when I say the
      distance used, I'm talking about the distance
      from your existing pipes to these customers that
      were never Sioux customers but which are now MU
      customers.

A.    I would say that if that pipe's within a mile –
      you know, in a section, okay.

Q.    Within a mile?

A.    Well, quarter mile, half mile, general. It wasn't
      scientific.

(Thompson 82-83.)

Moreover, Sioux's analysis does not factor in whether the prospective customers would have been willing to pay the cost to hook up with the Sioux line - a charge that would have to be borne by the customer.  (Thompson 84-85.)

It also does not factor in Sioux's physical limitations as a water provider, which are significant.  Sioux has identified Darin Schriever as an expert, and he was asked to determine whether Sioux could supply the water needs of some potential new customers identified in his report. (Schriever 55.) Schriever broke these potential customers into two geographical groups – east side and west side.  The areas in question are shown here within the yellow circles:

8

## EAST SIDE



## WEST SIDE



Sioux does not currently have adequate facilities in place to serve the potential new west side customers listed in Schriever's report, and both distribution and source improvements would be needed. (Schriever 28, 57.) If they added customers on the west side, Sioux would not be able to meet the needs of the new customers and /or some of the existing customers until improvements are made. (Schriever 47, 54.)

An improvement project was underway but not yet complete as of the time of Schriever's report. (Id.) The improvements will add distribution capacity, but not source capacity to the west side. (Schriever 57-58.) Even with the improvements, Sioux will be unable to service all of the potential customers on the west side. (Id.) The area studied on the west side of Watertown is operating at or near full capacity under peak demand conditions. (Schriever 64-65.)

The customers identified on the east side of Watertown are all businesses, not residences. (Schriever 22.) Sioux does not have any data about the actual usage of those entities. (Schriever 23.) In terms of the analysis on whether Sioux can serve these entities, it is only considering domestic water supply for consumption or other related uses. (Schriever 25-26.)

From a source capacity standpoint, Sioux is capped at 30-35 new customers without doing something to increase their

source capacity.  (Schriever 58, 82.)  Plant improvements on the

source capacity side are not under contract at this time.

(Schriever 83.)

**ARGUMENT**

**A.   7 U.S.C. §1926(b) does not apply, because Sioux lacks a legal right and physical ability to serve the disputed customers.**

   **1.   Background on §1926(b).**

      Sioux's case is premised on 7 U.S.C. §1926(b).

Section 1926 of Title 7, enacted as part of the Consolidated

Farm and Rural Development Act, governs federal loans made to

rural water facilities. It authorizes the Secretary of

Agriculture to make or insure loans to associations for water

conservation, use, development, and control projects. 7 U.S.C. §

1926.  Federal funds issued under § 1926 are for truly rural

uses, to "primarily serv[e] ranchers, farm tenants, farm

laborers, rural businesses, and other rural residents[.]" 7

U.S.C. § 1926(a)(1).

      Subdivision (a) of § 1926 governs the terms of loans

made or insured by the Secretary of Agriculture. Subdivision (b)

provides as follows:

      The service provided or made available through any
      such association shall not be curtailed or limited by
      inclusion of the area served by such association
      within the boundaries of any municipal corporation or
      other public body, or by the granting of any private
      franchise for similar service within such area during
      the term of such loan; nor shall the happening of any

such event be the basis of requiring such association to secure any franchise, license, or permit as a condition to continuing to serve the area served by the association at the time of the occurrence of such event.

7 U.S.C. § 1926(b).

There are two identified purposes behind § 1926(b): (1) the encouragement of rural water development by expanding the number of potential users of such systems; and (2) to safeguard the viability and financial security of such associations, and, by extension, safeguarding the federal government's loans and investment in the rural water system. See Rural Water System #1 v. City of Sioux Center, 967 F.Supp. 1483, 1511 (N.D. Iowa 1997).

"'[T]o receive the protection against competition provided by § 1926(b) a water association must (1) have a continuing indebtedness to the [USDA] and (2) have provided or made service available.'" B-Y Water Dist. v. City of Yankton, 2008 U.S. Dist. LEXIS 100373, at *3 (D.S.D. Dec. 10, 2008) (quoting Sequoyah County Rural Water Dist. No. 7 v. Town of Muldrow, 191 F.3d 1192, 1197 (10th Cir. 1999)). The "made service available" element is where Sioux fails, for two reasons: (1) Sioux does not have the legal right to serve the disputed area; and (2) Sioux cannot prove the physical ability to serve the disputed area.

