UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
NORTHERN DIVISION

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

SIOUX RURAL WATER SYSTEM, INC., A NON-PROFIT CORPORATION,

Plaintiff,

vs.

CITY OF WATERTOWN, A SOUTH DAKOTA MUNICIPALITY; AND WATERTOWN MUNICIPAL UTILITIES, AN AGENCY OF THE CITY OF WATERTOWN,

Defendants.

1:15-CV-01023-CBK

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

D E P O S I T I O N

O F

HEATH THOMPSON

February 17, 2016

9:35 o'clock, a.m.

Taken at:
Offices of Watertown Municipal Utilities
901 Fourth Avenue SW
Watertown, South Dakota

Reporter: Tammy Stolle, RPR

EXHIBIT
tabbies
A

A. **Or sorry, no.**
Q. Okay. What is your educational background?
A. **A high school graduate from Howard High.**
Q. What year?
A. **1989. A year and a half at DSU, a year at Morningside College in Sioux City.**
Q. Any degrees?
A. **Went back later on online, finished a two-year associate of arts in business.**
Q. From which school?
A. **XE University which is a subsidiary of Phoenix university -- University of Phoenix.**
Q. Okay. And what was that -- what was the major?
A. **It's associate in arts in business. It was a business -- two-year associate of business degree.**
Q. Two-year business degree?
A. **Correct.**
Q. All right. Tell me about how you came to be the general manager at Sioux. Did you apply for the job?
A. **Yes.**
Q. How did you find out about it?
A. **It was listed in newspapers and I believe online also.**
Q. Okay. So you weren't -- the reason I ask that is being at Kingbrook right next-door, I thought maybe you might

have been approached by a board member or somebody to --
A. **No.**
Q. Okay. Prior to becoming the general manager at Sioux, did you have any interaction with the Sioux Rural Water System or its employees?
A. **No.**
Q. So while you were at Kingbrook, there was no back and forth between Sioux and Kingbrook on anything?
A. **Not with me.**
Q. Okay. Who would have been the person at Kingbrook that would have had that type of back and forth?
A. **Randy Jencks and Jolene King for a short period of time.**
Q. Who are those individuals?
A. **Randy Jencks is general manager of Kingbrook Rural Water, and Jolene King is the office manager.**
Q. We had produced as part of the production a document marked DEF 396, and I'll tell you where this came from. This came from the South Dakota Association of Rural Water Systems. It's off of their website. Is this a map that you've seen before?
A. **Yes.**
Q. Do you know -- when I look at this map, it shows Sioux -- it shows a territory depicted in red with the word "Sioux" in the middle of it. Do you see that?

A. **Yes, I do.**
Q. And then beneath that there is an area depicted in brown with the word "Kingbrook" depicted on it?
A. **Yes.**
Q. Do those areas as depicted to your knowledge generally reflect the service territories of those two rural water providers?
A. **I believe it's a picture of a general idea of where things are at.**
Q. Obviously this map is pretty small. It would be -- you would need something blown up to see the actual boundaries with any degree of accuracy, is that fair?
I'm trying to qualify your answer for you to say that these are generally the boundaries that represent the service areas to your knowledge?
A. **I think it's a picture to give you a general idea of where the systems lie in the state.**
Q. Well, and in your opinion at least as to Sioux and Kingbrook, does that accurately reflect a general idea of where their service territories run?
A. **It's a general idea of where they lay in correlation with each other, yes.**
Q. Okay. Well, and does it generally reflect the actual service territories claimed by those two entities to your knowledge?

A. **Like you said before, it's pretty ambiguous, but it's a close idea on a map where those systems are.**
Q. Okay. I mean, in looking at this, knowing what you know about those two systems, do you look at it and say, "Well, that's just wrong because, you know, Sioux's territory goes over here or doesn't go there," anything of that nature?
A. **No.**
Q. Okay. Do you know where the information came from that the South Dakota Association of Rural Water Systems used to put this map together?
A. **Not specifically, no.**
Q. Well, generally do you know where it came from?
A. **I would assume base maps.**
Q. Okay. When you say a base map, what is that?
A. **A map of the piping of the rural water systems.**
Q. All right. You're familiar with the various forms that rural water systems can take in terms of how they're organized?
A. **Generally, yes.**
Q. Okay. What is your familiarity, or what are you aware of, the different types?
A. **Well, in Sioux's behalf, we're a 501(c)(12) not for profit corporation governed by a board of directors. Kingbrook was the same way.**
Q. Right. What are the other types of organizations

that provide rural water service in South Dakota to your knowledge?
A. **There would be water districts.**
Q. Are they called water user districts or --
A. **Could be.**
Q. Okay.
A. **Could be.**
Q. And those are the two that I'm -- those are the two forms that I am familiar with. I didn't know if there were any others. Are there any others that you know of?
A. **Not specifically that I could answer.**
Q. So is it fair to say that at least as far as you know, when we look at DEF 396 and the various systems that exist around South Dakota, those either take the form of a 501(c)(3), or they take the form of a water district created pursuant to state law?
A. **As far as I know.**
Q. Okay. Now my understanding is that the water districts which are created pursuant to state law, the process for that involves basically putting your territory on a map and sending it into Pierre and having somebody at the state approve that territory. Are you familiar with that process?
A. **I think that's correct.**
Q. Okay. Now with respect to the 501(c)(3) form --

or the 501(c) form that Sioux uses to govern its entity, is there any kind of a territory map that sets geographical boundaries?
A. **No.**
Q. So to your knowledge, has Sioux ever developed any kind of a geographical boundary on a map that it uses to define its territory?
A. **The base map would be the -- would be where we have pipes in the ground.**
Q. Okay. And you've produced for us a map in discovery that shows where Sioux has pipes in the ground?
A. **Yes.**
Q. That tells me where the pipes are, but it doesn't tell me with any degree of certainty where the boundaries are. So I guess what I'm asking is, has Sioux to your knowledge ever taken it a step further and said, "Here's where our pipes are and here's where we claim our boundaries are?"
A. **No.**
Q. All right. I took the liberty of blowing up the base map because -- or having it blown up because as of yesterday --
(Todd Kays entered the deposition.)
MR. HIEB: I'll tell you what, let's go off the record a second.

