1

```
 1                UNITED STATES DISTRICT COURT
                   DISTRICT OF SOUTH DAKOTA
 2                     NORTHERN DIVISION

 3   * * * * * * * * * * * * * * * * * * * * * * * *
     SIOUX RURAL WATER SYSTEM, INC.,  *  1:15-CV-01023-CBK
 4   A NON-PROFIT CORPORATION,        *
                                      *
 5               Plaintiff,           *
                                      *
 6     vs.                            *
                                      *
 7   CITY OF WATERTOWN, A SOUTH       *
     DAKOTA MUNICIPALITY; AND         *
 8   WATERTOWN MUNICIPAL UTILITIES,   *
     AN AGENCY OF THE CITY OF         *
 9   WATERTOWN,                       *
                                      *
10               Defendants.          *
     * * * * * * * * * * * * * * * * * * * * * * * *
11

12

13                    D E P O S I T I O N

14                          O F

15                      JEFF DEVILLE

16                    February 16, 2016

17                    10:55 o'clock, a.m.

18

19

20

21   Taken at:
     Offices of Watertown Municipal Utilities
22   901 Fourth Avenue SW
     Watertown, South Dakota
23

24   Reporter:  Tammy Stolle, RPR

25
```

EXHIBIT B

7

1  A. Right, that's the peak that we have produced.
2  Q. What is the peak capacity of your plant?
3  A. 14.6 is what it's designed for.
4  Q. Okay. I just didn't ask the question the right
5  way.
6  A. Okay.
7  Q. And that will happen sometimes.
8  A. Yep.
9  Q. And so you've still, as we sit here today, you've
10 got about 5 million gallons a day that you can produce over
11 and above what your prior peak day has been?
12 A. In design. I don't know that we've got the water
13 developed to that.
14 Q. The water rights you mean?
15 A. Actually wells in the ground that will produce
16 14.6.
17 Q. What will your wells in the ground produce as we
18 sit here today?
19 A. I couldn't give you an exact number.
20 Q. And I mean, I know that's part of a record some
21 place, but --
22 A. Yeah.
23 Q. -- just in general what can you tell me?
24 A. I would have to say -- I'm trying to refer back
25 to when I did a total on that. I'm thinking maybe 12, I

8

1  think, 12 million a day.
2  Q. So in other words, to ramp up to the 14.6 million
3  gallons per day, you'd need to drill additional wells?
4  A. Correct.
5  Q. Would you also need new piping and pumping
6  stations to do that?
7  A. We would have to do some distribution expansion
8  to move all of that water out of the treatment plant, yes.
9  Q. Have you had any conversation with any individual
10 member of Sioux regarding this lawsuit?
11 A. No.
12 Q. Have you had a conversation with Doug Anderson,
13 the former manager of Sioux, about this lawsuit?
14 A. No, I have not.
15 Q. When was the last time you talked to Doug
16 Anderson?
17 A. The last -- well, let me see. Probably at the
18 rural water -- or at the South Dakota Water Conference, I
19 think in September. Basically said hello to him, how are you
20 doing.
21 Q. September of 2015?
22 A. Yes.
23 Q. And who was he there on behalf of?
24 A. I'm not sure who he's employed with right now.
25 He was vending at a booth.

9

1  Q. Did you have any conversations with Doug Anderson
2  about the provision of water by Municipal Utilities prior to
3  this lawsuit?
4  A. Could you say that again?
5  Q. Sure. Did you have any conversation with Doug
6  Anderson about MU providing water to areas where Sioux had
7  pipes and had service prior to the lawsuit?
8  A. Yes.
9  Q. Just tell me about those.
10 A. I guess probably the last time we talked about
11 that would have been when CHS had annexed into the city and
12 they ran a water line into the office, I guess is I believe
13 what that is out there. That was the first building they put
14 up out there.
15 Q. So Sioux ran a line into the CHS office?
16 A. I believe so, yes.
17 Q. And what did you discuss?
18 A. I had told Doug that, you know, that property is
19 in city limits.
20 Q. And what else?
21 A. Well, that we were the ones that were going to
22 supply them with water.
23 Q. And what did he do as a result of that, if you
24 know?
25 A. I believe he disconnected the line.

