1

```
 1                  UNITED STATES DISTRICT COURT
                      DISTRICT OF SOUTH DAKOTA
 2                       NORTHERN DIVISION

 3    * * * * * * * * * * * * * * * * * * * * * * * * *
      SIOUX RURAL WATER SYSTEM, INC.,   *  1:15-CV-01023-CBK
 4    A NON-PROFIT CORPORATION,         *
                                        *
 5                    Plaintiff,        *
                                        *
 6      vs.                             *
                                        *
 7    CITY OF WATERTOWN, A SOUTH        *
      DAKOTA MUNICIPALITY; AND          *
 8    WATERTOWN MUNICIPAL UTILITIES,    *
      AN AGENCY OF THE CITY OF          *
 9    WATERTOWN,                        *
                                        *
10                    Defendants.       *
      * * * * * * * * * * * * * * * * * * * * * * * * *
11

12

13                       D E P O S I T I O N

14                              O F

15                         STEVE LEHNER

16                       February 16, 2016

17                        9 o'clock, a.m.

18

19

20

21    Taken at:
      Offices of Watertown Municipal Utilities
22    901 Fourth Avenue SW
      Watertown, South Dakota
23

24    Reporter:  Tammy Stolle, RPR

25
```

EXHIBIT C

23

1 Q. Is this SRF loan to Municipal Utilities, or is it
2 to the City of Watertown, or both?
3 A. Restate your question.
4 Q. Is this SRF loan that we've just been talking
5 about, is that loan to Municipal Utilities or to the City of
6 Watertown?
7 A. **It's to the Municipal Utilities.**
8 Q. Does the debt of the Municipal Utilities count
9 against the debt limit that's set by state law for
10 municipalities?
11 A. **I would guess you'd have to ask the city that.**
12 Q. All right.
13 MR. HIEB: You don't know?
14 A. **I don't know.**
15 Q. (BY MR. COLE) It's okay if you don't know the
16 answer, you don't know.
17 A. **Maybe I shouldn't be telling you to ask**
18 **questions.**
19 By the way, DWSRF stands for Drinking Water State
20 Revolving Fund.
21 Q. Thank you.
22 You talked about the improvements that had been
23 made to your water production facilities, and it was several
24 years ago that you had this $24 million expansion project?
25 A. **Correct.**

24

1 Q. What is your daily water capacity as we sit here
2 today?
3 A. **I'm going to be guessing, but it's around 9**
4 **million a day, but that -- the water superintendent again has**
5 **superior knowledge of that, and that fluctuates depending**
6 **upon weather.**
7 Q. Okay. I'm talking about the total production
8 capacity on your peak day?
9 A. **That you would probably have to ask the water**
10 **superintendent.**
11 Q. Okay. And I've been told at one point in time, I
12 believe, that Watertown had like a 15 million gallon per day
13 peak production ability. Do you know whether it does?
14 A. **I don't know exactly what it is. It's more than**
15 **the 9 million a day. Again, that's probably better answered**
16 **by the water superintendent.**
17 Q. When you talk about 9 million a day, are you -- I
18 thought somebody walked in. Sorry.
19 When you talk about 9 million a day, are you
20 talking about that's the average daily use?
21 A. **That's a -- yes. My water superintendent can**
22 **correct me in future depositions.**
23 MR. HIEB: Off the record.
24 (Off-the-record discussion.)
25 Q. (BY MR. COLE) Okay. As we sit here today,

25

1 you're not aware if there's any updates going onto the 2010
2 comp plan?
3 A. **I'm not aware of any, no.**
4 Q. Let's go to D-21 if we could, please.
5 MR. HIEB: (Handing.)
6 THE WITNESS: Thanks, Jack.
7 MR. HIEB: You're welcome.
8 Q. (BY MR. COLE) And it looks like your attorney
9 has provided Defendant Bates number 21 to you. Do you see
10 that?
11 A. **Yes.**
12 Q. And towards the bottom -- let me back up a minute
13 here. This is part of the 2005 to 2020 comp plan, correct?
14 A. **Okay.**
15 Q. Yes?
16 A. **Yes, it looks like it.**
17 MR. HIEB: Well, just take a look.
18 A. **It looks like it.**
19 MR. HIEB: Okay.
20 A. **It's in sequence.**
21 Q. (BY MR. COLE) I'm not trying to trick you.
22 MR. HIEB: Yes is fine. I just wanted to make
23 sure you had looked at the cover.
24 A. **It appears that it is, yes.**
25 Q. (BY MR. COLE) Okay. And at the bottom of

