1

```
 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF SOUTH DAKOTA
 2                   NORTHERN DIVISION

 3   * * * * * * * * * * * * * * * * * * * * * * * * *
     SIOUX RURAL WATER SYSTEM, INC.,  *  1:15-CV-01023-CBK
 4   A NON-PROFIT CORPORATION,        *
                                      *
 5                 Plaintiff,         *
                                      *
 6     vs.                            *
                                      *
 7   CITY OF WATERTOWN, A SOUTH       *
     DAKOTA MUNICIPALITY; AND         *
 8   WATERTOWN MUNICIPAL UTILITIES,   *
     AN AGENCY OF THE CITY OF         *
 9   WATERTOWN,                       *
                                      *
10                 Defendants.        *
     * * * * * * * * * * * * * * * * * * * * * * * * *
11

12

13                   D E P O S I T I O N

14                         O F

15                   HEATH THOMPSON

16                   February 17, 2016

17                   9:35 o'clock, a.m.

18

19

20

21   Taken at:
     Offices of Watertown Municipal Utilities
22   901 Fourth Avenue SW
     Watertown, South Dakota
23

24   Reporter:  Tammy Stolle, RPR

25
```

EXHIBIT

4

tabbies

---

**7**

1    A.    Or sorry, no.

2    Q.    Okay.  What is your educational background?

3    A.    A high school graduate from Howard High.

4    Q.    What year?

5    A.    1989.  A year and a half at DSU, a year at

6  Morningside College in Sioux City.

7    Q.    Any degrees?

8    A.    Went back later on online, finished a two-year

9  associate of arts in business.

10   Q.    From which school?

11   A.    XE University which is a subsidiary of Phoenix

12  university -- University of Phoenix.

13   Q.    Okay.  And what was that -- what was the major?

14   A.    It's associate in arts in business.  It was a

15  business -- two-year associate of business degree.

16   Q.    Two-year business degree?

17   A.    Correct.

18   Q.    All right.  Tell me about how you came to be the

19  general manager at Sioux.  Did you apply for the job?

20   A.    Yes.

21   Q.    How did you find out about it?

22   A.    It was listed in newspapers and I believe online

23  also.

24   Q.    Okay.  So you weren't -- the reason I ask that is

25  being at Kingbrook right next-door, I thought maybe you might

---

**8**

1  have been approached by a board member or somebody to --

2    A.    No.

3    Q.    Okay.  Prior to becoming the general manager at

4  Sioux, did you have any interaction with the Sioux Rural

5  Water System or its employees?

6    A.    No.

7    Q.    So while you were at Kingbrook, there was no back

8  and forth between Sioux and Kingbrook on anything?

9    A.    Not with me.

10   Q.    Okay.  Who would have been the person at

11  Kingbrook that would have had that type of back and forth?

12   A.    Randy Jencks and Jolene King for a short period

13  of time.

14   Q.    Who are those individuals?

15   A.    Randy Jencks is general manager of Kingbrook

16  Rural Water, and Jolene King is the office manager.

17   Q.    We had produced as part of the production a

18  document marked DEF 396, and I'll tell you where this came

19  from.  This came from the South Dakota Association of Rural

20  Water Systems.  It's off of their website.  Is this a map

21  that you've seen before?

22   A.    Yes.

23   Q.    Do you know -- when I look at this map, it shows

24  Sioux -- it shows a territory depicted in red with the word

25  "Sioux" in the middle of it.  Do you see that?

---

**9**

1    A.    Yes, I do.

2    Q.    And then beneath that there is an area depicted

3  in brown with the word "Kingbrook" depicted on it?

4    A.    Yes.

5    Q.    Do those areas as depicted to your knowledge

6  generally reflect the service territories of those two rural

7  water providers?

8    A.    I believe it's a picture of a general idea of

9  where things are at.

10   Q.    Obviously this map is pretty small.  It would be

11  -- you would need something blown up to see the actual

12  boundaries with any degree of accuracy, is that fair?

13   A.    I'm trying to qualify your answer for you to say

14  that these are generally the boundaries that represent the

15  service areas to your knowledge?

16   A.    I think it's a picture to give you a general idea

17  of where the systems lie in the state.

18   Q.    Well, and in your opinion at least as to Sioux

19  and Kingbrook, does that accurately reflect a general idea of

20  where their service territories run?

21   A.    It's a general idea of where they lay in

22  correlation with each other, yes.

23   Q.    Okay.  Well, and does it generally reflect the

24  actual service territories claimed by those two entities to

25  your knowledge?

---

**10**

1    A.    Like you said before, it's pretty ambiguous, but

2  it's a close idea on a map where those systems are.

3    Q.    Okay.  I mean, in looking at this, knowing what

4  you know about those two systems, do you look at it and say,

5  "Well, that's just wrong because, you know, Sioux's territory

6  goes over here or doesn't go there," anything of that nature?

7    A.    No.

8    Q.    Okay.  Do you know where the information came

9  from that the South Dakota Association of Rural Water Systems

10  used to put this map together?

11   A.    Not specifically, no.

12   Q.    Well, generally do you know where it came from?

13   A.    I would assume base maps.

14   Q.    Okay.  When you say a base map, what is that?

15   A.    A map of the piping of the rural water systems.

16   Q.    All right.  You're familiar with the various

17  forms that rural water systems can take in terms of how

18  they're organized?

19   A.    Generally, yes.

20   Q.    Okay.  What is your familiarity, or what are you

21  aware of, the different types?

22   A.    Well, in Sioux's behalf, we're a 501(c)(12) not

23  for profit corporation governed by a board of directors.

24  Kingbrook was the same way.

25   Q.    Right.  What are the other types of organizations

---

11

1    that provide rural water service in South Dakota to your
2    knowledge?
3        A.    There would be water districts.
4        Q.    Are they called water user districts or --
5        A.    Could be.
6        Q.    Okay.
7        A.    Could be.
8        Q.    And those are the two that I'm -- those are the
9    two forms that I am familiar with.  I didn't know if there
10   were any others.  Are there any others that you know of?
11       A.    Not specifically that I could answer.
12       Q.    So is it fair to say that at least as far as you
13   know, when we look at DEF 396 and the various systems that
14   exist around South Dakota, those either take the form of a
15   501(c)(3), or they take the form of a water district created
16   pursuant to state law?
17       A.    As far as I know.
18       Q.    Okay.  Now my understanding is that the water
19   districts which are created pursuant to state law, the
20   process for that involves basically putting your territory on
21   a map and sending it into Pierre and having somebody at the
22   state approve that territory.  Are you familiar with that
23   process?
24       A.    I think that's correct.
25       Q.    Okay.  Now with respect to the 501(c)(3) form --

12

1    or the 501(c) form that Sioux uses to govern its entity, is
2    there any kind of a territory map that sets geographical
3    boundaries?
4        A.    No.
5        Q.    So to your knowledge, has Sioux ever developed
6    any kind of a geographical boundary on a map that it uses to
7    define its territory?
8        A.    The base map would be the -- would be where we
9    have pipes in the ground.
10       Q.    Okay.  And you've produced for us a map in
11   discovery that shows where Sioux has pipes in the ground?
12       A.    Yes.
13       Q.    That tells me where the pipes are, but it doesn't
14   tell me with any degree of certainty where the boundaries
15   are.  So I guess what I'm asking is, has Sioux to your
16   knowledge ever taken it a step further and said, "Here's
17   where our pipes are and here's where we claim our boundaries
18   are?"
19       A.    No.
20       Q.    All right.  I took the liberty of blowing up the
21   base map because -- or having it blown up because as of
22   yesterday --
23             (Todd Kays entered the deposition.)
24             MR. HIEB:  I'll tell you what, let's go off the
25   record a second.

