### Page 1

```
            UNITED STATES DISTRICT COURT
                DISTRICT OF SOUTH DAKOTA
                   NORTHERN DIVISION

SIOUX RURAL WATER SYSTEM, INC., a
Non-Profit Corporation,

              Plaintiff,         Civil No.
                                  15-1023
    vs.

CITY OF WATERTOWN, a South Dakota
Municipality, and WATERTOWN
MUNICIPAL UTILITIES, an agency of
the CITY OF WATERTOWN,

              Defendants.



            DEPOSITION OF STEVEN BURIAN




DATE:     Tuesday, September 20, 2016
PLACE:    AE2S, Inc.
          4170 South 28th Avenue
          Fargo, North Dakota
TIME:     1:51 p.m.
REPORTED BY:  Deanna L. Sager, R.P.R., R.M.R.
```

### Page 2

```
                 A P P E A R A N C E S

FOR THE PLAINTIFF:

       Zimmer, Duncan and Cole, L.L.P.
       Attorneys at Law
       5000 South Broadband Lane
       Suite 119
       Sioux Falls, South Dakota  57108
       By:  Jeff Cole
            jcole@zdclaw.com

FOR THE DEFENDANTS:

       Richardson, Wyly, Wise, Sauck & Hieb, LLP
       Attorneys at Law
       1 Court Street
       P.O. Box 1030
       Aberdeen, South Dakota  57402
       By:  Jack H. Hieb
            jhieb@rwwsh.com
            jstucke@rwwsh.com
```

### Page 3

```
                  C O N T E N T S
                    WITNESSES
                                              PAGE
STEVEN BURIAN

   Examination by Mr. Cole                      4


                    E X H I B I T S

EXHIBIT NO.    DESCRIPTION                    MARKED

     6         Technical Memorandum             4
               from Steve Burian, PE
               and Richard Wagner, PE
               8/12/2016
```

### Page 4

```
                  P R O C E E D I N G S
             (Whereupon, the deposition of STEVEN
BURIAN commenced at 1:51 p.m. as follows:)
             (Whereupon, Deposition Exhibit No.
              6, was marked for identification by
              the court reporter.)
              STEVEN BURIAN,
HAVING BEEN FIRST DULY SWORN TO TESTIFY THE TRUTH,
THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, RELATIVE
TO THE CAUSE SPECIFIED, TESTIFIED AS FOLLOWS:
                    EXAMINATION
BY MR. COLE:
    Q.   Could you please state your name?
    A.   Steve Burian.
    Q.   Have you ever had your deposition taken
before?
    A.   No.
    Q.   Is it okay today if I refer to you as
Steve?
    A.   Sure.
    Q.   Steve, if I ask you a question that you
don't understand, I want you to tell me that.
Otherwise I'm going to assume that you understood the
question.  Is that agreeable to you?
    A.   Yes.
    Q.   And I'll try not to speak over you and
you try not to speak over me so we have a clear
```



EXHIBIT 5

1  either, are they?
2      A.  Not that I'm aware of.
3      Q.  Okay. And these are recommended
4  standards, as I understand it, from just looking at
5  the cover?
6      A.  Yes.
7      Q.  Are you aware of any ruling by any
8  South Dakota regulatory agency that states that the
9  10 States Standards are the standard that's to be
10 used in the construction of facilities in the state
11 of South Dakota?
12     A.  No.
13     Q.  Are you aware of any regulatory
14 decision by any governmental entity in the state of
15 South Dakota that how Sioux Rural Water provides
16 water is insufficient in any way under South Dakota
17 law?
18     A.  No.
19     Q.  Did you make notes that -- well, strike
20 that. Let me back up a minute.
21         You did note in your report some areas
22 that you believe that Sioux does not meet the
23 10 States Standards; correct?
24     A.  Yes.
25     Q.  And that was what you put into your