**2. Sioux lacks the legal right serve the customers within three miles of the Watertown City Limits under applicable state law.**

Importantly, §1926(b) does not define or otherwise create a service area.  See <u>B-Y Water Dist.</u> at \*4 (the scope of the protection[§1926(b)] provides indebted water associations is murky because neither the "service provided or made available" nor the "area served" by the water association are defined in the federal statute or regulations).  The Eighth Circuit has said that a water provider has "made service available" according to section 1926(b) if it has: (1) the physical ability to serve an area; and (2) the legal right to serve an area.  <u>Rural Water Sys. #1 v. City of Sioux Ctr.</u>, 202 F.3d 1035, 1037 (8th Cir. 2000).  Since the <u>Sioux Center</u> decision, a growing majority of United States Courts of Appeal have held that a rural water provider must have the right to serve the area in dispute under state law before § 1926(b) is triggered.  <u>See e.g.</u>, <u>Le-Ax Water District v. City of Athens</u>, 346 F.3d 701, 706 (6th Cir. 2003); <u>Sequoyah County Rural Water Dist. No. 7 v. Town of Muldrow</u>, 191 F.3d 1192, 1203 (10th Cir. 1999); <u>Bell Arthur Water Corp. v. Greenville Utilities Comm'n</u>, 173 F.3d 517, 525-26 (4th Cir. 1999).

U.S. District Judge Piersol's decision in <u>B-Y Water Dist.</u> is helpful in analyzing whether Sioux has the legal right to serve the area within three miles of the City of Watertown's boundaries.  In that case, B-Y filed a lawsuit against Yankton

alleging that the City had commenced a series of annexations
that directly curtailed, and threatened to curtail in the
future, B-Y's customer base and service territory.  It sought
injunctive, declaratory and monetary relief.  The City of
Yankton argued that B-Y lacked a legal right to serve the areas
within three miles of the city if the city first chooses to
provide water service.

        Critically, B-Y was organized as a Water User
District.  B-Y's geographic boundaries in its original Petition
for Organization included all of Yankton County, South Dakota,
outside the boundaries of the City of Yankton, all of Bon Homme
County, South Dakota, and portions of Turner County, South
Dakota.  Id. at *5-6.  Judge Piersol attributed great
significance to these facts in framing B-Y's legal right to
serve, reasoning as follows:

> Yankton ignores the fact that South Dakota law
> attaches geographical boundaries when authorizing a
> water user district to provide water under state
> regulations. See SDCL 46A-9-4(3) (the petition for
> organization must include a "description of the lands
> constituting the proposed district and of the
> boundaries thereof, and the names of any
> municipalities included partly or wholly within the
> boundaries of the proposed district"). B-Y's Petition
> for Organization included the three-mile area
> surrounding Yankton, the Petition was approved by the
> appropriate state regulatory agency, and B-Y has
> served customers in that area for years. South Dakota
> law clearly gives water districts such as B-Y the
> right to provide water services, see SDCL 46A-9-39
> through SDCL 46A-9-45, and B-Y provides those services
> within its geographical boundaries. Under South Dakota
> law, B-Y has a legal right to serve all of Yankton

14

County, with the exception of the City of Yankton,
just as stated in its Petition for Organization.

Id. at *7-8.

In other words, when an entity decides to organize as
a Water User District, its geographical territory is included on
a map that is approved by the State of South Dakota when the
Water User District is established.   In B-Y Water Dist., that
geographical territory was defined under state law, and it was
used by the federal court to determine whether the City of
Yankton was encroaching on B-Y's territory.

By contrast, Sioux **is not** a water user district; it is
a 501(c) not for profit corporation.   It does not have a
territory map that sets any geographic boundaries.  (Thompson
11-12; 94; 102.)  While Sioux has maps showing the location of
its current pipes, it has not gone a step further to establish
any boundaries.  (Thompson 12.)

Heath Thompson, Sioux's general manager testified that
Sioux's service territory could include any area where Sioux may
be willing to put pipes in the ground based upon a customer
request.  (Thompson 94-96.)  Since there is no defined
geographical boundary, according to Thompson, Sioux's service
area can change every time it puts a new line in the ground.
(Thompson 99.)  Thompson views Sioux's ability to expand its
service area to be limited only by where it is unwilling to run
lines.  (Thompson 99.)  In fact, he testified he would even

15

consider running lines into the City of Watertown and past its existing city limits. (Thompson 99-100.)

Since Sioux is not a Water User District and does not have a defined territory, the only state law that talks about "territory" is SDCL 9-47-22, which provides:

> If a rural water system is requested after July 1, 1989, to provide water service to any person who resides within three miles of a municipality owning and operating a water supply system, the rural water system shall promptly notify such municipality of such request in writing. Within sixty days from the receipt of such notice, the municipality may elect to provide water service to such person. If the municipality does not so elect, the rural water system may provide such service.