(A break was taken at 9:50 o'clock, a.m. to take Todd Kays' deposition.)
(Deposition was resumed at 10:33 o'clock, a.m.)
Q. (BY MR. HIEB) We'll go back on the record and resume your deposition.
I'm showing you a blown-up copy of a map that was produced by Sioux with a production number Sioux 2535. I will tell you that I'm going to go ahead and mark this as Exhibit 1. Do you want to mark it? I'll explain why in a minute I'm doing that.
(Exhibit No. 1 was marked.)
Q. (BY MR. HIEB) I've marked as Exhibit 1 this map that as I said has a production number of 2535 from Sioux. The one thing that I think was added by us, there's a legend down here that you see with some color coding that relates to the size of the mains, and I think that that's something we added to it. That's why this isn't an actual identical reproduction of what you produced. Are we on the same page?
A. **Okay.**
Q. Okay. First of all, I'd like you to take a look at that and tell me, when you talked about the base map, is Exhibit 1 generally what you're talking about when you say base map for Sioux?
A. **Yes.**
Q. Okay.

A. **If this was the base map that we gave you, yes.**
Q. It is the base map you gave me. We simply added --
A. **The colors.**
Q. -- the color to identify the sizes of the lines that you've got in the ground. Does that make sense to you?
A. **Yes.**
Q. All right. And when you look at the color coding with the sizes of the lines as you see there, as you look at this map, does that generally appear to be an accurate depiction of Sioux's lines, both in location and size from what you can tell?
A. **Yes, without, you know, picking through mile by mile.**
Q. Right. Nothing about it appears to be odd or out of the ordinary as you look at it here?
A. **Nothing strikes me that way, no.**
Q. Okay. Do you know the history of Sioux and sort of the development of its system?
A. **It would be very rough.**
Q. Okay. And I'm going to go over your rough understanding of it with you. Who would have a better understanding of that history?
A. **DGR would have a very -- should have a very good understand -- well, they would have an understanding.**

Q. DGR is the engineering firm that Sioux at least uses at this time to update its base map?

**A. Uses.**

Q. Right. And to your knowledge, has DGR been the entity that Sioux has used since its inception?

**A. Yes, I believe so.**

Q. Okay. Tell me why would it be that DGR would have knowledge of the history of the development of the Sioux system? What does DGR do for Sioux?

**A. They are our -- they're our engineer.**

Q. Right.

**A. From -- I'll give you an example if I may?**

Q. You bet.

**A. Our current 2015 piping improvement project which we have is a composite of information they have and basically outlines the improvements that we're going to make to the system.**

Q. When DGR does engineering work for Sioux -- here's what I'm asking. Obviously part of what they do would be what I would call CAD based work to update or create maps of the kind we see here in Exhibit 1, correct?

**A. Correct.**

Q. In addition, do they also do engineering work that relates to the laying and the locating of the lines?

**A. Yes.**

Q. So if that's the case, then if DGR has an adequate archive of the work they've done for Sioux, we could go back and we could see when -- basically whenever Sioux added to its system, DGR would have plans that would show those additions and when they occurred and what was done?

**A. I believe so.**

Q. Assuming that they've got that information archived?

**A. Correct.**

Q. Does Sioux keep that information archived?

**A. There are some of it there, yes. I mean, I won't tell you that every piece is there.**

Q. Sure. Here's what I'd like to know then. Based upon the knowledge that you do have about the history of the Sioux system, where did the Sioux system get its start to your knowledge?

**A. In this general area. I mean, as far as exactly, I can't --**

Q. Okay. Well, do you have any idea where the first -- let's do it this way. Where does the water come from that supplies Sioux's network?

**A. Currently it comes from the Castlewood treatment plant.**

Q. All right. And you've pointed to a spot with the word "Castlewood." Is that the -- it's right next to the

Town of Castlewood, it's right to the west of the Town of Castlewood on the map?

**A. Correct.**

Q. And has that always been the location of the treatment plant?

**A. No.**

Q. Where was the treatment plant located before it was located in Castlewood?

**A. Originally the Sioux treatment plant which is still in use.**

Q. Which is where?

**A. Right here.**

Q. You're pointing to a spot south of the City of Watertown. Was that the original treatment plant for Sioux?

**A. One of them.**

Q. Where was the other original treatment plant?

**A. Hayti.**

Q. And you're pointing to a spot down here just north of the Town of Hayti?

**A. Correct.**

Q. And has -- is all of the water that's supplied by Sioux run through a treatment plant at some point owned by Sioux?

**A. Currently.**

Q. Has that always been the case, to your knowledge?

**A. It gets into the definition of treatment plant. It's always been treated. I mean, you have chlorination. You have --**

Q. Right. My question is this. I'm trying to do this at about a second grade level because that's about my level of understanding of water treatment and distribution.

If I go back in time to when Sioux was created, and when was that to your knowledge?

**A. 1974.**

Q. So if I go back to 1974, when --

**A. It's --**

Q. Roughly. If I go back to 1974 when Sioux was originated and I got in the pickup with the then manager of Sioux and told him, "Go show me what assets Sioux has in terms of facilities, etc.," to your knowledge where would he have taken me and what would he have shown me?

MR. COLE: Object to form.

Q. (BY MR. HIEB) Well, go ahead, to your knowledge.

MR. HIEB: What's the -- I can rephrase.

MR. COLE: Speculation and conjecture.

Q. (BY MR. HIEB) And I said to your knowledge. I'm not assuming -- I'm not asking you a leading question. I'm not assuming you know anything. I want to know what you do know, okay?

So to your knowledge, based on your knowledge of

A. **I believe so, yes.**
Q. Okay. I found what appears to be the entire file for the Boerger farm --
A. **Okay.**
Q. -- in the production. And, Jeff, you can jump in. Was the entire file for Lew's produced also?
MR. COLE: I believe so. Anything that we received on that would have been produced to you. I can go back and look and see if there's anything else. I certainly don't think there is.
Q. (BY MR. HIEB) Okay. What's in a disconnect file?
A. **Well, there would be the, you know, initial paperwork down to the, in this case, when the meter was read out and the final bill was sent, and like that receipt that you showed me --**
Q. Yep.
A. **-- was probably in there.**
Q. Okay. Well, here's what I'm going to show you. There are documents marked Sioux 122 through Sioux 127. Would these be the documents that are likely from the disconnect file for Lew's Fireworks?
A. **I believe this is for sure. This would be.**
Q. Look them over for now and then I'll go through them one at a time.