10

1  Q. Do you agree with me in that particular area by
2  CHS that Sioux has pipes in the ground?
3  A. Yep, by the maps given us, yes.
4  Q. Do you agree with me that it was their intent
5  when they hooked up CHS's office to provide water to CHS?
6  A. I'm assuming so, they ran the line.
7  Q. What was the basis for you telling Doug Anderson
8  to disconnect the line and that the City of Watertown
9  Municipal Utility was going to provide water to that
10 location?
11 A. Because any other time previous to that, they
12 notified us that they were going to hook somebody up within
13 three miles of the city.
14 Q. And you heard about the discussion about the
15 state statute during Steve's deposition?
16 A. Yes.
17 Q. Is that one of the bases for you telling him
18 that?
19 A. Yes.
20 Q. What was his response when he told you to
21 disconnect, or you told him to disconnect?
22 A. I believe he said that -- it's been a while ago,
23 but he said, well, how am I supposed to know where city
24 limits are and I said, well, it's supposed to be within three
25 miles, and I said that you know that feed mill is within

```
                                                   11
 1   three miles of the city because it's, you know, it's less
 2   than three miles off of Highway 212.
 3        Q.   What did you mean by that, within three miles?
 4        A.   I believe that's what the state statute says is
 5   that that's the perimeter around the city that is first right
 6   of refusal, I guess.
 7        Q.   And is that what you meant by that, within three
 8   miles of the city limits of Watertown, the city would always
 9   have the right of first refusal with regard to a particular
10   customer or area?
11        A.   For a new customer.
12        Q.   How about for an existing customer, if it was
13   annexed into the city?
14        A.   Well, if it's hooked to Sioux Rural, it's hooked
15   to Sioux Rural, if it's actually a customer hooked to them.
16        Q.   We heard about Lew's Fireworks?
17        A.   Correct.
18        Q.   And that was disconnected, correct?
19        A.   That is correct.
20        Q.   And there's also a UPS hookup, Sioux was hooked
21   up to that?
22        A.   Yes.
23        Q.   And you asked Sioux to disconnect that one as
24   well, right?
25        A.   That particular case is that -- you're referring
```

```
                                                   12
 1   to the UPS now?
 2        Q.   Yes.
 3        A.   Okay. UPS ran off a well for a number of years
 4   and they were neighboring with TruGreen Chem Lawn I think it
 5   is, and their well dried up and then they rehooked to the UPS
 6   building and hooked up TruGreen Chem Lawn. That time we told
 7   them that --
 8             MR. HIEB: Who's they?
 9        A.   It would be Sioux Rural Water. I believe I was
10   talking to, I can't think of her first name now, Anderson.
11        Q.   (BY MR. COLE) Brenda?
12        A.   Brenda, yeah. When that was -- when that was
13   happening.
14             MR. HIEB: What's the current status of the UPS
15   building?
16        A.   I don't know if they're on Sioux Rural Water or
17   if they're on a well, I do not know.
18        Q.   (BY MR. COLE) Okay. When you talk about the
19   three-mile area though, when there's a new customer that
20   comes up, you have proceeded under the assumption that the
21   City Municipal Utility has a right of first refusal as to
22   that customer?
23        A.   That is correct.
24        Q.   And when an area is annexed into the city, the
25   same principle, that MU has the right of first refusal with
```

```
                                                   13
 1   regard to that customer, correct?
 2             MR. HIEB: Objection to the extent that calls for
 3   a legal conclusion. Go ahead. If you can ask him what he's
 4   proceeding under as opposed to what reality is, that's the
 5   reason I objected to the question so you know.
 6             MR. COLE: Okay.
 7        A.   If they're a customer, we do not ask them to hook
 8   to us.
 9        Q.   (BY MR. COLE) If -- I'm sorry?
10        A.   If there is a Sioux Rural Water customer that
11   gets annexed, we would not ask that customer to hook to us.
12        Q.   How long -- are there any -- let me back up. Are
13   there any specific examples of where that's happened where
14   the city's annexed and there's a Sioux Rural Water customer
15   and you have not required that Sioux customer to connect?
16        A.   I don't recall any.
17        Q.   Is this a new policy that MU is following?
18        A.   No, this was one that's -- it's not a written
19   policy. It's just that we never intended to pull customers
20   away from them if they're hooked.
21        Q.   What's the basis for that policy?
22        A.   It's just a long-standing policy, one that
23   probably was told to me when I took over this position at,
24   you know, at some point.
25        Q.   So you're telling me that it's MU's policy,
```

```
                                                   14
 1   unwritten policy, that when the city annexes, that MU will
 2   not require a Sioux customer within the city limits to become
 3   an MU customer?
 4        A.   We would -- we would not require it.
 5        Q.   What if the -- and I assume this has happened,
 6   but I don't know, but what if the customer requested that
 7   they go from Sioux to MU, what's the policy on that?
 8        A.   We would follow the state law. They would -- we
 9   would have to buy out and pay the five percent of the gross
10   revenues.
11        Q.   And with regard to that example, that's at the
12   option of MU, not at the option of Sioux, correct?
13        A.   Well, a request would be made to us, so yes, it
14   would be -- we would have the option to say yes or no.
15        Q.   Right, but Sioux doesn't get a vote on MU's
16   decision on whether or not to take that customer, true?
17        A.   I don't know of any way that that would be in
18   place, no.
19        Q.   Has Sioux ever told MU not to hook up a customer
20   and MU not hooked up a customer?
21        A.   Say that again.
22        Q.   Could you read the question back, please?
23             (The requested portion of the record was read
24   back by the court reporter.)
25        A.   I don't recall, no.
```