26

1 Defendant 21 there, it says, "Strategies. Maintain the
2 policy of not providing water service beyond the city limits
3 of Watertown." Do you see that?
4 A. **Yes, I see that.**
5 Q. Do you agree that this is the official policy, as
6 you understand it, of the City of Watertown regarding
7 providing water outside the city limits?
8 A. **Generally, yes.**
9 Q. You limited your answer by saying generally.
10 Explain your answer, if you would, please.
11 A. **We have a couple of agreements for providing**
12 **water to users outside of the city limits of Watertown.**
13 Q. Are you aware of any change in this policy that's
14 set forth by the City of Watertown that changes the policy of
15 not providing water service beyond the city limits of
16 Watertown?
17 A. **This policy is a policy of Watertown Municipal**
18 **Utilities, not the City of Watertown.**
19 Q. Okay. And I'm directing my question specifically
20 to the City of Watertown. Are you aware of any policy that
21 the city has adopted that changes this policy of not
22 providing water service beyond the city limits?
23 A. **I don't know.**
24 Q. Let's go to Defendant 22, if we could, please.
25 And towards the top of that, there's an arrow, it says,

```
                                                    35
 1              MR. HIEB:  Yeah, I just --
 2       Q.     (BY MR. COLE) Okay.  Now the economics of
 3  acquiring existing rural water distribution systems, are they
 4  ever considered when the city provides water such as you have
 5  and as shown in Defendant 871 to 881?
 6       A.     Now when you're -- we don't have a formal formula
 7  for economics.  We get a request from a customer.  We'll look
 8  at, you know, whether or not the city is growing in that
 9  area.  We have lots of requests for water outside of the city
10  limits and typically we don't -- we follow our policy and
11  don't provide water to those folks.
12              If there's a reason, a significant reason to do
13  so, then our board considers it.  We don't base it solely on
14  an economic evaluation of the price to take it there or the
15  revenue back or a payback in terms of -- because it's
16  generally something that's going to be annexed into the city
17  and we have that obligation to serve them when they're
18  annexed.
19       Q.     Do you know how long some of those customers have
20  been served by the city?
21              MR. HIEB:  You're referencing DEF-871?
22              MR. COLE:  Yes.  Sorry.
23              MR. HIEB:  That's okay.
24       A.     It looks like the date is right on the sheet.
25       Q.     (BY MR. COLE) What's the latest, or the longest
```

```
                                                    36
 1  time someone's been served outside the city limits based on
 2  what you see in Defendant 871?
 3       A.     It looks like about 1990 would be the -- well,
 4  1971 would be Western Area Power Administration or the Bureau
 5  of Reclamation.
 6       Q.     Okay.  When you talk about your policy, you're
 7  talking about MU's policy?
 8       A.     Correct.
 9       Q.     And in MU's policy, does it specifically state
10  that you're not going to provide water outside the city
11  limits?
12       A.     Without approval of the board.  There is a
13  provision for approval of the board to do so.  As with all of
14  our policies, the board can approve deviations from it.
15       Q.     Does the city council ever approve MU providing
16  water outside Watertown city limits?
17       A.     I don't believe so, no.  That's a Utility board
18  decision.
19       Q.     Now one of the things that the city and MU has
20  provided to us are answers to request for production of
21  documents, and specifically, Jack, 19.  I'm going to ask him
22  a couple questions about that.
23              MR. HIEB:  Your request to us?
24              MR. COLE:  Yes.
25              MR. HIEB:  Okay.
```

```
                                                    37
 1              MR. COLE:  It's on page seven.
 2              MR. HIEB:  Okay.  (Handing.)  It's in front of
 3  him.
 4       Q.     (BY MR. COLE) And one of the answers here, or
 5  part of the answer, I should be clear on this, it says, "All
 6  of its policies, procedures and/or directives were drafted
 7  pursuant to 9-47."  Do you see that?
 8       A.     Sure.
 9       Q.     Is that your understanding of MU policies,
10  procedures or directives?
11       A.     I don't have a copy of 9-47 in front of me, I
12  guess.
13       Q.     Yeah, I'm just asking, is it your understanding
14  that all of MU's policies, procedures, and/or directives were
15  drafted pursuant to SDCL 9-47?
16       A.     We follow the state law when it comes to
17  annexation, so I'm assuming 9-47 deals with that.
18       Q.     And I'm just -- I'm going to try to get a clearer
19  answer to that, and if you've answered the question, I
20  apologize to you, but are MU's policies, procedures and/or
21  directives drafted pursuant to SDCL 9-47 to your
22  understanding?
23       A.     I would say that not all of our policies are
24  drafted to 9-47 because we have policies for every aspect of
25  our operation and not every aspect of our operation deals
```

```
                                                    38
 1  with 9-47.
 2       Q.     Fair answer.  But with regard to specifically the
 3  acquisition or annexation of areas that include water --
 4  areas served by rural water systems, you have utilized SDCL
 5  9-47 in the drafting of your policies, procedures, and/or
 6  directives, true?
 7       A.     Correct.
 8       Q.     And this question may draw an objection, but
 9  what's your understanding of what SDCL 9-47 does?
10              MR. HIEB:  Well, you did it.  Objection.  Calls
11  for a legal conclusion.  Lack of foundation.
12       Q.     (BY MR. COLE) Just asking your understanding.
13       A.     My understanding is that when we annex a
14  customer, or we annex a property, a customer that's being
15  served by Sioux Rural Water, we have an obligation to buy out
16  what system is there providing service to them and pay, I
17  believe it's five percent gross revenues for five years.
18       Q.     And when that happens, is it your understanding
19  that it's MU's decision on whether or not it will serve a
20  customer that has previously been served by Sioux?
21              MR. HIEB:  Objection.  Calls for a legal
22  conclusion.  Go ahead.
23       A.     Repeat the question.
24              MR. COLE:  Could you read it back, please?
25              (The requested portion of the record was read by
```