13

1             (A break was taken at 9:50 o'clock, a.m. to take
2    Todd Kays' deposition.)
3             (Deposition was resumed at 10:33 o'clock, a.m.)
4        Q.    (BY MR. HIEB)  We'll go back on the record and
5    resume your deposition.
6             I'm showing you a blown-up copy of a map that was
7    produced by Sioux with a production number Sioux 2535.  I
8    will tell you that I'm going to go ahead and mark this as
9    Exhibit 1.  Do you want to mark it?  I'll explain why in a
10   minute I'm doing that.
11            (Exhibit No. 1 was marked.)
12       Q.    (BY MR. HIEB)  I've marked as Exhibit 1 this map
13   that as I said has a production number of 2535 from Sioux.
14   The one thing that I think was added by us, there's a legend
15   down here that you see with some color coding that relates to
16   the size of the mains, and I think that that's something we
17   added to it.  That's why this isn't an actual identical
18   reproduction of what you produced.  Are we on the same page?
19       A.    Okay.
20       Q.    Okay.  First of all, I'd like you to take a look
21   at that and tell me, when you talked about the base map, is
22   Exhibit 1 generally what you're talking about when you say
23   base map for Sioux?
24       A.    Yes.
25       Q.    Okay.

14

1        A.    If this was the base map that we gave you, yes.
2        Q.    It is the base map you gave me.  We simply
3    added --
4        A.    The colors.
5        Q.    -- the color to identify the sizes of the lines
6    that you've got in the ground.  Does that make sense to you?
7        A.    Yes.
8        Q.    All right.  And when you look at the color coding
9    with the sizes of the lines as you see there, as you look at
10   this map, does that generally appear to be an accurate
11   depiction of Sioux's lines, both in location and size from
12   what you can tell?
13       A.    Yes, without, you know, picking through mile by
14   mile.
15       Q.    Right.  Nothing about it appears to be odd or out
16   of the ordinary as you look at it here?
17       A.    Nothing strikes me that way, no.
18       Q.    Okay.  Do you know the history of Sioux and sort
19   of the development of its system?
20       A.    It would be very rough.
21       Q.    Okay.  And I'm going to go over your rough
22   understanding of it with you.  Who would have a better
23   understanding of that history?
24       A.    DGR would have a very -- should have a very good
25   understand -- well, they would have an understanding.

15

```
 1      Q.    DGR is the engineering firm that Sioux at least
 2  uses at this time to update its base map?
 3      A.    Uses.
 4      Q.    Right.  And to your knowledge, has DGR been the
 5  entity that Sioux has used since its inception?
 6      A.    Yes, I believe so.
 7      Q.    Okay.  Tell me why would it be that DGR would
 8  have knowledge of the history of the development of the Sioux
 9  system?  What does DGR do for Sioux?
10      A.    They are our -- they're our engineer.
11      Q.    Right.
12      A.    From -- I'll give you an example if I may?
13      Q.    You bet.
14      A.    Our current 2015 piping improvement project which
15  we have is a composite of information they have and basically
16  outlines the improvements that we're going to make to the
17  system.
18      Q.    When DGR does engineering work for Sioux --
19  here's what I'm asking.  Obviously part of what they do would
20  be what I would call CAD based work to update or create maps
21  of the kind we see here in Exhibit 1, correct?
22      A.    Correct.
23      Q.    In addition, do they also do engineering work
24  that relates to the laying and the locating of the lines?
25      A.    Yes.
```

16

```
 1      Q.    So if that's the case, then if DGR has an
 2  adequate archive of the work they've done for Sioux, we could
 3  go back and we could see when -- basically whenever Sioux
 4  added to its system, DGR would have plans that would show
 5  those additions and when they occurred and what was done?
 6      A.    I believe so.
 7      Q.    Assuming that they've got that information
 8  archived?
 9      A.    Correct.
10      Q.    Does Sioux keep that information archived?
11      A.    There are some of it there, yes.  I mean, I won't
12  tell you that every piece is there.
13      Q.    Sure.  Here's what I'd like to know then.  Based
14  upon the knowledge that you do have about the history of the
15  Sioux system, where did the Sioux system get its start to
16  your knowledge?
17      A.    In this general area.  I mean, as far as exactly,
18  I can't --
19      Q.    Okay.  Well, do you have any idea where the first
20  -- let's do it this way.  Where does the water come from that
21  supplies Sioux's network?
22      A.    Currently it comes from the Castlewood treatment
23  plant.
24      Q.    All right.  And you've pointed to a spot with the
25  word "Castlewood."  Is that the -- it's right next to the
```

17

```
 1  Town of Castlewood, it's right to the west of the Town of
 2  Castlewood on the map?
 3      A.    Correct.
 4      Q.    And has that always been the location of the
 5  treatment plant?
 6      A.    No.
 7      Q.    Where was the treatment plant located before it
 8  was located in Castlewood?
 9      A.    Originally the Sioux treatment plant which is
10  still in use.
11      Q.    Which is where?
12      A.    Right here.
13      Q.    You're pointing to a spot south of the City of
14  Watertown.  Was that the original treatment plant for Sioux?
15      A.    One of them.
16      Q.    Where was the other original treatment plant?
17      A.    Hayti.
18      Q.    And you're pointing to a spot down here just
19  north of the Town of Hayti?
20      A.    Correct.
21      Q.    And has -- is all of the water that's supplied by
22  Sioux run through a treatment plant at some point owned by
23  Sioux?
24      A.    Currently.
25      Q.    Has that always been the case, to your knowledge?
```

18

```
 1      A.    It gets into the definition of treatment plant.
 2  It's always been treated.  I mean, you have chlorination.
 3  You have --
 4      Q.    Right.  My question is this.  I'm trying to do
 5  this at about a second grade level because that's about my
 6  level of understanding of water treatment and distribution.
 7            If I go back in time to when Sioux was created,
 8  and when was that to your knowledge?
 9      A.    1974.
10      Q.    So if you go back to 1974, when --
11      A.    It's --
12      Q.    Roughly.  If I go back to 1974 when Sioux was
13  originated and I got in the pickup with the then manager of
14  Sioux and told him, "Go show me what assets Sioux has in
15  terms of facilities, etc.," to your knowledge where would he
16  have taken me and what would he have shown me?
17            MR. COLE:  Object to form.
18      Q.    (BY MR. HIEB)  Well, go ahead, to your knowledge.
19            MR. HIEB:  What's the -- I can rephrase.
20            MR. COLE:  Speculation and conjecture.
21      Q.    (BY MR. HIEB)  And I said to your knowledge.  I'm
22  not assuming -- I'm not asking you a leading question.  I'm
23  not assuming you know anything.  I want to know what you do
24  know, okay?
25            So to your knowledge, based on your knowledge of
```

**59**

1    A.    I believe so, yes.

2    Q.    Okay.  I found what appears to be the entire file

3    for the Boerger farm --

4    A.    Okay.

5    Q.    -- in the production.  And, Jeff, you can jump

6    in.  Was the entire file for Lew's produced also?

7         MR. COLE:  I believe so.  Anything that we

8    received on that would have been produced to you.  I can go

9    back and look and see if there's anything else.  I certainly

10   don't think there is.

11   Q.    (BY MR. HIEB)  Okay.  What's in a disconnect

12   file?

13   A.    Well, there would be the, you know, initial

14   paperwork down to the, in this case, when the meter was read

15   out and the final bill was sent, and like that receipt that

16   you showed me --

17   Q.    Yep.

18   A.    -- was probably in there.

19   Q.    Okay.  Well, here's what I'm going to show you.

20   There are documents marked Sioux 122 through Sioux 127.

21   Would these be the documents that are likely from the

22   disconnect file for Lew's Fireworks?