25

1  understand it.
2      A.  Yes.
3      Q.  Go ahead if you want to.
4      A.  For instance, on the treatment plant,
5  though, when we looked at that, that large part of
6  the treatment plant capacity was based on DGR's
7  assessment of the treatment plant, and 10 States
8  Standards were referenced in that case, but it
9  was -- the information that we received from DGR was
10 probably more influential in drawing those opinions
11 than 10 States Standards were.
12     Q.  Let me ask you, do any of your rural
13 water customers provide fire protection?
14     A.  Not directly.
15     Q.  And I understand if they provide water
16 to a municipality that municipality may provide water
17 protection.
18     A.  That wasn't my point in saying not
19 directly.
20     Q.  What was your point? I didn't mean to
21 put words in your mouth.
22     A.  We have some rural water districts in
23 North Dakota that have become heavily urbanized and
24 they've developed cooperative agreements with their
25 adjacent municipalities. And so they may own the

27

1  opinion in this case.
2      A.  That was a part of our opinion. We
3  also had the benefit of the DGR analysis which that
4  was really the first thing we started with was DGR's
5  work. And many of the solutions that DGR drew, in
6  terms of capacity of different elements, were
7  utilized as part of the assessment in addition to the
8  10 States Standards.
9      Q.  Okay. But as I looked at the
10 conclusions in your report and throughout your
11 report, you noted that there were insufficient
12 capacities in several areas. True?
13     A.  Yes.
14     Q.  And those were based upon failure to
15 meet the 10 States Standards.
16     A.  In most cases they were.
17     Q.  Did you make notes of what particular
18 section of the 10 States Standards that you found in
19 your report Sioux did not meet?
20     A.  I did not. Richard would have to help
21 with that.
22     Q.  So I guess I just looked at it, and
23 there are various sections in these recommended
24 standards for water works. And he would have the
25 specific section that Sioux fell short on as I

26

1  asset and provide fire protection through that asset,
2  but it's all been designed to municipal standards and
3  the system is actually operated by the municipality
4  and the fire protection is provided by the
5  municipality. And Cass Rural Water would be a prime
6  example of that.
7      Q.  That's the county surrounding the Fargo
8  area?
9      A.  Yes.
10     Q.  The typical rural water system does not
11 provide fire protection; is that fair to say?
12     A.  Yes.
13     Q.  And as part of your work with rural
14 water systems, typically you don't include design
15 that includes fire protection; is that correct?
16     A.  No. Unless we were asked to provide
17 that capacity.
18     Q.  Okay. And one of the things I noted in
19 your opinion, you talk about the inability to provide
20 fire protection by Sioux.
21         MR. HIEB: Can you reference where in
22 the opinion?
23     Q.  Well, I'm talking about page 13. You
24 say fire flow demands in Table 7?
25     A.  What page are you on, Jeff?