Section 1926(b) merely preserves Sioux's territorial rights under state law. Since Sioux chose to organize as a non-profit corporation and not as a state-approved water user district, there is no geographical boundary approved by the State with an entity like Sioux. This leaves the three-mile boundary established by SDCL 9-47-22 as the only state definition of Sioux's boundaries. Indeed, Sioux has even established a practice of recognizing the three-mile area around Watertown city limits as being territory where the City has a right of first refusal. (Thompson 107-108; Sioux 141-142.) In other words, until they filed this suit, even Sioux recognized SDCL 9-47-22 as the state law which set its boundaries.

Any customer located within three miles of Watertown's city limits is, by definition, outside of Sioux's "territory."

Sioux does not have a legal right to serve in the three-mile area around Watertown if MU first desires to serve such customers, and Sioux cannot use Section 1926(b) to seize customers within that three mile area.

**3.    Sioux has not made service available to the disputed areas, and cannot make service available without substantial improvements.**

Assuming arguendo that Sioux has the legal right to serve the areas in question, the analysis for determining whether §1926(b) applies is far from over.  Sioux must also show that it historically had and currently has the capacity and ability to provide such service, an inquiry known as the "pipes in the ground" test.  Importantly, it is the rural water system's burden to prove that it satisfies the "pipes in the ground" inquiry.  See Bell Arthur Water Corp. v. Greenville Utilities Commission, 173 F.3d 517, 526 (4th Cir. 1999) (holding that, for § 1926(b) to apply, an association must demonstrate as a threshold matter that it has adequate facilities within or adjacent to the area to provide service).  "If an association does not already have service in existence, water lines must either be within or adjacent to the property claimed to be protected by Section 1926(b) prior to the time an allegedly encroaching association begins providing service in order to be eligible for Section 1926(b) protection."  Lexington-S. Elkhorn Water Dist. v. City of Wilmore, 93 F.3d 230, 237 (6th Cir.

1996).  This is where Sioux's claim runs into significant problems.

        **a.   West Side.**

Sioux's appetite for new customers on the west side ignores its system's lack of distribution and source capacity. The west side is an area where Sioux is operating at near full capacity.  (Schriever 63-65.)  Both source and distribution capacity is necessary to serve a customer.  (Schriever 80.) Sioux's expert confirmed that, even with projects currently underway, it will not be increasing its source capacity, and cannot serve the west side customers:

> Q     All right. The west side couldn't really be added without making some improvements.
>
> A     That's correct.
>
> Q     And those improvements that need to be added in order to supply any of these potential customers on the west side, are they distribution improvements, source capacity improvements, or some of both?
>
> A     To serve all of the identified users on the west side, they would need to make both distribution and source improvements.
>
> Q     Now, we know from your testimony that the project that is currently underway will add some distribution capacity to the west side, correct?
>
> A     Correct.
>
> Q     It doesn't add any source capacity, does it?
>
> A     Not the currently funded project, no.

Q    Okay. So even when that project is complete, they
     still wouldn't be able to service all of these
     customers on the west side, correct?

A    Correct.

(Schriever 57.)

Sioux's own expert confirms that Sioux does not have
adequate facilities within or adjacent to the area to provide
service to the West Side customers.  Defendants are entitled to
summary judgment insofar as Sioux's claim relates to an
entitlement to serve those customers.

        **b.   East Side.**

The "pipes in the ground" test is customer-specific.
Sequoyah County Rural Water District No. 7 v. Town of Muldrow,
191 F.3d 1192, 1203 (10th Cir. 1999).  In nearly all §1926(b)
litigation that examines the "pipes in the ground test," the
analysis focuses upon the ability of the rural water system to
deliver water to specific customers or areas.  As stated by the
United States Court of Appeals for the Tenth Circuit, the "pipes
in the ground" test is "essentially an inquiry into whether a
water association has the capacity to provide water service to *a
given customer*."  Rural Water District No. 1 v. City of Wilson,
243 F.3d 1263, 1270 (10th Cir. 2001) (emphasis added).  In
making that customer-specific inquiry, courts determine whether
the rural water system has adequate facilities and
infrastructure to provide service within a reasonable time.  Id.

Further, a rural district does not have unlimited discretion. It has not "made service available" if the rural district's method of providing service amounts to a constructive denial of service. "For instance, failing to provide a type of service that is generally accepted in the industry, failing to comply with state law requirements such as health and sanitation codes, or providing unreasonably costly or delayed service each might amount to such a constructive denial of service." Pub. Water Supply Dist. No. 3 v. City of Leb., 605 F.3d 511, 522 n.11 (8th Cir. 2010).

Sioux makes *assumptions* about its capacity to serve the new customers on the east side, i.e., that it has the necessary capacity, because such users will need about the same amount of water as residential users. But that is as far as Sioux went. The customers identified on the east side of Watertown are all businesses, not residences.[2] (Schriever 22.) Sioux does not have any data about the actual usage of those entities. (Schriever 23.) In terms of the analysis on whether Sioux can serve these entities, it is only considering domestic water supply for consumption or other related uses. (Schriever 25-26.)