A. **I would think so, yes.**
Q. Okay.
A. **I mean, I --**
Q. I'll represent to you that --
A. **I don't know about -- but more than likely.**
Q. Right.
A. **I'd have to look.**
Q. Sure. I'll represent to you that documents marked Sioux 122 through Sioux 127 were all produced from Sioux's files.
A. **Okay.**
Q. And they all appear to relate to Lew's Fireworks. Would you agree with that?
A. **Yes.**
Q. And it appears to me that Sioux invoiced the City of Watertown as you can see on Sioux 122, correct?
A. **Yes.**
Q. That the City of Watertown paid the amount invoiced to Sioux as you can see on Sioux 123?
A. **Yes.**
Q. It looks like Sioux 124 is just a tape from an adding machine or a calculator with some handwriting on it that calculates the 30-year depreciation amount on the infrastructure Sioux had associated with Lew's. Does that look right?

A. **That looks right.**
Q. Sioux 125 is a -- well, what is Sioux 125?
A. **That looks like the charges to Lew's Fireworks to hook up.**
Q. Based --
A. **As far as inventory goes, parts.**
Q. Right.
A. **And a membership fee and then --**
Q. Sure.
A. **-- some digging and labor technician.**
Q. Basically 125 appears to me to be a laundry list of the costs of the infrastructure associated with Lew's that Sioux had into the deal, is that --
A. **I'm assuming it's a service line that would have went to the place.**
Q. Which is what Sioux was invoicing Watertown for in Sioux 122, right?
A. **Okay.**
Q. Does that look right to you?
A. **It's -- yes, that sounds right.**
Q. Okay. And then Sioux 126 appears to be a document in which someone from Sioux calculated five years of income on the Lew's Fireworks account, correct?
A. **A couple years.**
Q. Well, if you look at the very bottom, what does

it say there?
A. **Oh, they took a composite. Okay.**
Q. Does that look right?
A. **Yes.**
Q. All right. Which is part of the calculation that went into the amount invoiced here on Sioux 122, right?
A. **Yes.**
Q. If you look at the second line there.
A. **Yes, I see this and that.**
Q. Okay. So what it looks like to me is that if I went to the file at Sioux for Lew's Fireworks that these came out of, you've got the invoice that Sioux sent to the city, which is Sioux 122, and then the documents behind it, Sioux 123 through 127, are sort of the homework that proves --
A. **Yes.**
Q. -- the amount on the invoice, is that fair?
A. **Fair.**
Q. All right. Do you have any knowledge or understanding about why it is that Lew's Fireworks wanted to be annexed into the City of Watertown and/or receive water service from the City of Watertown?
A. **My general understanding was it was for fire protection.**
Q. And was that something that Sioux was capable of providing to Lew's?

A. **We don't provide fire protection.**
Q. All right. So -- well, so in other words, you weren't willing to provide Lew's with the fire protection they claimed they wanted or needed?
A. **I don't know about that time, but I mean, if you were talking about present day today and you came to me and asked me for fire protection, I would say, "No, we don't have fire protection."**
Q. All right. Any reason to believe that things were any different back when Lew's was looking for fire protection?
A. **I would have no reason to believe that, no.**
Q. All right. So if Lew's came to Sioux right now hypothetically and said, "I want you to provide me fire protection at this building and I want to hook up to Sioux," your response as the manager would be?
A. **We don't provide fire protection.**
Q. "I'm not going to do that for you?"
A. **Sioux Rural Water does not provide fire protection.**
Q. All right. The second account on Sioux 121 that you've got listed there is a previous Sioux account now on Watertown utilities is CHS elevator. Do you see that?
A. **Yes, I do.**
Q. Are you familiar with the CHS elevator plant or

fertilizer plant?
A. **From a drive by sense.**
Q. Okay. Were you involved in Sioux's operations at the time that Sioux had hooked up the CHS plant?
A. **No.**
Q. There's been testimony, and I think it would be borne out by the records, that the CHS fertilizer plant is an entity that exists within the city limits of Watertown. Do you have any reason to disagree with that?
A. **No.**
Q. And do you know what kind of hookup was provided to CHS by Sioux?
A. **I'm assuming it was a standard meter pit, three-quarter inch meter, inch and a half service line.**
Q. Okay. Do you have any knowledge of what went on between Sioux and the City of Watertown that resulted in Sioux discontinuing that service and the City of Watertown picking up that service?
A. **No.**
Q. On exhibit --
A. **Well --**
Q. Go ahead.
A. **Yesterday's depositions. Just --**
Q. Okay. What you heard yesterday?
A. **Correct. You know, and when I asked the**

**question, they said, well, they dug them in and then the guy came back and said no, I can't be hooked to you guys, so whatever, and I don't know what it says there, I don't remember that verbatim.**
Q. Okay. If you look at Exhibit 1, can you just identify for me where the CHS plant is to the best of your knowledge on this exhibit?
A. **It might take me a minute. Now I wish I would have brought my readers.**
Q. See if these help. (Handing.)
A. **Actually they do.**
Q. Yeah, it's not the first time I've done that.
A. **In this area right here. (Indicating.)**
Q. Okay. Give those back because now I need them.
A. **(Handing.)**
Q. There's a little yellow circle with a 12 in the middle of it --
A. **Yep.**
Q. -- on Exhibit No. 1, and do you know what that represents, that 12?
A. **It's a section number.**
Q. Okay.
A. **I believe. Yes.**
Q. There you go. So Township 116 north, range 53 west in Section 12?

A. **Northeast.**
Q. Up in the northeast corner of that section is roughly where that CHS plant is located?
A. **Correct.**
Q. And do you know whether at the time Sioux hooked up the CHS plant, the CHS plant was already within the city limits of the City of Watertown?
A. **I don't know.**
Q. Okay. Your current policy at Sioux, is your current policy at Sioux to hook up anyone within the city limits of Watertown?
A. **I'm unaware of a policy that says I couldn't.**
Q. Okay. And I'm not asking about written policies necessarily, but I'm going to give you a hypothetical. If I owned a house some place within the city limits of Watertown and I decided I wanted Sioux's water service instead of the city's water service, and I called you up and said, "Can you hook me up," and you had a line that was across the street from me, would that be something you would do?
A. **I would entertain it.**
Q. Okay. Would you have to talk to somebody, or would it just be your decision as the manager?
A. **I believe that would fall under my decision.**
Q. Okay.
A. **My discretion.**