23   A.    I believe this is for sure.  This would be.

24   Q.    Look them over for now and then I'll go through

25   them one at a time.

**60**

1    A.    I would think so, yes.

2    Q.    Okay.

3    A.    I mean, I --

4    Q.    I'll represent to you that --

5    A.    I don't know about -- but more than likely.

6    Q.    Right.

7    A.    I'd have to look.

8    Q.    Sure.  I'll represent to you that documents

9    marked Sioux 122 through Sioux 127 were all produced from

10   Sioux's files.

11   A.    Okay.

12   Q.    And they all appear to relate to Lew's Fireworks.

13   Would you agree with that?

14   A.    Yes.

15   Q.    And it appears to me that Sioux invoiced the City

16   of Watertown as you can see on Sioux 122, correct?

17   A.    Yes.

18   Q.    That the City of Watertown paid the amount

19   invoiced to Sioux as you can see on Sioux 123?

20   A.    Yes.

21   Q.    It looks like Sioux 124 is just a tape from an

22   adding machine or a calculator with some handwriting on it

23   that calculates the 30-year depreciation amount on the

24   infrastructure Sioux had associated with Lew's.  Does that

25   look right?

**61**

1    A.    That looks right.

2    Q.    Sioux 125 is a -- well, what is Sioux 125?

3    A.    That looks like the charges to Lew's Fireworks to

4    hook up.

5    Q.    Based --

6    A.    As far as inventory goes, parts.

7    Q.    Right.

8    A.    And a membership fee and then --

9    Q.    Sure.

10   A.    -- some digging and labor technician.

11   Q.    Basically 125 appears to me to be a laundry list

12   of the costs of the infrastructure associated with Lew's that

13   Sioux had into the deal, is that --

14   A.    I'm assuming it's a service line that would have

15   went to the place.

16   Q.    Which is what Sioux was invoicing Watertown for

17   in Sioux 122, right?

18   A.    Okay.

19   Q.    Does that look right to you?

20   A.    It's -- yes, that sounds right.

21   Q.    Okay.  And then Sioux 126 appears to be a

22   document in which someone from Sioux calculated five years of

23   income on the Lew's Fireworks account, correct?

24   A.    A couple years.

25   Q.    Well, if you look at the very bottom, what does

**62**

1    it say there?

2    A.    Oh, they took a composite.  Okay.

3    Q.    Does that look right?

4    A.    Yes.

5    Q.    All right.  Which is part of the calculation that

6    went into the amount invoiced here on Sioux 122, right?

7    A.    Yes.

8    Q.    If you look at the second line there.

9    A.    Yes, I see this and that.

10   Q.    Okay.  So what it looks like to me is that if I

11   went to the file at Sioux for Lew's Fireworks that these came

12   out of, you've got the invoice that Sioux sent to the city,

13   which is Sioux 122, and then the documents behind it, Sioux

14   123 through 127, are sort of the homework that proves --

15   A.    Yes.

16   Q.    -- the amount on the invoice, is that fair?

17   A.    Fair.

18   Q.    All right.  Do you have any knowledge or

19   understanding about why it is that Lew's Fireworks wanted to

20   be annexed into the City of Watertown and/or receive water

21   service from the City of Watertown?

22   A.    My general understanding was it was for fire

23   protection.

24   Q.    And was that something that Sioux was capable of

25   providing to Lew's?

**63**

1   A.   We don't provide fire protection.
2   Q.   All right.  So -- well, so in other words, you
3   weren't willing to provide Lew's with the fire protection
4   they claimed they wanted or needed?
5   A.   I don't know about that time, but I mean, if you
6   were talking about present day today and you came to me and
7   asked me for fire protection, I would say, "No, we don't have
8   fire protection."
9   Q.   All right.  Any reason to believe that things
10   were any different back when Lew's was looking for fire
11   protection?
12   A.   I would have no reason to believe that, no.
13   Q.   All right.  So if Lew's came to Sioux right now
14   hypothetically and said, "I want you to provide me fire
15   protection at this building and I want to hook up to Sioux,"
16   your response as the manager would be?
17   A.   We don't provide fire protection.
18   Q.   "I'm not going to do that for you?"
19   A.   Sioux Rural Water does not provide fire
20   protection.
21   Q.   All right.  The second account on Sioux 121 that
22   you've got listed there is a previous Sioux account now on
23   Watertown utilities is CHS elevator.  Do you see that?
24   A.   Yes, I do.
25   Q.   Are you familiar with the CHS elevator plant or

**64**

1   fertilizer plant?
2   A.   From a drive by sense.
3   Q.   Okay.  Were you involved in Sioux's operations at
4   the time that Sioux had hooked up the CHS plant?
5   A.   No.
6   Q.   There's been testimony, and I think it would be
7   borne out by the records, that the CHS fertilizer plant is an
8   entity that exists within the city limits of Watertown.  Do
9   you have any reason to disagree with that?
10   A.   No.
11   Q.   And do you know what kind of hookup was provided
12   to CHS by Sioux?
13   A.   I'm assuming it was a standard meter pit,
14   three-quarter inch meter, inch and a half service line.
15   Q.   Okay.  Do you have any knowledge of what went on
16   between Sioux and the City of Watertown that resulted in
17   Sioux discontinuing that service and the City of Watertown
18   picking up that service?
19   A.   No.
20   Q.   On exhibit --
21   A.   Well --
22   Q.   Go ahead.
23   A.   Yesterday's depositions.  Just --
24   Q.   Okay.  What you heard yesterday?
25   A.   Correct.  You know, and when I asked the

**65**

1   question, they said, well, they dug them in and then the guy
2   came back and said no, I can't be hooked to you guys, so
3   whatever, and I don't know what it says there, I don't
4   remember that verbatim.
5   Q.   Okay.  If you look at Exhibit 1, can you just
6   identify for me where the CHS plant is to the best of your
7   knowledge on this exhibit?
8   A.   It might take me a minute.  Now I wish I would
9   have brought my readers.
10   Q.   See if these help.  (Handing.)
11   A.   Actually they do.
12   Q.   Yeah, it's not the first time I've done that.
13   A.   In this area right here.  (Indicating.)
14   Q.   Okay.  Give those back because now I need them.
15   A.   (Handing.)
16   Q.   There's a little yellow circle with a 12 in the
17   middle of it --
18   A.   Yep.
19   Q.   -- on Exhibit No. 1, and do you know what that
20   represents, that 12?
21   A.   It's a section number.
22   Q.   Okay.
23   A.   I believe.  Yes.
24   Q.   There you go.  So Township 116 north, range 53
25   west in Section 12?