28

| | |
|---|---|
| 1   Q.   Page 13.<br>2   A.   I heard 7. So the reason that we<br>3 looked at that was because these systems are<br>4 currently afforded fire protection. That was the<br>5 reason that we looked at that.<br>6   Q.   Explain your answer. I don't<br>7 understand it.<br>8   A.   ==All of these users that are==<br>9 ==current -- that we currently looked at in the west==<br>10 ==side that are served by Watertown and served by the==<br>11 ==east side currently, are served with fire protection.==<br>12   Q.   Okay. But you know that rural waters<br>13 are not required to provide fire protection; correct?<br>14       MR. HIEB: Object to the form of the<br>15 question. It calls for a legal conclusion, but go<br>16 ahead.<br>17   A.   I guess we didn't really look at the<br>18 capacity from that perspective. We looked at it from<br>19 the standpoint that this system was receiving a<br>20 domestic service -- these users were receiving<br>21 domestic service and they were currently serving fire<br>22 protection. We were very careful to bifurcate our<br>23 analysis so as to not overlap those two things. So<br>24 in the memorandum that we developed we drew<br>25 conclusions on the domestic side. But then, because<br>29 | 1   A.   I can see a point that if we were more<br>2 thorough that would have been something we could have<br>3 added. Or could add.<br>4   Q.   Do you know what has been amended or<br>5 changed in the 10 States Standards from 1962 until<br>6 2012?<br>7   A.   I don't.<br>8   Q.   Is it fair to say that a system, a<br>9 water system, that met 10 States Standards in 1987,<br>10 I'm just picking that as a year, might not meet those<br>11 standards today?<br>12   A.   It's possible I would think.<br>13   Q.   You didn't do any analysis to determine<br>14 that in this case in coming to your opinions.<br>15   A.   Not at this point.<br>16   Q.   Now the 10 States Standards are not<br>17 applied retroactively, are they?<br>18   A.   Explain.<br>19   Q.   Well, if you get a 2012 10 State<br>20 Standard -- and I understand, just incidentally, that<br>21 they amend them about every five years so we should<br>22 be coming up on a new one here, but if you have a<br>23 2012 edition of the 10 States Standards, you don't<br>24 use those 2012 standards to go back and judge<br>25 something that was done in 1987 under the standards<br>31 |
| 1 they were currently receiving fire flow, we drew<br>2 separate conclusions on the fire flow without judging<br>3 who was supposed to be providing that.<br>4   Q.   Okay. If Watertown provides the fire<br>5 flow as they are now, there's sufficient fire<br>6 protection for those customers; true?<br>7   A.   Assuming the current service is<br>8 adequate, yeah.<br>9   Q.   Now these 10 States Standards, just<br>10 from what I read, looks like they've been amended<br>11 many times. They were first published in 1962 and<br>12 amended in 1968, 1976, 1982, 1987, 1992, 1997, 2003,<br>13 2007, and 2012. Does that sound right?<br>14   A.   Yes.<br>15   Q.   Which -- in coming to your opinions<br>16 here in the 10 States Standards, which ones of those<br>17 did you use in coming to your opinion?<br>18   A.   I don't know.<br>19   Q.   Did you use the most current 2012<br>20 10 States Standard?<br>21   A.   I don't know.<br>22   Q.   Would it be important to note that in<br>23 your report?<br>24       MR. HIEB: Objection. Argumentative,<br>25 but go ahead, answer.<br>30 | 1 in place at that time, do you?<br>2   A.   I don't mean to pause, but it depends<br>3 on what we were asked to do. If we were asked to<br>4 look at the adequacy of that system in terms of<br>5 regulatory compliance versus looking at the adequacy<br>6 in current situation, if they were going to move<br>7 forward we would probably use the current standard<br>8 because that was the current industry practice. If<br>9 somebody asked us to say was this okay in 1987, then<br>10 I would likely go back to the one that was available<br>11 at the time.<br>12   Q.   Watertown never asked you to do that in<br>13 this case, did they?<br>14   A.   Not to that level of specificity.<br>15   Q.   You were asked to use the most current<br>16 2012 standard.<br>17   A.   We weren't asked to use any standard.<br>18 We were asked to use our judgment in terms of what<br>19 the most widely accepted standards were to judge<br>20 capacity so that all of our analysis would be<br>21 objective and defendable.<br>22   Q.   Are the 2012 edition standards the most<br>23 widely accepted ones today?<br>24   A.   That I'm professionally aware of.<br>25   Q.   And so were the 2012 standards the one<br>32 |