---

[2]Sioux's Articles of Incorporation belie the notion that its purpose is to provide commercial water service to anyone. The articles limit their purpose to the supply of "domestic" water, and none of the east side entities are residences. (Sioux 429-434.)

It is impossible to determine whether Sioux actually has the capacity to meet the needs of the businesses on the East Side. Sioux simply has not provided enough information about those customers to meet its threshold burden. Under these circumstances, defendants are entitled to summary judgment.

**4. Section 1926(a) is meant to be used as a shield, not a sword.**

The preceding sections of this brief establish that this is not a case where MU has moved within established rural water system boundaries and stolen rural water customers. Indeed, none of the West Side or East Side customers studied by Sioux's experts were ever serviced by Sioux. Rather, this is a case where Sioux is focusing its growth efforts on the areas immediately adjacent to the City of the Watertown, even though it currently lacks the capacity to serve the customers in those areas. Courts have refused to sanction rural water systems using §1926(b) offensively, as a sword to advance their growth.

Sioux's mindset seems to be that it should be able to rely upon §1926(b) to permit its expansion as far as its system's capabilities will support it, even if that includes areas not within any established rural water boundaries where state law gives defendants the right of first refusal. However, a similar view was wisely rejected in Le-Ax Water Dist. v. City of Athens:

> Le-Ax argues that § 1926(b) should apply whenever a rural water association has the capability of serving

21

users that could also be served by some other entity.
This vision of § 1926(b) is expansive indeed. It would
essentially give Le-Ax monopoly status not only within
its boundaries and among its current users, but also
would extend that status to wherever Le-Ax could
provide service. When questioned by the panel at oral
argument, Le-Ax did not dispute that, under its view
of § 1926(b), it was entitled by federal law to the
exclusive right to provide service to any
unincorporated area that it could physically serve.
Were we to uphold Le-Ax's claim in this case, we would
be holding that this federal law, originally meant to
protect water associations from undue intrusion,
somehow gives them this sort of roving monopoly
status. Without support in the statute's text, the
legislative history, or in relevant precedent, we are
reluctant to take such a broad step.

346 F.3d 701, 709 (6th Cir. 2003)

The Le-Ax Water Dist. court held that "when a rural

water district's boundaries are geographically determined by the

state, a rural water district cannot use § 1926(b) to obtain new

customers outside that geographic area." Id. Although the Le-

Ax Water Dist. court expressly noted that it was not considering

a case where the state had not defined the rural system's

boundaries, its analysis is equally compelling here.  As argued

above, state law creates Sioux's boundaries in this case.  SDCL

9-47-22 establishes that the three-mile area around the City of

Watertown is subject to the City's right of first refusal.

Sioux is asking for the Court's blessing over its attempt to

monopolize areas within that three-mile area.

Just as in Le-Ax Water Dist., this Court should refuse

to allow for the offensive use of §1926(b), and should grant

summary judgment to defendants on that basis.  Customers within

22

three miles of the City of Watertown should not be compelled to be served by Sioux.  And this lawsuit should not be used as a means of allowing Sioux to expand its territories into areas South Dakota law gives it no right to serve.

### CONCLUSION

For all the reasons discussed in this brief, Sioux cannot prevail on its various claims for relief.  Defendants respectfully urge the Court to grant their motion for summary judgment.

Dated this 7th day of November, 2016.

RICHARDSON, WYLY, WISE, SAUCK
    & HIEB, LLP

By _/s/ Zachary W. Peterson_____
    Attorneys for Defendants

One Court Street
Post Office Box 1030
Aberdeen, SD 57402-1030
Telephone No.(605)225-6310
E-mail: JHieb@rwwsh.com
E-mail: ZPeterson@rwwsh.com

## CERTIFICATE OF SERVICE

The undersigned, one of the attorneys for Defendants, hereby certifies that on the 7th day of November, 2016, a true and correct copy of **BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** was served electronically through the CM/ECF system on:

Mr. Jeffrey A. Cole
Mr. William D. Sims
Zimmer, Duncan & Cole, LLP
5000 S. Broadband Lane, Suite 119
Sioux Falls, SD 57108
JCole@zdcLaw.com
Bill@zdcLaw.com

RICHARDSON, WYLY, WISE, SAUCK
   & HIEB, LLP

By _/s/ Zachary W. Peterson
   Attorneys for Defendants

One Court Street
Post Office Box 1030
Aberdeen, SD 57402-1030
Telephone No.(605)225-6310
E-mail: JHieb@rwwsh.com
E-mail: ZPeterson@rwwsh.com