Q. What factors would factor into your entertainment of doing that?
**A. I would have them fill out the paperwork that we submitted through DGR, our engineering model, see if their -- a capacity existed and what it would take.**
Q. Okay.
**A. So that they have an idea what it would cost them to hook up.**
Q. Okay. And in this case, do you know whether -- do you know what kind of water needs the CHS plant had?
**A. No.**
Q. Do you know what kind of water usage the CHS plant runs?
**A. No.**
Q. The CHS transaction essentially occurred under your predecessor's --
**A. Correct.**
Q. -- watch?
All right. The third one on there is the Tim and Darrell Boerger, now Titan Machinery, account?
**A. Correct.**
Q. Once again, are you familiar with how that hookup went from being a Sioux hookup to being a Municipal Utilities' hookup?
**A. When I first came, it was all in March of '13,**

**they were building the Titan Machinery program there, and there were a lot of things going on at the time at Sioux, of course you can imagine.**
Q. Yeah.
**A. But the question had been posed who's serving that because we had a line down to the Boerger farm. We did stop out. We were doing some locates, some of the contractors there. I did pose that question. I believe eventually I ended up visiting with Jeff about that, Jeff DeVille about that.**
Q. Okay.
**A. That hookup.**
Q. And what did that conversation entail?
**A. Just that, you know, that Watertown had -- was planning on serving that is best of my recollection. It was a phone conversation. I said, well, I'm not so sure that Sioux doesn't, you know, have the right to serve that area. We talked back and forth, and briefly, you know, it wasn't very detailed and that, you know, that's a matter probably for attorneys to decide.**
Q. And as I understand it then, the attorneys got involved, is that fair?
**A. That's fair.**
Q. I'm going to show you what have been marked Sioux 551 through Sioux 546, and I know that's going backwards, but

that's how you have to read them in order to read this e-mail chain between Todd Boyd and Stan Fox.
**A. Okay.**
Q. I'd like you to review those e-mails and then I'll have some questions for you.
**A. (Witness reviewing documents.) Backwards and bottom to top, correct?**
Q. Yeah, if you're going to read them chronologically.
**A. (Witness reviewing documents.)**
Q. Have you had a chance to review Sioux 546 through 551?
**A. Yes.**
Q. And are these e-mails that you've seen prior to today?
**A. Yes.**
Q. It appears to me that the way that Titan Machinery/Boerger farm account discussions occurred was that you on behalf of Sioux had a conversation with Jeff DeVille on behalf of Watertown Municipal Utilities about who had the right to serve the Boerger farm which was now going to be the Titan building, correct?
**A. Correct.**
Q. And I think you indicated previously that you decided that's a better discussion that should be had between

the attorneys, right?
**A. I believe Jeff had made that comment, and I said yeah, fine, that's what they're there for.**
Q. And then it looks like that discussion was had at least in part through a series of e-mails which are marked Sioux 546 through 551 between Stan Fox and Todd Boyd. Would you agree with that?
**A. Um-huh. Yes. Sorry.**
Q. Okay. Which culminates with an e-mail from Todd Boyd to Stan Fox on Sioux 546 which states, "Sioux Rural Water makes no claim for the water service to the new Titan building." Would you agree with that?
**A. That's what the -- yes.**
Q. Well, did Mr. Boyd make that representation without the authority of Sioux?
**A. I don't believe so. I mean, chronologically it's a whole different kettle of fish.**
Q. Well, you would agree with me that Mr. Boyd was representing Sioux --
**A. Yes.**
Q. -- at that time?
**A. Yes.**
Q. And he was representing Sioux with respect to this issue in his discussions with Mr. Fox?
**A. Yes.**

Q. And it looks like from the e-mail sent on Sioux 547, it indicates that Mr. Boyd was meeting with -- or going to be meeting with the board or talking to the board about this issue to find out what the board's thoughts were, correct?
A. **Yes.**
Q. And did he do that?
A. **Yes.**
Q. There are minutes marked Sioux 2391 through Sioux 2394. I'll just show you the last page which is Sioux 2394 and if you would just read the last bullet point.
A. **It says, "Attorney Boyd explained the current status of the water service to a site located along the east border of Watertown for the new Titan machine building. The system is unable to make any claim for compensation under either state or federal law."**
Q. Okay. And was that the information that Attorney Boyd gave to the board at that meeting?
A. **They were -- there's more information that I don't believe is contained in those minutes. I think there are other phone conversations that were held that aren't represented in the e-mails too.**
Q. Okay. But at the end of the day, Mr. Boyd in representing Sioux sent an e-mail to Stan Fox who represented Municipal Utilities saying Sioux's not going to make any

claim to this building, right?
A. **Yes.**
Q. And --
A. **In the print, yes.**
Q. Right. Well, were there any --
A. **No. Yes.**
Q. Okay. Well, to me that -- from looking at things, that was pretty much the end of the story with respect to Titan. Is that fair?
A. **Yes.**
Q. Do you have any knowledge of what Titan's needs are for water?
A. **No, they never approached us.**
Q. Okay. Do you have any knowledge, as you sit here today knowing what you know about the Titan operation, do you believe that Sioux has sufficient capacity to supply Titan with its needs?
A. **Not all of their needs, no.**
Q. So in order for Sioux to supply Titan, Sioux would have to supply part of it and then Titan would have to get the rest of its water some place else?
A. **It's my assumption based on the fact I don't know what their needs are.**
Q. All right. And I appreciate that. But knowing what you know about a commercial operation, the nature of

which Titan is running out there, what parts of their water needs do you believe you would be unlikely to be able to provide?
A. **I don't know if they have fire protection, I've never been in the building, that would be one. Two, they have a truck wash, I don't know what the requirements of that are. And three, I don't know the general layout. I mean, if they've got bathrooms, showers, sinks, hot tubs, I don't know what they have.**
Q. Okay. Back to Sioux 121 which is this list that either you prepared or provided --
A. **Yes.**
Q. -- the information to have prepared.
A. **And I very well may have. It's just been --**
Q. Yeah, I get it.
A. **So...**
Q. The rest of the list is included under a heading entitled Kittelson's addition accounts on Sioux Rural Water?
A. **Yes.**
Q. Why did you list those on here?
A. **It goes back to the Alice Madline hookup which we -- was talked about yesterday also. When we had initially sent in the list, the three-mile list --**
Q. Yep.
A. **-- for approval by the MU, is that what it is?**