**66**

1   A.   Northeast.
2   Q.   Up in the northeast corner of that section is
3   roughly where that CHS plant is located?
4   A.   Correct.
5   Q.   And do you know whether at the time Sioux hooked
6   up the CHS plant, the CHS plant was already within the city
7   limits of the City of Watertown?
8   A.   I don't know.
9   Q.   Okay.  Your current policy at Sioux, is your
10   current policy at Sioux to hook up anyone within the city
11   limits of Watertown?
12   A.   I'm unaware of a policy that says I couldn't.
13   Q.   Okay.  And I'm not asking about written policies
14   necessarily, but I'm going to give you a hypothetical.  If I
15   owned a house some place within the city limits of Watertown
16   and I decided I wanted Sioux's water service instead of the
17   city's water service, and I called you up and said, "Can you
18   hook me up," and you had a line that was across the street
19   from me, would that be something you would do?
20   A.   I would entertain it.
21   Q.   Okay.  Would you have to talk to somebody, or
22   would it just be your decision as the manager?
23   A.   I believe that would fall under my decision.
24   Q.   Okay.
25   A.   My discretion.

```
                                                              67
 1      Q.      What factors would factor into your entertainment
 2  of doing that?
 3      A.      I would have them fill out the paperwork that we
 4  submitted through DGR, our engineering model, see if their --
 5  a capacity existed and what it would take.
 6      Q.      Okay.
 7      A.      So that they have an idea what it would cost them
 8  to hook up.
 9      Q.      Okay.  And in this case, do you know whether --
10  do you know what kind of water needs the CHS plant had?
11      A.      No.
12      Q.      Do you know what kind of water usage the CHS
13  plant runs?
14      A.      No.
15      Q.      The CHS transaction essentially occurred under
16  your predecessor's --
17      A.      Correct.
18      Q.      -- watch?
19              All right.  The third one on there is the Tim and
20  Darrell Boerger, now Titan Machinery, account?
21      A.      Correct.
22      Q.      Once again, are you familiar with how that hookup
23  went from being a Sioux hookup to being a Municipal
24  Utilities' hookup?
25      A.      When I first came, it was all in March of '13,
```

```
                                                              68
 1  they were building the Titan Machinery program there, and
 2  there were a lot of things going on at the time at Sioux, of
 3  course you can imagine.
 4      Q.      Yeah.
 5      A.      But the question had been posed who's serving
 6  that because we had a line down to the Boerger farm.  We did
 7  stop out.  We were doing some locates, some of the
 8  contractors there.  I did pose that question.  I believe
 9  eventually I ended up visiting with Jeff about that, Jeff
10  DeVille about that.
11      Q.      Okay.
12      A.      That hookup.
13      Q.      And what did that conversation entail?
14      A.      Just that, you know, that Watertown had -- was
15  planning on serving that is best of my recollection.  It was
16  a phone conversation.  I said, well, I'm not so sure that
17  Sioux doesn't, you know, have the right to serve that area.
18  We talked back and forth, and briefly, you know, it wasn't
19  very detailed and that, you know, that's a matter probably
20  for attorneys to decide.
21      Q.      And as I understand it then, the attorneys got
22  involved, is that fair?
23      A.      That's fair.
24      Q.      I'm going to show you what have been marked Sioux
25  551 through Sioux 546, and I know that's going backwards, but
```

```
                                                              69
 1  that's how you have to read them in order to read this e-mail
 2  chain between Todd Boyd and Stan Fox.
 3      A.      Okay.
 4      Q.      I'd like you to review those e-mails and then
 5  I'll have some questions for you.
 6              (Witness reviewing documents.)  Backwards and
 7  bottom to top, correct?
 8      Q.      Yeah, if you're going to read them
 9  chronologically.
10              (Witness reviewing documents.)
11      Q.      Have you had a chance to review Sioux 546 through
12  551?
13      A.      Yes.
14      Q.      And are these e-mails that you've seen prior to
15  today?
16      A.      Yes.
17      Q.      It appears to me that the way that Titan
18  Machinery/Boerger farm account discussions occurred was that
19  you on behalf of Sioux had a conversation with Jeff DeVille
20  on behalf of Watertown Municipal Utilities about who had the
21  right to serve the Boerger farm which was now going to be the
22  Titan building, correct?
23      A.      Correct.
24      Q.      And I think you indicated previously that you
25  decided that's a better discussion that should be had between
```

```
                                                              70
 1  the attorneys, right?
 2      A.      I believe Jeff had made that comment, and I said
 3  yeah, fine, that's what they're there for.
 4      Q.      And then it looks like that discussion was had at
 5  least in part through a series of e-mails which are marked
 6  Sioux 546 through 551 between Stan Fox and Todd Boyd.  Would
 7  you agree with that?
 8      A.      Um-huh.  Yes.  Sorry.
 9      Q.      Okay.  Which culminates with an e-mail from Todd
10  Boyd to Stan Fox on Sioux 546 which states, "Sioux Rural
11  Water makes no claim for the water service to the new Titan
12  building."  Would you agree with that?
13      A.      That's what the -- yes.
14      Q.      Well, did Mr. Boyd make that representation
15  without the authority of Sioux?
16      A.      I don't believe so.  I mean, chronologically it's
17  a whole different kettle of fish.
18      Q.      Well, you would agree with me that Mr. Boyd was
19  representing Sioux --
20      A.      Yes.
21      Q.      -- at that time?
22      A.      Yes.
23      Q.      And he was representing Sioux with respect to
24  this issue in his discussions with Mr. Fox?
25      A.      Yes.
```

```
                                                      71
 1       Q.      And it looks like from the e-mail sent on Sioux
 2   547, it indicates that Mr. Boyd was meeting with -- or going
 3   to be meeting with the board or talking to the board about
 4   this issue to find out what the board's thoughts were,
 5   correct?
 6       A.      Yes.
 7       Q.      And did he do that?
 8       A.      Yes.
 9       Q.      There are minutes marked Sioux 2391 through Sioux
10   2394.  I'll just show you the last page which is Sioux 2394
11   and if you would just read the last bullet point.
12       A.      It says, "Attorney Boyd explained the current
13   status of the water service to a site located along the east
14   border of Watertown for the new Titan machine building.  The
15   system is unable to make any claim for compensation under
16   either state or federal law."
17       Q.      Okay.  And was that the information that Attorney
18   Boyd gave to the board at that meeting?
19       A.      They were -- there's more information that I
20   don't believe is contained in those minutes.  I think there
21   are other phone conversations that were held that aren't
22   represented in the e-mails too.
23       Q.      Okay.  But at the end of the day, Mr. Boyd in
24   representing Sioux sent an e-mail to Stan Fox who represented
25   Municipal Utilities saying Sioux's not going to make any
```

```
                                                      72
 1   claim to this building, right?
 2       A.      Yes.
 3       Q.      And --
 4       A.      In the print, yes.
 5       Q.      Right.  Well, were there any --
 6       A.      No.  Yes.
 7       Q.      Okay.  Well, to me that -- from looking at
 8   things, that was pretty much the end of the story with
 9   respect to Titan.  Is that fair?
10       A.      Yes.
11       Q.      Do you have any knowledge of what Titan's needs
12   are for water?
13       A.      No, they never approached us.
14       Q.      Okay.  Do you have any knowledge, as you sit here
15   today knowing what you know about the Titan operation, do you
16   believe that Sioux has sufficient capacity to supply Titan
17   with its needs?
18       A.      Not all of their needs, no.
19       Q.      So in order for Sioux to supply Titan, Sioux
20   would have to supply part of it and then Titan would have to
21   get the rest of its water some place else?
22       A.      It's my assumption based on the fact I don't know
23   what their needs are.
24       Q.      All right.  And I appreciate that.  But knowing
25   what you know about a commercial operation, the nature of
```

```
                                                      73
 1   which Titan is running out there, what parts of their water
 2   needs do you believe you would be unlikely to be able to
 3   provide?
 4       A.      I don't know if they have fire protection, I've
 5   never been in the building, that would be one.  Two, they
 6   have a truck wash, I don't know what the requirements of that
 7   are.  And three, I don't know the general layout.  I mean, if
 8   they've got bathrooms, showers, sinks, hot tubs, I don't know
 9   what they have.
10       Q.      Okay.  Back to Sioux 121 which is this list that
11   either you prepared or provided --
12       A.      Yes.
13       Q.      -- the information to have prepared.
14       A.      And I very well may have.  It's just been --
15       Q.      Yeah, I get it.
16       A.      So...
17       Q.      The rest of the list is included under a heading
18   entitled Kittelson's addition accounts on Sioux Rural Water?
19       A.      Yes.
20       Q.      Why did you list those on here?
21       A.      It goes back to the Alice Madline hookup which we
22   -- was talked about yesterday also.  When we had initially
23   sent in the list, the three-mile list --
24       Q.      Yep.
25       A.      -- for approval by the MU, is that what it is?
```

```
                                                      74
 1       Q.      Yeah, that's fine.
 2       A.      That one came back with a red flag due to the
 3   fact that there was a group of individuals that had
 4   approached the city about being annexed into the City of
 5   Watertown, and it became a little bit problematic for me at
 6   that point in time that we had an entire addition that may be
 7   annexed into the City of Watertown, and if the same process
 8   that happened at Titan Machinery was applied to that, now
 9   we're not talking about a single hookup, but an actual entire
10   addition and --
11       Q.      Would you agree with me that as things currently
12   sit, Watertown Municipal Utilities does not supply water to
13   anyone within Kittelson's addition to your knowledge?
14       A.      That's correct.
15       Q.      Okay.  And so --
16       A.      And at the end of the day that e-mail showed --
17   not to talk over you.
18       Q.      Go ahead.
19       A.      But yes.
20       Q.      The e-mail from Jeff that said go ahead and hook
21   up Alice Madline or whoever you want to in Kittelsons?
22       A.      Well, the time frame to get the annexation in
23   process and everything and not to hold her up, but there
24   again, the conundrum lies in hooking up another person who
25   may be gone from the mix next week, next year, six months
```