```
1      A.   If you operate at 400 gallons per
2  minute for either 20 or 24 hours of operation, you
3  don't get 600,000 gallons per day in either
4  situation.
5      Q.   Do you have any facts that suggest
6  because of this deficiency that Sioux hasn't been
7  able to serve any of its existing customers?
8      A.   I don't.
9      Q.   Then you've got 450 gallons per minute
10 capacity appears deficient; exceeds filter loading
11 rate of 400 gallons per minute.  Do you see that?
12     A.   I do.
13     Q.   Explain what that means.
14     A.   So at the smaller time frame there
15 wasn't enough capacity.  At the larger time frame you
16 would have enough hydraulic water, but it was stated
17 in the DGR report that that exceeds the design
18 standard because of manganese breakthrough.
19     Q.   And as I understand it, you've noted
20 this in your report, manganese breakthrough is a
21 cosmetic issue, it's not a safe drinking water issue.
22     A.   Correct.
23     Q.   Do you know of any facts to suggest
24 that because of this shortcoming that you've
25 identified that Sioux has not been able to serve any
                                                    49
```

```
1      Q.   Do you agree with that?
2      A.   Yes.
3      Q.   Then on the west side we've already
4  talked about this where capacity appears deficient.
5  Are you willing to at least concede that your
6  analysis might be incorrect now that this
7  improvement's been made?
8      A.   I don't know.
9      Q.   Okay.  And then on the east side you
10 just say you don't know.
11     A.   That's not exactly what we said.  We
12 said that there appears to be unique users that we
13 would need to complete additional modeling to draw
14 that conclusion.  Or somebody would need to do
15 further modeling.
16     Q.   Is that the modeling that you've talked
17 about before?
18     A.   Yes.
19     Q.   I'm just reading it, and it says,
20 "Acceptability of capacity is unknown."  That's your
21 opinion.
22     A.   Because we weren't asked to replicate
23 the modeling, we were asked to interpret the adequacy
24 of the modeling, we felt the modeling on the west
25 side was adequate and drew conclusions that we
                                                    51
```

```
1  of its customers?
2      A.   I do not.
3      Q.   Were you ever asked to determine
4  whether Sioux couldn't serve its current customers
5  based upon these deficiencies?
6      A.   These deficiencies meaning the
7  treatment plant?  Or the entire analysis.
8      Q.   The entire analysis where you say
9  capacity appears deficient.
10          MR. HIEB:  Object to the form of the
11 question.  I believe it's vague.  I don't know what
12 you mean by unable to serve their customers.  That
13 was the analysis we asked them to perform.  Are you
14 talking about whether a customer complained that they
15 had bad water or not enough water?
16     Q.   Did you understand the question?
17     A.   I didn't.
18     Q.   Okay.  Do you have any facts that
19 suggest that because of these deficiencies Sioux's
20 customers didn't get water?
21     A.   I don't.
22     Q.   Finished water storage capacity appears
23 adequate.
24          MR. HIEB:  That's a question?
25     A.   A question?
                                                    50
```

```
1  thought made sense.  In this case, because the user
2  base was sufficiently different than what the typical
3  domestic customers are, we felt it would warrant
4  putting real user data in there in order to draw that
5  conclusion.
6      Q.   Have you done that?
7      A.   As I pointed out earlier, we weren't
8  asked to actually replicate the modeling so somebody
9  would have to do that work.
10     Q.   Fair enough.  But --
11     A.   But no.
12     Q.   Getting at a simple point is, at this
13 point whether the capacity is acceptable or not is
14 unknown according to your opinion.
15     A.   Yes.
16     Q.   And did anyone tell you not to take
17 into account the improvements made on the west side
18 in coming to your analysis?
19     A.   No.
20     Q.   Is part of your opinion here in Table 7
21 including a requirement that Sioux provide fire flow
22 to both of those -- both the west side and the east
23 side?
24     A.   Are we suggesting that that's
25 mandatory?  Is that your question?
                                                    52
```

```
 1          MR. COLE:  No.  Could you read the
 2   question back, please?
 3          MR. HIEB:  Well, he just told you he