Q. Yeah, that's fine.
A. **That one came back with a red flag due to the fact that there was a group of individuals that had approached the city about being annexed into the City of Watertown, and it became a little bit problematic for me at that point in time that we had an entire addition that may be annexed into the City of Watertown, and if the same process that happened at Titan Machinery was applied to that, now we're not talking about a single hookup, but an actual entire addition and --**
Q. Would you agree with me that as things currently sit, Watertown Municipal Utilities does not supply water to anyone within Kittelson's addition to your knowledge?
A. **That's correct.**
Q. Okay. And so --
A. **And at the end of the day that e-mail showed -- not to talk over you.**
Q. Go ahead.
A. **But yes.**
Q. The e-mail from Jeff that said go ahead and hook up Alice Madline or whoever you want to in Kittelsons?
A. **Well, the time frame to get the annexation in process and everything and not to hold her up, but there again, the conundrum lies in hooking up another person who may be gone from the mix next week, next year, six months**

**from now if that group of people decides to be annexed in.**

Q. Right. So I guess to make sure I'm clear, when we look at Sioux 121, was that an attempt on your part to provide a somewhat complete list of the various accounts that either used to be served by Watertown -- or used to be served by Sioux and are now served by Watertown, plus some accounts that you think might be in jeopardy?

A. **What was the first --**

Q. Well, the purpose of -- when you put together Sioux 121, --

A. **Yeah.**

Q. -- how did you decide what information to put on it?

A. **It was a starting point.**

Q. Well, where's the ending point?

A. **I don't know.**

Q. Well, what I'm here to do --

A. **Let me --**

Q. Go ahead.

A. **My answer to that is, you know, when I look at things like the five-year plan, ten-year plan, I don't know.**

Q. I get that. As we sit here today though, in the Complaint that's been filed against both the city and Municipal Utilities, that's an allegation that the city and Municipal Utilities have taken certain customers from Sioux.

Do you understand that allegation?

A. **Yes, I do.**

Q. And as I look at it, the three that you've identified that have been taken to this point are the first three listed on Sioux 121 to your knowledge?

A. **They were previously served by Sioux, correct.**

Q. Right. Is that fair?

A. **Correct.**

Q. Do you know of any others as you sit here today?

A. **No. That were previous Sioux accounts, no.**

Q. Correct. I'm talking about customers that were Sioux customers --

A. **Correct.**

Q. -- and that are now --

A. **MU customers.**

Q. -- MU customers?

A. **Correct.**

Q. Right?

A. **Yes.**

Q. And so those three would be the only three that you are aware of as you sit here today that fall under that category?

A. **Yes.**

Q. The second category that I'll talk about are customers that are currently Sioux customers, but that based

upon your view of the comprehensive plan or of discussions that people may have had regarding annexation, may not be Sioux customers in the future if the City of Watertown annexes them and starts to provide them with water. Okay, do you understand that category?

A. **Yes.**

Q. And would that be basically what we see here on Sioux 121 as the Kittelson addition?

A. **In this Kittelson addition specifically, this would be a number of people, had the annexation gone through, that MU would have hooked up for their own customers, much like the Boerger farm.**

Q. Right. Well, which presupposes that those individuals would have wanted to be hooked up to Municipal Utilities, correct, in that hypothetical?

MR. COLE: Object to form, speculation and conjecture.

Q. (BY MR. HIEB) Do you understand what I'm talking about? We talked about the first category of customers, those which you believe were formerly Sioux customers which are now WMU customers?

A. **Right.**

Q. Those were the first three on Sioux 121, correct?

A. **Yes.**

Q. The second group on Sioux 121 are those in the

Kittelson addition which are not currently hooked up, nor have they ever been hooked up to Watertown Municipal Utilities' water, right?

A. **Yes.**

Q. But you put them on the list because there is a concern based upon discussions or other information you've seen that they may one day in the future become hooked up to Watertown Municipal Utilities which will then involve them no longer being Sioux customers, right?

A. **Yes, they may want to.**

Q. Right. So that's why they're on this list?

A. **Um-huh.**

Q. Correct? Yes?

A. **Yes.**

Q. Okay. And in that category, those people that are not WMU customers, have never been WMU customers, but there's some reason to believe they may in the near to distant future become WMU customers, other than the Kittelson addition accounts that we see on Sioux 121, are there any other accounts that fit into that category to your knowledge as you sit here today?

A. **I could use the three-mile radius to argue that everyone in that could be on that category.**

Q. Fair enough. Okay. Because it's basically just speculation as we sit here right now, correct, about what

falls into that category?
A. **No, I mean it's -- I don't know how -- I know who we have for customers now.**
Q. Sure.
A. **Okay. If they fall within that three-mile radius and with the current practice and they voluntarily annex themselves because I've heard that it's not been a forced annexation.**
Q. Right.
A. **And then they decide that they wish to have MU services, because I'm assuming MU is not going to give them sewer, power, streets, curb and gutter and not water. It will be the whole package or nothing. Is that --**
Q. Well, I don't know if that's true. You heard, you know, Jeff's testimony yesterday that the current practice is not to force anyone to hook up to the water system, even if they become a part of the city.
A. **Okay.**
Q. It's only if they want to --
A. **Right.**
Q. -- that they do that. So go ahead.
Here's my point. In that second category, you've listed the Kittelson addition accounts that are on Sioux 121?
A. **Um-huh.**
Q. Have you sat down and put together any other

lists that would list additional accounts falling within this category?
A. **Yes.**
Q. Have those been provided to me? Either one of can you answer.
MR. COLE: I don't know, Jack.
Q. (BY MR. HIEB) Okay. Have you provided them to your attorney?
A. **I believe so.**
Q. Okay.
A. **But as long as I'm talking about the same thing. I'm --**
Q. I'm talking about accounts that you are currently serving that you have some reason to believe or fear may become --
A. **Oh, no.**
Q. -- MU customers?
A. **No. No.**
Q. All right. So we can agree that the Kittelson accounts that are listed on Sioux 121 all fall into that category, right? That category of because of what I know, I have reason to fear that these may become MU customers and will no longer be Sioux customers, right?
A. **Yes.**
Q. And we can agree that there are potentially other