75

1  from now if that group of people decides to be annexed in.
2      Q.   Right.  So I guess to make sure I'm clear, when
3  we look at Sioux 121, was that an attempt on your part to
4  provide a somewhat complete list of the various accounts that
5  either used to be served by Watertown -- or used to be served
6  by Sioux and are now served by Watertown, plus some accounts
7  that you think might be in jeopardy?
8      A.   What was the first --
9      Q.   Well, the purpose of -- when you put together
10 Sioux 121, --
11     A.   Yeah.
12     Q.   -- how did you decide what information to put on
13 it?
14     A.   It was a starting point.
15     Q.   Well, where's the ending point?
16     A.   I don't know.
17     Q.   Well, what I'm here to do --
18     A.   Let me --
19     Q.   Go ahead.
20     A.   My answer to that is, you know, when I look at
21 things like the five-year plan, ten-year plan, I don't know.
22     Q.   I get that.  As we sit here today though, in the
23 Complaint that's been filed against both the city and
24 Municipal Utilities, that's an allegation that the city and
25 Municipal Utilities have taken certain customers from Sioux.

76

1  Do you understand that allegation?
2      A.   Yes, I do.
3      Q.   And as I look at it, the three that you've
4  identified that have been taken to this point are the first
5  three listed on Sioux 121 to your knowledge?
6      A.   They were previously served by Sioux, correct.
7      Q.   Right.  Is that fair?
8      A.   Correct.
9      Q.   Do you know of any others as you sit here today?
10     A.   No.  That were previous Sioux accounts, no.
11     Q.   Correct.  I'm talking about customers that were
12 Sioux customers --
13     A.   Correct.
14     Q.   -- and that are now --
15     A.   MU customers.
16     Q.   -- MU customers?
17     A.   Correct.
18     Q.   Right?
19     A.   Yes.
20     Q.   And so those three would be the only three that
21 you are aware of as you sit here today that fall under that
22 category?
23     A.   Yes.
24     Q.   The second category that I'll talk about are
25 customers that are currently Sioux customers, but that based

77

1  upon your view of the comprehensive plan or of discussions
2  that people may have had regarding annexation, may not be
3  Sioux customers in the future if the City of Watertown
4  annexes them and starts to provide them with water.  Okay, do
5  you understand that category?
6      A.   Yes.
7      Q.   And would that be basically what we see here on
8  Sioux 121 as the Kittelson addition?
9      A.   In this Kittelson addition specifically, this
10 would be a number of people, had the annexation gone through,
11 that MU would have hooked up for their own customers, much
12 like the Boerger farm.
13     Q.   Right.  Well, which presupposes that those
14 individuals would have wanted to be hooked up to Municipal
15 Utilities, correct, in that hypothetical?
16         MR. COLE:  Object to form, speculation and
17 conjecture.
18     Q.   (BY MR. HIEB)  Do you understand what I'm talking
19 about?  We talked about the first category of customers,
20 those which you believe were formerly Sioux customers which
21 are now WMU customers?
22     A.   Right.
23     Q.   Those were the first three on Sioux 121, correct?
24     A.   Yes.
25     Q.   The second group on Sioux 121 are those in the

78

1  Kittelson addition which are not currently hooked up, nor
2  have they ever been hooked up to Watertown Municipal
3  Utilities' water, right?
4      A.   Yes.
5      Q.   But you put them on the list because there is a
6  concern based upon discussions or other information you've
7  seen that they may one day in the future become hooked up to
8  Watertown Municipal Utilities which will then involve them no
9  longer being Sioux customers, right?
10     A.   Yes, they may want to.
11     Q.   Right.  So that's why they're on this list?
12     A.   Um-huh.
13     Q.   Correct?  Yes?
14     A.   Yes.
15     Q.   Okay.  And in that category, those people that
16 are not WMU customers, have never been WMU customers, but
17 there's some reason to believe they may in the near to
18 distant future become WMU customers, other than the Kittelson
19 addition accounts that we see on Sioux 121, are there any
20 other accounts that fit into that category to your knowledge
21 as you sit here today?
22     A.   I could use the three-mile radius to argue that
23 everyone in that could be on that category.
24     Q.   Fair enough.  Okay.  Because it's basically just
25 speculation as we sit here right now, correct, about what

---

79

1  falls into that category?

2      A.   **No, I mean it's -- I don't know how -- I know who**

3  **we have for customers now.**

4      Q.   Sure.

5      A.   **Okay.  If they fall within that three-mile radius**

6  **and with the current practice and they voluntarily annex**

7  **themselves because I've heard that it's not been a forced**

8  **annexation.**

9      Q.   Right.

10     A.   **And then they decide that they wish to have MU**

11 **services, because I'm assuming MU is not going to give them**

12 **sewer, power, streets, curb and gutter and not water.  It**

13 **will be the whole package or nothing.  Is that --**

14     Q.   Well, I don't know if that's true.  You heard,

15 you know, Jeff's testimony yesterday that the current

16 practice is not to force anyone to hook up to the water

17 system, even if they become a part of the city.

18     A.   Okay.

19     Q.   It's only if they want to --

20     A.   Right.

21     Q.   -- that they do that.  So go ahead.

22          Here's my point.  In that second category, you've

23 listed the Kittelson addition accounts that are on Sioux 121?

24     A.   **Um-huh.**

25     Q.   Have you sat down and put together any other

---

80

1  lists that would list additional accounts falling within this

2  category?

3      A.   **Yes.**

4      Q.   Have those been provided to me?  Either one of

5  can you answer.

6          MR. COLE:  I don't know, Jack.

7      Q.   (BY MR. HIEB)  Okay.  Have you provided them to

8  your attorney?

9      A.   **I believe so.**

10     Q.   Okay.

11     A.   **But as long as I'm talking about the same thing.**

12 **I'm --**

13     Q.   I'm talking about accounts that you are currently

14 serving that you have some reason to believe or fear may

15 become --

16     A.   **Oh, no.**

17     Q.   -- MU customers?

18     A.   **No.  No.**

19     Q.   All right.  So we can agree that the Kittelson

20 accounts that are listed on Sioux 121 all fall into that

21 category, right?  That category because of what I know, I

22 have reason to fear that these may become MU customers and

23 will no longer be Sioux customers, right?

24     A.   **Yes.**

25     Q.   And we can agree that there are potentially other

---

81

1  accounts that fit into this category, but you haven't really

2  sat down and listed them at this point, right?