 4   didn't understand the question so what would reading
 5   it back be?
 6          MR. COLE:  Go ahead and read it back,
 7   please.
 8          THE COURT REPORTER:  "Is part of your
 9   opinion here in Table 7 including a requirement that
10   Sioux provide fire flow to both of those -- both the
11   west side and the east side?"
12      A.  We weren't responsible for determining
13   the requirements.
14      Q.  (Mr. Cole continuing)  I guess what I'm
15   asking is, and I'll concede maybe the question wasn't
16   clear, but in coming to your opinion as stated in
17   Table 7, was fire flow and the ability to provide
18   fire flow part of the analysis?
19      A.  Part of our analysis?
20      Q.  Yes.
21      A.  Yes.
22      Q.  In terms of the capacity to serve, was
23   fire flow part of your analysis?
24      A.  It was done independently from both a
25   domestic perspective and a fire flow perspective.
                                                    53
```

```
 1   And so, yes, that was one element of what we
 2   analyzed.  What really warranted that in our opinion
 3   is that when we dug into the service size of those 13
 4   customers, some of those service lines are greater
 5   than the biggest pipe that Sioux Rural Water has in
 6   that vicinity.  And so if service lead is bigger then
 7   the entire transmission system, it created technical
 8   questions on our part on how -- what did that user
 9   really need if they had that big a pipe service lead
10   going into their building.
11      Q.  If you take fire flow out of your
12   analysis on the west side, do you agree with me that
13   with the improvements Sioux has the capacity to
14   serve?
15      A.  We were never given any information
16   on -- if you read all the reports, there's nowhere is
17   it stated what the impacts are going to be of the
18   improvements.
19      Q.  Did you read Darin Schriever's
20   deposition?
21      A.  Yes.
22      Q.  Do you recall in his deposition that he
23   talked about additional customers that could be
24   served on the west side after the improvements were
25   made?
                                                    54
```

```
 1      A.  I don't recall the specifics.  It was
 2   84 pages.
 3      Q.  You're aware generally, aren't you,
 4   that Darin Schriever had given the opinion that with
 5   these improvements Sioux can serve a number of new
 6   customers on the west side.
 7      A.  And we just didn't do the analysis with
 8   that information in hand.
 9      Q.  So you don't know one way or the other
10   whether you can agree or disagree with that then.
11      A.  Right.
12      Q.  And on the east side, if you take out
13   the fire flow requirement and you just look at, you
14   know, domestic demands, you don't know whether or not
15   Sioux has the capacity to serve those particular
16   customers identified.
17      A.  Right.
18      Q.  But would you agree with me, then, that
19   some of those customers who have lower demands, as
20   set forth in your report, Sioux could certainly serve
21   those folks, couldn't they?
22      A.  We weren't asked to look at users on an
23   individual basis.  We were asked to look at them
24   collectively.  And so until we knew what the impact
25   of the larger ones would be, you have to be able to
                                                    55
```

```
 1   serve the branch, not just an individual customer.
 2      Q.  Well, let's look at page 9, Table 4.
 3   And let's just go through these.  Taking fire flow
 4   out of the equation.  Based on the infrastructure
 5   that Sioux has, Sioux could serve Big Shot Fireworks,
 6   couldn't it?
 7      A.  We didn't know when we did the report,
 8   and I'm not going to be able to know as we answer the
 9   questions until we were able to assess that in
10   totality.  That customer is less than the assumption
11   they use in the modeling effort, and so provided all
12   of the customers also did that, then I think that
13   particular customer could be served.
14      Q.  Okay.  And let's just go to Dakota
15   Automation.  That one's below the usage amount too,
16   isn't it?
17      A.  2013 they used 35,000 gallons; right?
18      Q.  You're right.  They might have a well
19   there.  I don't know what they've got.
20      A.  I would hope they wouldn't run their
21   well through the meter in Watertown.  That would get
22   really pricey.
23      Q.  I don't know what they're doing, but
24   something changed from 35,000 to --
25      A.  Right.  And I'm not being