accounts that fit into this category, but you haven't really sat down and listed them at this point, right?
A. **I would believe anything in that three-mile radius is open to that.**
Q. Right. And --
A. **Which is --**
Q. -- there are more accounts than those in Kittelson addition that are within that three-mile radius, right?
A. **Correct.**
Q. So in order to complete the second part of the list that we see on Sioux 121, under your theory or how you look at this, we would have to list all of Sioux's accounts that are within the three-mile radius to make it complete?
A. **They -- well, yes.**
Q. Okay. And then there is yet another category that I don't have a list for that I can think of which would be the category of accounts that were never hooked up by Sioux but are now MU customers, but because of where they're situated, they might have been Sioux customers based upon the location of Sioux's pipes?
A. **Yes.**
Q. Do you understand that category?
A. **Yes.**
Q. Have you put together any kind of a list of those

customers?
A. **Yes.**
Q. Has that been produced to me?
A. **I don't know.**
Q. Have you given that to your attorney?
A. **Yes.**
MR. COLE: He's given it to us, Jack. I don't know if it's been produced to you or not. I know it's part of the expert stuff that's being worked on.
MR. HIEB: Okay.
Q. (BY MR. HIEB) What did you do to compile that list?
A. **We took a look at where our existing lines lay and used a distance from them, you know, a quarter mile, half mile, whatever that may be to compile that list.**
Q. Well, and that's going to be my first question. What was the number, quarter mile, half mile? How did you --
A. **Within a general distance. I --**
Q. Were you part of the group or the -- did you assist in putting together that list?
A. **Yes.**
Q. Do you remember what the distance was you used in order to compile that list? And when I say the distance used, I'm talking about the distance from your existing pipes to these customers that were never Sioux customers but which

are now MU customers.
A. **I would say that if that pipe's within a mile -- you know, in a section, okay.**
Q. Within a mile?
A. **Well, quarter mile, half mile, general. It wasn't scientific.**
Q. Well, how did you include or exclude if you didn't have a specific distance that you were using from your existing pipes?
A. **Whatever seemed reasonable to the distance of that pipe.**
Q. How do you define reasonable?
A. **Well, if it wasn't a quarter to a half mile -- quarter mile, maybe a half mile, in that general distance.**
Q. And how did you come up with that number as a basis?
A. **It was a place to start.**
Q. Okay. But I mean what we're talking about really are customers that Sioux would claim they would have hooked up had they had the opportunity to, correct?
A. **Correct.**
Q. And I think you told me previously that if I'm a perspective customer of Sioux and I come to you wanting water with my property located across the street from one of your lines, the determination about whether you would hook me up



would be in large part determined by the cost that your engineers would give you for putting me on the line, right?
A. **Right now if you were to come, you know, the cost to hook to that line would be yours.**
Q. Right. And so some of that -- whether or not those individuals in that category, these customers that were never Sioux customers but that Sioux is claiming to be within their territory that were eventually hooked up by Municipal Utilities, the determination about whether they would have ever been a Sioux customer would in some cases be determined on whether they were willing to pay the cost that you were going to give them to get hooked onto your line, correct?
A. **Yes, and I don't know what that was. I don't know that we were given that option.**
Q. That you were given that option?
A. **I don't know that -- much like Titan Machinery, I don't know that anybody came to Sioux and said, "This is happening. You have pipes here. Is this something we can do?"**
Q. Right. In that category of businesses or residences, these customers that are now MU customers that you believe are within your territory, how did you decide which ones to include as customers taken from you and which ones not to include?
A. **Based on their distance from our existing water**



**line.**
Q. Okay. Any other factors?
A. **To compile the list, no.**
Q. Okay. But you would agree with me that in each of those cases, one of the issues would be whether that particular customer was willing to pay the charge that you would charge them to hook to your system?
A. **That would be one of the factors.**
Q. Okay. A factor that really you couldn't control, right?
A. **No.**
Q. With respect to any of those customers in that category, was there ever any kind of a notice or alert sent to Watertown Municipal Utilities or the City of Watertown indicating that you believed they were unlawfully hooking up a customer within your territory?
A. **No. You're talking about the secondary list?**
Q. I'm talking about --
A. **Not these?**
Q. Correct.
A. **Okay.**
Q. I'm talking about the third category.
A. **Okay.**
Q. Those being customers that were never Sioux customers that are now WMU customers and that are on a list



that you've put together of customers you believe have been taken from your service territory. Are we on the same page?
A. **Yes.**
Q. With respect to that list and that category of customers, was there ever any kind of a notice or alert sent to either the City of Watertown or Watertown Municipal Utilities by Sioux indicating that Sioux felt those customers were being unlawfully connected?
A. **No. Because they were already connected.**
Q. Well, they were already connected when you compiled the list?
A. **Correct.**
Q. But Sioux was in existence at the time they were connected in each case?
A. **Right.**
Q. And you have, I'm assuming, searched the records for Sioux for anything that's related to this litigation, correct?
A. **To the best of my ability, yes.**
Q. And have you come across any correspondence with anyone at Sioux that would indicate that they provided notice to the city or to Watertown Municipal Utilities that they believe those hookups were somehow illegal at the time they were made?
A. **No, I don't believe illegal would be the word. I**

guess, this third category of damages which are those customers that are WMU customers that were never served by Sioux but that Sioux believes were hooked up within Sioux's territory. Do you follow me?
A. **Um-huh.**
Q. Yes?
A. **Yes. I'm sorry.**
Q. That's okay.
A. **I'm sorry.**
Q. The map I've got in front of you is the only map that you've indicated really exists that would help us determine where Sioux's territory is, correct?
A. **It's our base map, yes, with our water lines, yes.**
Q. Right. And I guess, I've got an orange highlighter. Can you sort of draw what you believe Sioux's territory to be on this map so I've got some idea?
A. **It's difficult, and I can give you an explanation for that.**
Q. Sure. Absolutely.
A. **Let's say this -- the system exists based on the pipes we have in the ground today, okay?**
Q. Okay.
A. **It's not uncommon for a rural water system to do what's called an expansion program.**

Q. Okay.
A. **And basically you would have signups for possibly anybody within this area who's not hooked up to become part of the system. Usually you incorporate it with system improvements. That being said, I'll -- this is strictly for an example. See this big gap in here where we see no lines?**
Q. Yes.
A. **Okay. Earlier when you had referred to the state association's map with those crude, ambiguous --**
Q. The document that was produced as DEF 396?
A. **Correct. Within that, the way this puzzle is pieced together, you can also see that there's gaps existing.**
Q. Yeah.
A. **So let's say, hypothetically, there's a person over here that wants water or there's four people over here that want water, can we incorporate them into an expansion project? We would run a line from here to here and pick those people up.**
Q. All right. So do this for me and we'll walk through this so I understand it. Use that hypothetical on Exhibit 2 with that orange highlighter and put an X on the four people that hypothetically would want water, put four Xs in orange.
A. **That could want water?**
Q. Right. Right.