3      A.   **I would believe anything in that three-mile**

4  **radius is open to that.**

5      Q.   Right.  And --

6      A.   **Which is --**

7      Q.   -- there are more accounts than those in

8  Kittelson addition that are within that three-mile radius,

9  right?

10     A.   **Correct.**

11     Q.   So in order to complete the second part of the

12 list that we see on Sioux 121, under your theory or how you

13 look at this, we would have to list all of Sioux's accounts

14 that are within the three-mile radius to make it complete?

15     A.   **They -- well, yes.**

16     Q.   Okay.  And then there is yet another category

17 that I don't have a list for that I can think of which would

18 be the category of accounts that were never hooked up by

19 Sioux but are now MU customers, but because of where they're

20 situated, they might have been Sioux customers based upon the

21 location of Sioux's pipes?

22     A.   **Yes.**

23     Q.   Do you understand that category?

24     A.   **Yes.**

25     Q.   Have you put together any kind of a list of those

---

82

1  customers?

2      A.   **Yes.**

3      Q.   Has that been produced to me?

4      A.   **I don't know.**

5      Q.   Have you given that to your attorney?

6      A.   **Yes.**

7          MR. COLE:  He's given it to us, Jack.  I don't

8  know if it's been produced to you or not.  I know it's part

9  of the expert stuff that's being worked on.

10         MR. HIEB:  Okay.

11     Q.   (BY MR. HIEB)  What did you do to compile that

12 list?

13     A.   **We took a look at where our existing lines lay**

14 **and used a distance from them, you know, a quarter mile, half**

15 **mile, whatever that may be to compile that list.**

16     Q.   Well, and that's going to be my first question.

17 What was the number, quarter mile, half mile?  How did you --

18     A.   **Within a general distance.  I --**

19     Q.   Were you part of the group or the -- did you

20 assist in putting together that list?

21     A.   **Yes.**

22     Q.   Do you remember what the distance was you used in

23 order to compile that list?  And when I say the distance

24 used, I'm talking about the distance from your existing pipes

25 to these customers that were never Sioux customers but which

---

83

1  are now MU customers.
2      A.     I would say that if that pipe's within a mile --
3  you know, in a section, okay.
4      Q.     Within a mile?
5      A.     Well, quarter mile, half mile, general. It
6  wasn't scientific.
7      Q.     Well, how did you include or exclude if you
8  didn't have a specific distance that you were using from your
9  existing pipes?
10     A.     Whatever seemed reasonable to the distance of
11  that pipe.
12     Q.     How do you define reasonable?
13     A.     Well, if it wasn't a quarter to a half mile --
14  quarter mile, maybe a half mile, in that general distance.
15     Q.     And how did you come up with that number as a
16  basis?
17     A.     It was a place to start.
18     Q.     Okay. But I mean what we're talking about really
19  are customers that Sioux would claim they would have hooked
20  up had they given the opportunity to, correct?
21     A.     Correct.
22     Q.     And I think you told me previously that if I'm a
23  perspective customer of Sioux and I come to you wanting water
24  with my property located across the street from one of your
25  lines, the determination about whether you would hook me up

84

1  would be in large part determined by the cost that your
2  engineers would give you for putting me on the line, right?
3      A.     Right now if you were to come, you know, the cost
4  to hook to that line would be yours.
5      Q.     Right. And so some of that -- whether or not
6  those individuals in that category, these customers that were
7  never Sioux customers but that Sioux is claiming to be within
8  their territory that were eventually hooked up by Municipal
9  Utilities, the determination about whether they would have
10  ever been a Sioux customer would in some cases be determined
11  on whether they were willing to pay the cost that you were
12  going to give them to get hooked onto your line, correct?
13     A.     Yes, and I don't know what that was. I don't
14  know that we were given that option.
15     Q.     That you were given that option?
16     A.     I don't know that -- much like Titan Machinery, I
17  don't know that anybody came to Sioux and said, "This is
18  happening. You have pipes here. Is this something we can
19  do?"
20     Q.     Right. In that category of businesses or
21  residences, these customers that are now MU customers that
22  you believe were taken from you, how did you decide
23  which ones to include as customers taken from you and which
24  ones not to include?
25     A.     Based on their distance from our existing water

85

1  line.
2      Q.     Okay. Any other factors?
3      A.     To compile the list, no.
4      Q.     Okay. But you would agree with me that in each
5  of those cases, one of the issues would be whether that
6  particular customer was willing to pay the charge that you
7  would charge them to hook to your system?
8      A.     That would be one of the factors.
9      Q.     Okay. A factor that really you couldn't control,
10  right?
11     A.     No.
12     Q.     With respect to any of those customers in that
13  category, was there ever any kind of a notice or alert sent
14  to Watertown Municipal Utilities or the City of Watertown
15  indicating that you believed they were unlawfully hooking up
16  a customer within your territory?
17     A.     No. You're talking about the secondary list?
18     Q.     I'm talking about --
19     A.     Not these?
20     Q.     Correct.
21     A.     Okay.
22     Q.     I'm talking about the third category.
23     A.     Okay.
24     Q.     Those being customers that were never Sioux
25  customers that are now WMU customers and that are on a list

86

1  that you've put together of customers you believe have been
2  taken from your service territory. Are we on the same page?
3      A.     Yes.
4      Q.     With respect to that list and that category of
5  customers, was there ever any kind of a notice or alert sent
6  to either the City of Watertown or Watertown Municipal
7  Utilities by Sioux indicating that Sioux felt those customers
8  were being unlawfully connected?
9      A.     No. Because they were already connected.
10     Q.     Well, they were already connected when you
11  compiled the list?
12     A.     Correct.
13     Q.     But Sioux was in existence at the time they were
14  connected in each case?
15     A.     Right.
16     Q.     And you have, I'm assuming, searched the records
17  for Sioux for anything that's related to this litigation,
18  correct?
19     A.     To the best of my ability, yes.
20     Q.     And have you come across any correspondence with
21  anyone at Sioux that would indicate that they provided notice
22  to the city or to Watertown Municipal Utilities that they
23  believe those hookups were somehow illegal at the time they
24  were made?
25     A.     No, I don't believe illegal would be the word. I

91

1    guess, this third category of damages which are those
2    customers that are WMU customers that were never served by
3    Sioux but that Sioux believes were hooked up within Sioux's
4    territory.  Do you follow me?
5        A.    Um-huh.
6        Q.    Yes?
7        A.    Yes.  I'm sorry.
8        Q.    That's okay.
9        A.    I'm sorry.
10       Q.    The map I've got in front of you is the only map
11   that you've indicated really exists that would help us
12   determine where Sioux's territory is, correct?
13       A.    It's our base map, yes, with our water lines,
14   yes.
15       Q.    Right.  And I guess, I've got an orange
16   highlighter.  Can you sort of draw what you believe Sioux's
17   territory to be on this map so I've got some idea?
18       A.    It's difficult, and I can give you an explanation
19   for that.
20       Q.    Sure.  Absolutely.
21       A.    Let's say this -- the system exists based on the
22   pipes we have in the ground today, okay?
23       Q.    Okay.
24       A.    It's not uncommon for a rural water system to do
25   what's called an expansion program.