                                                    56
```

```
 1  argumentative. It's just that would be a suspect ---
 2       Q.  You made your point. You're right
 3  about that. I missed it. Fed Ex, though, is within
 4  that range, isn't it?
 5       A.  Similar to my answer for Big Shot
 6  Fireworks, yes.
 7       Q.  So it looks, as we sit here today, like
 8  Sioux could serve Fed Ex if you take fire flow out of
 9  it; true?
10       A.  And if you had the luxury to look at an
11  isolated customer.
12       Q.  Okay. And same question for Randy
13  Hartley.
14       A.  That one's right on the bubble, but...
15  A little bit more than -- I think 5,500 was the
16  standard that DGR used.
17       Q.  But it's within the realm of
18  possibility, isn't it?
19       A.  As an individual customer.
20       Q.  And Lew's Fireworks is also; correct?
21       A.  Yes.
22       Q.  And -- oh, I see what they've done
23  here. Okay. So at least for those customers,
24  potentially you have to concede that Sioux could
25  serve them if you take out fire flow.
                                                   57
```

```
 1       Q.  You could go one by one.
 2       A.  Within the model I guess you could take
 3  the model and then you could look to add one user at
 4  a time incrementally and remodel it. That would be
 5  technically possible.
 6       Q.  In fact, that's what rural water
 7  systems do, isn't it, they go one by one to decide
 8  whether or not they can add a particular customer.
 9       A.  That's not been my experience, Jeff.
10  They're going to go into an area where they think
11  they need to serve, and they usually go into a
12  sign-up campaign and they look at all the users
13  they're going to serve and then they try to have the
14  ability to put the right pipe in the first time.
15       Q.  Right. That's when they're doing a
16  service expansion. Fair?
17       A.  Yes.
18       Q.  But when they have a pipe that's in the
19  ground and they're determining whether or not that
20  pipe can serve particular customers who want to come
21  on, they do a customer by customer analysis, don't
22  they?
23       A.  If they came in over time they would
24  take them in the order they were received.
25       Q.  And if that was done in this case, you
                                                   59
```

```
 1       A.  So -- we're talking about treatment in
 2  totality, or are we talking about do they fit within
 3  the modeling assumptions that DGR used. Because if
 4  they fit within the modeling that DGR used, the
 5  analysis looked at treatment, the analysis looked at
 6  all aspects of those things, those customers do fit
 7  within the modeling assumptions that DGR used.
 8       Q.  Are you finding fault or do you find
 9  fault with any of the modeling assumptions that DGR
10  used?
11       A.  We feel that for the east side, given
12  these water use dynamics and given those service
13  leads, that they should have looked at special class
14  customers for these larger users when they did the
15  modeling.
16       Q.  Fair enough. But the ones now we've
17  got some information on; true? The ones we've talked
18  about you've got some information on.
19       A.  For better or worse, we would
20  have -- we would look at it in totality of serving
21  that branch. We didn't -- we weren't thinking of it
22  as a discrete customer.
23       Q.  You didn't do it one by one, you went
24  as a whole.
25       A.  Right.
                                                   58
```

```
 1  agree with me that certain of these customers Sioux
 2  certainly could have served.
 3       A.  They would be consistent with the
 4  modeling assumptions that DGR used.
 5       Q.  I'm going -- I'm jumping around here
 6  because I'm just about done believe it or not. I
 7  don't know what time it is.
 8       A.  I'm good.
 9           MR. HIEB: It's 3:00. You're doing
10  fine.
11       Q.  In your website you talk about a
12  realistic design approach for rural waters. What
13  does that mean?
14       A.  I'm not sure.
15       Q.  I'll just show you the -- I'm not going
16  to mark it as an exhibit. It's your website.
17       A.  The website is done by the marketing
18  department, and I'm not exactly sure what they
19  intended by that.
20           MR. HIEB: Want me to get your website
21  out, Jeff?
22           MR. COLE: Let's go off the record here
23  a minute.
24           (Off the record.)
25           MR. HIEB: Back on the record.
                                                   60
```