A. **We'll just -- I'm going to just rough shot these in.**
Q. Yes, exactly.
A. **(Witness complying.) And I'll just, for simplicity sake, put this one here.**
Q. All right. So you've drawn four orange Xs on Exhibit 2 which represent four hypothetical potential customers that would come to Sioux and say, "We want to be hooked up to your system," correct?
A. **Okay.**
Q. And my question for you now is, at that point in time, as we sit here today, are those four Xs within your service territory?
A. **If I'm doing an expansion program, okay, I would just come like this for this line.**
Q. All right. Yeah, you've drawn a line now showing what would be new lines in the ground, correct?
A. **Correct.**
Q. But prior to drawing that orange -- those orange lines, are those four Xs within your service territory?
MR. COLE: Object to form. Calls for legal conclusion.
Q. (BY MR. HIEB) You know, that's valid. Let me do it this way. Based upon the analysis that you worked on with your expert in this case, would those four Xs be within your

service territory?
MR. COLE: Same objection. You can go ahead and answer.
Q. (BY MR. HIEB) Go ahead.
A. **I believe they would be, yes.**
Q. And why?
A. **Because we'll serve them water.**
Q. Okay. So does your service territory include anybody that you would agree to serve with water?
A. **I believe so, yes.**
Q. All right. And here's my problem with this. This is where I'm having a difficult understanding or getting my head around this.
A. **Yes.**
Q. You do not have geographical boundaries that you can provide for me regarding your service territory, correct?
A. **Correct.**
Q. The only thing we can look at are the pipes in the ground to give us an indication of your current service territory, correct?
A. **Correct.**
Q. On Exhibit 2, the pipes in the ground are all indicated on the base map, right?
A. **Yes.**
Q. So if you've got these four new potential

customers marked with the orange Xs that could be served by the orange lines that would represent new pipes in the ground, before those new pipes in the ground are laid, those four Xs really aren't in your service territory yet, are they?

MR. COLE: Object to form.

A. **Answer?**

Q. (BY MR. HIEB) Yeah.

MR. COLE: Go ahead and answer.

A. **I believe they would be.**

Q. (BY MR. HIEB) Well, you could draw -- and I'm going to do the drawing this time on Exhibit 2.

A. **Yes.**

Q. I'll draw a pink X even further to the west --

A. **Yes.**

Q. -- on that same map. If that person came to you and said, "I want to hook to your system," and was willing to pay the cost of having a line run out there, is that person within your service territory?

A. **Yes.**

Q. But that person is currently miles away from your nearest line, correct?

A. **Yes.**

Q. But you would still consider that person to be within your service territory?

A. **I would consider it to be serviceable by our territory, yes.**

Q. Well, serviceable by your territory, or within your existing service territory?

A. **I would say yes to both.**

Q. Okay. So really it sounds to me like the way the term "service territory" is being defined is anybody that you are willing to serve?

MR. COLE: Object to form.

A. **And able to serve, yes.**

Q. (BY MR. HIEB) Okay. So previously when you indicated to me that when you were working with your expert on determining which customers that are currently hooked up by Watertown Municipal Utilities that were hooked up within what Sioux believes to be its service territory, I think you indicated that you looked a half a mile to a quarter of a mile from your existing lines in order to identify that list of customers, right?

A. **Yes.**

Q. But in the example we've used, we've gone way more than a half a mile to a quarter mile from your existing lines and you're still indicating those customers would be in your service territory, right?

A. **After the pipe was installed, yes.**

Q. After the pipe was installed, right?

A. **Well, I can still come out and get them. They'll be -- we'll go get them.**

Q. Right. But that's my point. My point is that -- let's take the hypothetical closer to the City of Watertown.

A. **Okay, yes.**

Q. If at the time the City of Watertown or Watertown Municipal Utilities hooks a customer up, you don't have pipes within a half a mile of that customer, is that somebody that you would claim would be within your service territory?

A. **A half a mile you said --**

Q. Yeah.

A. **-- or a mile? Possibly, yes.**

Q. Okay. But I guess you understand the problem I have with this? How does Watertown Municipal Utilities know where at some point you may decide to run pipes and not?

A. **I --**

MR. COLE: Object to form. Calls for speculation and conjecture.

MR. HIEB: Sure.

MR. COLE: Go ahead and answer.

A. **I can appreciate that conundrum because the same is true in the reverse.**

Q. (BY MR. HIEB) Sure. And I mean, when I look at it in some cases -- you've heard the testimony from Watertown Municipal Utilities' officials who have indicated it's been

the policy of the City of Watertown not to hook up customers that are not within the city limits of Watertown, you heard that testimony, correct?

A. **I did.**

Q. And you've also heard that there have been a handful of exceptions testified to over the years, correct?

A. **Yes.**

Q. Do you have any reason to disagree with that testimony?

A. **No.**

Q. All right. So basically the City of Watertown or the Watertown Municipal Utilities' policy is that their service area is essentially confined to the existing city limits of their city. Would that be a fair statement?

MR. COLE: Object to form. Go ahead and answer.

A. **Generally, yes.**

Q. (BY MR. HIEB) Right. With the handful of exceptions where they've agreed to hook somebody up understanding that that person was going to seek voluntary annexation within a relatively short period of time?

A. **Yes.**

Q. Okay.

A. **Reasonable -- yeah, yes.**

Q. Right. And to your knowledge, that's been the development pattern of the Watertown Municipal Utilities'

water delivery going back to when Sioux started as far as you know?

**A. As far as I know, yes.**

Q. All right. But you'd agree with me that where Sioux is concerned, since they don't have any kind of a geographical boundary that they can provide me, your service area really changes every time you put a new line in the ground?

**A. Yes.**

Q. It expands, right?

**A. Yes.**

Q. And under your belief, how does that interact with Watertown's city limits at any given time? The -- go ahead.

MR. COLE: Object to form.

MR. HIEB: Sure.

**A. The question again?**

Q. (BY MR. HIEB) Well, you evidently view Sioux's ability to expand its service area to basically be limited only by where it's unwilling to run lines, true?

MR. COLE: Object to form. You can go ahead and answer, Heath.