92

1        Q.    Okay.
2        A.    And basically you would have signups for possibly
3    anybody within this area who's not hooked up to become part
4    of the system.  Usually you incorporate it with system
5    improvements.  That being said, I'll -- this is strictly for
6    an example.  See this big gap in here where we see no lines?
7        Q.    Yes.
8        A.    Okay.  Earlier when you had referred to the state
9    association's map with those crude, ambiguous --
10       Q.    The document that was produced as DEF 396?
11       A.    Correct.  Within that, the way this puzzle is
12   pieced together, you can also see that there's gaps existing.
13       Q.    Yeah.
14       A.    So let's say, hypothetically, there's a person
15   over here that wants water or there's four people over here
16   that want water, can we incorporate them into an expansion
17   project?  We would run a line from here to here and pick
18   those people up.
19       Q.    All right.  So do this for me and we'll walk
20   through this so I understand it.  Use that hypothetical on
21   Exhibit 2 with that orange highlighter and put an X on the
22   four people that hypothetically would want water, put four Xs
23   in orange.
24       A.    That could want water?
25       Q.    Right.  Right.

93

1        A.    We'll just -- I'm going to just rough shot these
2    in.
3        Q.    Yes, exactly.
4        A.    (Witness complying.)  And I'll just, for
5    simplicity sake, put this one here.
6        Q.    All right.  So you've drawn four orange Xs on
7    Exhibit 2 which represent four hypothetical potential
8    customers that would come to Sioux and say, "We want to be
9    hooked up to your system," correct?
10       A.    Okay.
11       Q.    And my question for you now is, at that point in
12   time, as we sit here today, are those four Xs within your
13   service territory?
14       A.    If I'm doing an expansion program, okay, I would
15   just come like this for this line.
16       Q.    All right.  Yeah, you've drawn a line now showing
17   what would be new lines in the ground, correct?
18       A.    Correct.
19       Q.    But prior to drawing that orange -- those orange
20   lines, are those four Xs within your service territory?
21             MR. COLE:  Object to form.  Calls for legal
22   conclusion.
23       Q.    (BY MR. HIEB)  You know, that's valid.  Let me do
24   it this way.  Based upon the analysis that you worked on with
25   your expert in this case, would those four Xs be within your

94

1    service territory?
2              MR. COLE:  Same objection.  You can go ahead and
3    answer.
4        Q.    (BY MR. HIEB)  Go ahead.
5        A.    I believe they would be, yes.
6        Q.    And why?
7        A.    Because we'll serve them water.
8        Q.    Okay.  So does your service territory include
9    anybody that you would agree to serve with water?
10       A.    I believe so, yes.
11       Q.    All right.  And here's my problem with this.
12   This is where I'm having a difficult understanding or getting
13   my head around this.
14       A.    Yes.
15       Q.    You do not have geographical boundaries that you
16   can provide for me regarding your service territory, correct?
17       A.    Correct.
18       Q.    The only thing we can look at are the pipes in
19   the ground to give us an indication of your current service
20   territory, correct?
21       A.    Correct.
22       Q.    On Exhibit 2, the pipes in the ground are all
23   indicated on the base map, right?
24       A.    Yes.
25       Q.    So if you've got these four new potential

95

1    customers marked with the orange Xs that could be served by
2    the orange lines that would represent new pipes in the
3    ground, before those new pipes in the ground are laid, those
4    four Xs really aren't in your service territory yet, are
5    they?
6              MR. COLE:  Object to form.
7         A.        Answer?
8         Q.    (BY MR. HIEB)  Yeah.
9              MR. COLE:  Go ahead and answer.
10        A.    I believe they would be.
11        Q.    (BY MR. HIEB)  Well, you could draw -- and I'm
12   going to do the drawing this time on Exhibit 2.
13        A.    Yes.
14        Q.    I'll draw a pink X even further to the west --
15        A.    Yes.
16        Q.    -- on that same map.  If that person came to you
17   and said, "I want to hook to your system," and was willing to
18   pay the cost of having a line run out there, is that person
19   within your service territory?
20        A.    Yes.
21        Q.    But that person is currently miles away from your
22   nearest line, correct?
23        A.    Yes.
24        Q.    But you would still consider that person to be
25   within your service territory?

96

1         A.        I would consider it to be serviceable by our
2    territory, yes.
3         Q.        Well, serviceable by your territory, or within
4    your existing service territory?
5         A.        I would say yes to both.
6         Q.        Okay.  So really it sounds to me like the way the
7    term "service territory" is being defined is anybody that you
8    are willing to serve?
9              MR. COLE:  Object to form.
10        A.    And able to serve, yes.
11        Q.    (BY MR. HIEB)  Okay.  So previously when you
12   indicated to me that when you were working with your expert
13   on determining which customers that are currently hooked up
14   by Watertown Municipal Utilities that were hooked up within
15   what Sioux believes to be its service territory, I think you
16   indicated that you looked a half a mile to a quarter of a
17   mile from your existing lines in order to identify that list
18   of customers, right?
19        A.    Yes.
20        Q.    But in the example we've used, we've gone way
21   more than a half a mile to a quarter mile from your existing
22   lines and you're still putting those customers would be in
23   your service territory, right?
24        A.    After the pipe was installed, yes.
25        Q.    After the pipe was installed, right?

97

1         A.        Well, I can still come out and get them.  They'll
2    be -- we'll go get them.
3         Q.    Right.  But that's my point.  My point is that --
4    let's take the hypothetical closer to the City of Watertown.
5         A.        Okay, yes.
6         Q.    If at the time the City of Watertown or Watertown
7    Municipal Utilities hooks a customer up, you don't have pipes
8    within a half a mile of that customer, is that somebody that
9    you would claim would be within your service territory?
10        A.    A half a mile you said --
11        Q.    Yeah.
12        A.    -- or a mile?  Possibly, yes.
13        Q.    Okay.  But I guess you understand the problem I
14   have with this?  How does Watertown Municipal Utilities know
15   where at some point you may decide to run pipes and not?
16        A.    I --
17             MR. COLE:  Object to form.  Calls for speculation
18   and conjecture.
19             MR. HIEB:  Sure.
20             MR. COLE:  Go ahead and answer.
21        A.        I can appreciate that conundrum because the same
22   is true in the reverse.
23        Q.    (BY MR. HIEB)  Sure.  And I mean, when I look at
24   it in some cases -- you've heard the testimony from Watertown
25   Municipal Utilities' officials who have indicated it's been

98

1    the policy of the City of Watertown not to hook up customers
2    that are not within the city limits of Watertown, you heard
3    that testimony, correct?
4         A.    I did.
5         Q.    And you've also heard that there have been a
6    handful of exceptions testified to over the years, correct?
7         A.    Yes.
8         Q.    Do you have any reason to disagree with that
9    testimony?
10        A.    No.
11        Q.    All right.  So basically the City of Watertown or
12   the Watertown Municipal Utilities' policy is that their
13   service area is essentially confined to the existing city
14   limits of their city.  Would that be a fair statement?
15             MR. COLE:  Object to form.  Go ahead and answer.
16        A.    Generally, yes.
17        Q.    (BY MR. HIEB)  Right.  With the handful of
18   exceptions where they've agreed to hook somebody up
19   understanding that that person was going to seek voluntary
20   annexation within a relatively short period of time?
21        A.    Yes.
22        Q.    Okay.
23        A.    Reasonable -- yeah, yes.
24        Q.    Right.  And to your knowledge, that's been the
25   development pattern of the Watertown Municipal Utilities'

99

1  water delivery going back to when Sioux started as far as you
2  know?
3      A.      As far as I know, yes.
4      Q.      All right.  But you'd agree with me that where
5  Sioux is concerned, since they don't have any kind of a
6  geographical boundary that they can provide me, your service
7  area really changes every time you put a new line in the
8  ground?
9      A.      Yes.
10     Q.      It expands, right?
11     A.      Yes.
12     Q.      And under your belief, how does that interact
13 with Watertown's city limits at any given time?  The -- go
14 ahead.
15             MR. COLE:  Object to form.
16             MR. HIEB:  Sure.
17     A.      The question again?
18     Q.      (BY MR. HIEB)  Well, you evidently view Sioux's
19 ability to expand its service area to basically be limited
20 only by where it's unwilling to run lines, true?
21             MR. COLE:  Object to form.  You can go ahead and
22 answer, Heath.
23     A.      Yes.
24     Q.      (BY MR. HIEB)  All right.  So with respect to
25 Sioux's willingness to run lines into the City of Watertown