**A. Yes.**

Q. (BY MR. HIEB) All right. So with respect to Sioux's willingness to run lines into the City of Watertown

past Watertown's existing city limits, I think you indicated previously that's something you would consider doing?

**A. Yes.**

Q. So really under your perspective, Sioux's territory theoretically includes the entire City of Watertown?

MR. COLE: Object to form. Calls for a legal conclusion, speculation, conjecture.

**A. I think there's a plateau of reasonability that has to be reached in determining those things.**

Q. (BY MR. HIEB) And what is that? How do we get there?

**A. That's a good question.**

Q. I mean, you understand what I'm saying?

**A. I do. Because I can beg --**

Q. Okay.

**A. -- those questions in the reverse, but...**

Q. Sure. And I think in the reverse what's been indicated is that the City of Watertown, generally speaking, looks at its existing boundaries as being the boundaries of where it will provide water with few exceptions?

**A. Corporate limits.**

Q. Correct.

**A. Which are changing.**

Q. Sure, they absolutely can change.

**A. I understand.**

Q. Right. Now --

**A. Much like my pipes in the ground can change.**

Q. Right. And what I'm asking about Sioux's policies with respect to the corporate limits of the City of Watertown, those corporate limits really have no impact as I understand it on where Sioux views its boundaries to be?

**A. Once again, I'd go back to that plateau of reasonability.**

Q. Okay. How about other rural suppliers and their boundaries, how do those interplay with what Sioux perceives its boundaries to be?

**A. There are intermixing. There have been at times intermixing of those boundaries.**

Q. Well, let's take Clark --

**A. Yes.**

Q. -- Rural Water. Are you familiar with how Clark Rural Water is -- what type of an entity it is?

**A. I couldn't say for sure. I'm assuming it's very similar to Sioux.**

Q. A nonprofit?

**A. Correct.**

Q. And as we indicated previously in your deposition, there are, to our knowledge, the two of us, --

**A. Yeah.**

Q. -- there are two type of entities. There are nonprofits which don't have any geographical boundaries approved by anyone, and there are water user districts that are creatures of the state which have geographical boundaries filed with the State of South Dakota, correct?

**A. Correct.**

Q. To the best of your knowledge, Clark is a nonprofit without geographical boundaries similar to Sioux?

**A. I believe that is correct.**

Q. Okay. And when I looked at what was provided by the association in DEF 396, and we'll mark this as Exhibit 3, if you would, Tammy.

(Exhibit No. 3 was marked.)

Q. (BY MR. HIEB) Exhibit 3 really sort of expands upon what we find in DEF 396, as you indicate it was kind of a crude representation of the service territories of the various rurals, correct?

**A. There is where different water systems are located, yes.**

Q. Right. And when I look at -- what I'll represent to you is that the yellow shown on Exhibit 3 is what is represented as part of the southern part of Clark Rural Water System which butts up against the Sioux system.

**A. Um-huh.**

Q. Do you recognize that?

you what's been produced as Sioux 580, for example. It's called a municipal agreement. Are you familiar with that document?
A. **I've seen them, yes.**
Q. And that's a document, it's my understanding, that was prepared either by someone at Sioux or on Sioux's behalf by someone, correct?
A. **Correct.**
Q. Do you know who put that document together?
A. **I am assuming Brenda Anderson.**
Q. Okay. Do you know if she had worked with Todd Boyd on that or not?
A. **I don't know.**
Q. All right. Somebody at Sioux came up with this form that we see in Sioux 580, correct?
A. **Correct.**
Q. And one of these was being sent with the list that we see, for instance in Sioux 141 and 142 each time there were requests to hook up within a three-mile radius of Watertown, right?
A. **Yes.**
Q. And as I looked at this, it looked like the practice was that Sioux would send the letter like we see on Sioux 141 and 142 with a blank municipal agreement like we see in Sioux 580 and essentially say to the city, "Here are

the people that want to hook up with us, please let us know whether we can hook them up and sign the agreement and send it back to us." Is that your understanding of how things were working?
A. **Yes.**
Q. And did they continue to work that way for a period of time after you became general manager?
A. **Yes.**
Q. Is it Sioux's position, as I understand it in this lawsuit, that the state law, which is essentially reflected in the letter and the agreement that we've just talked about, doesn't apply because of the federal law? Do you know why it is that Sioux was going this route?
A. **I believe just as common practice from when that state law was passed.**
Q. Okay. It was just something that somebody at Sioux, to the best of your knowledge, figured this is one way to do it?
A. **Yes.**
Q. But you would agree with me that these documents that I've just shown you, those all were generated by Sioux each time, correct?
A. **I believe so, yes.**
Q. It was not the City of Watertown or Watertown Municipal Utilities creating these documents?

A. **No. No. No, I don't believe that to be the case.**
Q. Okay. And then you heard testimony earlier from Mr. Heig who was the former manager of the Watertown Municipal Utilities, correct? You were here for that testimony?
A. **Right before lunch or --**
Q. Correct?
A. **Yes. Yes.**
Q. He testified that when he was the manager, this particular process was ongoing between -- you know, coming from Sioux each time they wanted to hook someone up within a three-mile radius, and that the agreements weren't being signed because the city attorney at that time, Mr. Foley, simply sent a letter to Sioux saying, "We're not going to sign an agreement that says we're going to follow state law." Do you remember that testimony?
A. **I believe so.**
Q. Do you have any reason to dispute that that's how things went down?
A. **I have -- I mean --**
Q. You don't know one way or the other?
A. **I have no reason to dispute it.**
Q. All right. Now it does look like from the documents that have been produced at least, whenever Sioux

would send this list of potential hookups to the city, the city would essentially write something on the letter and then send it back?
A. **Yes.**
Q. And with virtually very few exceptions, their response was always go ahead and hook them up, we aren't going to, is that true?
MR. COLE: Object to form. Go ahead and answer.
A. **Would you repeat that again?**
Q. (BY MR. HIEB) With very few exceptions, the response was usually go ahead and hook them up, we aren't going to?
A. **I believe that to be the case, yes.**
Q. And the only exceptions to that we've discussed in your testimony already here today, correct?
A. **Correct.**
Q. There was a brief holdup on a couple of them in the Kittelson addition?
A. **Yes.**
Q. Which you were eventually allowed to hook up, right?
A. **She still hasn't hooked up.**
Q. Well, you've been allowed to hook her, I mean --
A. **We were granted permission from MU.**
Q. Right. MU said, "Go ahead and hook her up, we