100

1  past Watertown's existing city limits, I think you indicated
2  previously that's something you would consider doing?
3      A.      Yes.
4      Q.      So really under your perspective, Sioux's
5  territory theoretically includes the entire City of
6  Watertown?
7             MR. COLE:  Object to form.  Calls for a legal
8  conclusion, speculation, conjecture.
9      A.      I think there's a plateau of reasonableness that
10 has to be reached in determining those things.
11     Q.      (BY MR. HIEB)  And what is that?  How do we get
12 there?
13     A.      That's a good question.
14     Q.      I mean, you understand what I'm saying?
15     A.      I do.  Because I can beg --
16     Q.      Okay.
17     A.      -- those questions in the reverse, but...
18     Q.      Sure.  And I think in the reverse what's been
19 indicated is that the City of Watertown, generally speaking,
20 looks at its existing boundaries as being the boundaries of
21 where it will provide water with few exceptions?
22     A.      Corporate limits.
23     Q.      Correct.
24     A.      Which are changing.
25     Q.      Sure, they absolutely can change.

101

1      A.      I understand.
2      Q.      Right.  Now --
3      A.      Much like my pipes in the ground can change.
4      Q.      Right.  And what I'm asking about Sioux's
5  policies with respect to the corporate limits of the City of
6  Watertown, those corporate limits really have no impact as I
7  understand it on where Sioux views its boundaries to be?
8      A.      Once again, I'd go back to that plateau of
9  reasonability.
10     Q.      Okay.  How about other rural suppliers and their
11 boundaries, how do those interplay with what Sioux perceives
12 its boundaries to be?
13     A.      There are intermixing.  There have been at times
14 intermixing of those boundaries.
15     Q.      Well, let's take Clark --
16     A.      Yes.
17     Q.      -- Rural Water.  Are you familiar with how Clark
18 Rural Water is -- what type of an entity it is?
19     A.      I couldn't say for sure.  I'm assuming it's very
20 similar to Sioux.
21     Q.      A nonprofit?
22     A.      Correct.
23     Q.      And as we indicated previously in your
24 deposition, there are, to our knowledge, the two of us, --
25     A.      Yeah.

102

1      Q.      -- there are two type of entities.  There are
2  nonprofits which don't have any geographical boundaries
3  approved by anyone, and there are water user districts that
4  are creatures of the state which have geographical boundaries
5  filed with the State of South Dakota, correct?
6      A.      Correct.
7      Q.      To the best of your knowledge, Clark is a
8  nonprofit without geographical boundaries similar to Sioux?
9      A.      I believe that is correct.
10     Q.      Okay.  And when I looked at what was provided by
11 the association in DEF 396, and we'll mark this as Exhibit 3,
12 if you will, Tammy.
13             (Exhibit No. 3 was marked.)
14     Q.      (BY MR. HIEB)  Exhibit 3 really sort of expands
15 upon what we find in DEF 396, as you indicate it was kind of
16 a crude representation of the service territories of the
17 various rurals, correct?
18     A.      There is where different water systems are
19 located, yes.
20     Q.      Right.  And when I look at -- what I'll represent
21 to you is that the yellow shown on Exhibit 3 is what is
22 represented as part of the southern part of Clark Rural Water
23 System which butts up against the Sioux system.
24     A.      Um-huh.
25     Q.      Do you recognize that?

107

1 you what's been produced as Sioux 580, for example. It's
2 called a municipal agreement. Are you familiar with that
3 document?
4 A. I've seen them, yes.
5 Q. And that's a document, it's my understanding,
6 that was prepared either by someone at Sioux or on Sioux's
7 behalf by someone, correct?
8 A. Correct.
9 Q. Do you know who put that document together?
10 A. I am assuming Brenda Anderson.
11 Q. Okay. Do you know if she had worked with Todd
12 Boyd on that or not?
13 A. I don't know.
14 Q. All right. Somebody at Sioux came up with this
15 form that we see in Sioux 580, correct?
16 A. Correct.
17 Q. And one of these was being sent with the list
18 that we see, for instance in Sioux 141 and 142 each time
19 there were requests to hook up within a three-mile radius of
20 Watertown, right?
21 A. Yes.
22 Q. And as I looked at this, it looked like the
23 practice was that Sioux would send the letter like we see on
24 Sioux 141 and 142 with a blank municipal agreement like we
25 see in Sioux 580 and essentially say to the city, "Here are

108

1 the people that want to hook up with us, please let us know
2 whether we can hook them up and sign the agreement and send
3 it back to us." Is that your understanding of how things
4 were working?
5 A. Yes.
6 Q. And did they continue to work that way for a
7 period of time after you became general manager?
8 A. Yes.
9 Q. Is it Sioux's position, as I understand it in
10 this lawsuit, that the state law, which is essentially
11 reflected in the letter and the agreement that we've just
12 talked about, doesn't apply because of the federal law? Do
13 you know why it is that Sioux was going this route?
14 A. I believe just as common practice from when that
15 state law was passed.
16 Q. Okay. It was just something that somebody at
17 Sioux, to the best of your knowledge, figured this is one way
18 to do it?
19 A. Yes.
20 Q. But you would agree with me that these documents
21 that I've just shown you, those all were generated by Sioux
22 each time, correct?
23 A. I believe so, yes.
24 Q. It was not the City of Watertown or Watertown
25 Municipal Utilities creating these documents?

109

1 A. No. No. No, I don't believe that to be the
2 case.
3 Q. Okay. And then you heard testimony earlier from
4 Mr. Heig who was the former manager of the Watertown
5 Municipal Utilities, correct? You were here for that
6 testimony?
7 A. Right before lunch or --
8 Q. Correct?
9 A. Yes. Yes.
10 Q. He testified that when he was the manager, this
11 particular process was ongoing between -- you know, coming
12 from Sioux each time they wanted to hook someone up within a
13 three-mile radius, and that the agreements weren't being
14 signed because the city attorney at that time, Mr. Foley,
15 simply sent a letter to Sioux saying, "We're not going to
16 sign an agreement that says we're going to follow state law."
17 Do you remember that testimony?
18 A. I believe so.
19 Q. Do you have any reason to dispute that that's how
20 things went down?
21 A. I have -- I mean --
22 Q. You don't know one way or the other?
23 A. I have no reason to dispute it.
24 Q. All right. Now it does look like from the
25 documents that have been produced at least, whenever Sioux

110

1 would send this list of potential hookups to the city, the
2 city would essentially write something on the letter and then
3 send it back?
4 A. Yes.
5 Q. And with virtually very few exceptions, their
6 response was always go ahead and hook them up, we aren't
7 going to, is that true?
8 MR. COLE: Object to form. Go ahead and answer.
9 A. Would you repeat that again?
10 Q. (BY MR. HIEB) With very few exceptions, the
11 response was usually go ahead and hook them up, we aren't
12 going to?
13 A. I believe that to be the case, yes.
14 Q. And the only exceptions to that we've discussed
15 in your testimony already here today, correct?
16 A. Correct.
17 Q. There was a brief holdup on a couple of them in
18 the Kittelson addition?
19 A. Yes.
20 Q. Which you were eventually allowed to hook up,
21 right?
22 A. She still hasn't hooked up.
23 Q. Well, you've been allowed to hook her, I mean --
24 A. We were granted permission from MU.
25 Q. Right. MU said, "Go ahead and hook her up, we