UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
NORTHERN DIVISION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |
|---|---|
| SIOUX RURAL WATER SYSTEM, INC., a Non-Profit Corporation | Civ. 15-1023 |
| Plaintiff, | |
| -vs- | **DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| CITY OF WATERTOWN, a South Dakota Municipality, and WATERTOWN MUNICIPAL UTILITIES, an agency of the CITY OF WATERTOWN, | |
| Defendants. | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## INTRODUCTION

The defendants, City of Watertown ("City") and Watertown Municipal Utilities ("MU"), have filed their own motion for summary judgment, in which they seek judgment as a matter of law because Sioux Rural Water System, Inc. ("Sioux"), is not entitled to the protection of 7 U.S.C. §1926(b) as to its claims in this lawsuit.  In addition to the argument set forth in the brief in support of defendants' motion (Doc. 29), defendants respectfully submit this brief in opposition to plaintiff's motion for partial summary judgment.[1]

---

[1] Since each party has moved for summary judgment and furnished the Court with its own statement required by D.S.D. LR 56.1, the Court should be well familiar with the factual background and a lengthy recitation of the facts will not be repeated here.  Pertinent factual references will be made throughout the brief as they apply to each issue.

1

## SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56.  Only disputes over facts that might affect the outcome of the case under the governing substantive law will properly preclude summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Summary judgment is not appropriate if a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

## ARGUMENT

### I.   SIOUX IS NOT ENTITLED TO A PERMANENT INJUNCTION.

#### A.   STANDARD FOR A PERMANENT INJUNCTION.

The standard for determining whether a permanent injunction should issue is essentially the same as the familiar standard for a preliminary injunction.  Amoco Prods. Co. v. Village of Gambell, 480 U.S. 531, 546 n. 12 (1987).  However, the movant must show actual success on the merits.  Id. at 546.  The Eighth Circuit Court of Appeals has identified four factors to be considered in determining whether or not to grant a permanent

2

injunction: (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties; (3) whether the movant proves actual success on the merits; and (4) the public interest.  <u>Forest Park II v. Hadley</u>, 336 F.3d 724, 731 (8th Cir. 2003); <u>Dataphase Sys. v. C.L. Sys., Inc.</u>, 640 F.2d 109, 113 (8th Cir. 1981).

## B.   SIOUX CANNOT SUCCEED ON THE MERITS BECAUSE 7 U.S.C. §1926(b) DOES NOT APPLY.

The threshold question that must be answered in addressing Sioux's claim for injunctive relief is whether Sioux is even entitled to the protection of 7 U.S.C. §1926(b).[2] Briefly stated, under South Dakota law, Sioux does not have the legal right to serve the customers that are the focus of its motion, and it is not entitled to injunctive relief.

### 1.   State law defines Sioux's service territory and, thus, where it has the legal right to serve.

In order for Sioux to prevail, the Court must conclude that Sioux has a limitless service territory.  Sioux cites to <u>Rural Water Sys. # 1 v. City of Sioux Ctr.</u>, 967 F. Supp. 1483 (N.D. Iowa 1997), and <u>B.Y. Water District v. City of Yankton</u>, 2008 U.S. Dist. LEXIS 100373 (D.S.D. Dec. 10, 2008), as support

---

[2] Defendants addressed Sioux's lack of a legal right to serve the disputed customers in the brief in support of their motion for summary judgment (Doc. 29, pp. 13-17), and that argument is incorporated here.

for its contention that it should be protected by §1926(b).  In reality, those cases help to illustrate why Sioux's situation is different and it is <u>not</u> entitled to the protection of §1926(b).

As a starting point, the Court must understand Sioux's position regarding the boundaries of its service territory. Sioux's position is very simple: there are no boundaries.  Heath Thompson, Sioux's general manager, testified that Sioux's service territory could include any area where Sioux may be willing to put pipes in the ground based upon a customer request.  (Doc. 34-1, Thompson 94-96.)  Since there is no defined geographical boundary, according to Thompson, Sioux's service area can change every time it puts a new line in the ground. (<u>Id.</u>, Thompson 99.) Thompson views Sioux's ability to expand its service area to be limited only by where it is unwilling to run lines.  (<u>Id.</u>, Thompson 99.)  In fact, he testified he would even consider running lines into the City of Watertown and past its existing city limits.  (<u>Id.</u>, Thompson 99-100.)  In short, Sioux believes it should be protected by §1926(b), *wherever* it chooses to go.

This stands in stark contrast to the situation in <u>B-Y Water Dist.</u>  In that case, B-Y's service area was defined by the state's approval of its territory, which included all of Yankton County except the City of Yankton itself.  Because the disputed areas outside of Yankton were in B-Y's defined territory, Judge

4

Piersol concluded B-Y had a legal right to serve customers in that area:

> Yankton ignores the fact that South Dakota law attaches geographical boundaries when authorizing a water user district to provide water under state regulations. *See* SDCL 46A-9-4(3) (the petition for organization must include a "description of the lands constituting the proposed district and of the boundaries thereof, and the names of any municipalities included partly or wholly within the boundaries of the proposed district"). B-Y's Petition for Organization included the three-mile area surrounding Yankton, the Petition was approved by the appropriate state regulatory agency, and B-Y has served customers in that area for years. South Dakota law clearly gives water districts such as B-Y the right to provide water services, *see* SDCL 46A-9-39 through SDCL 46A-9-45, and <u>B-Y provides those services within its geographical boundaries</u>. Under South Dakota law, B-Y has a legal right to serve all of Yankton County, with the exception of the City of Yankton, just as stated in its Petition for Organization.

<u>Id.</u> at *7-8 (emphasis added).

As a non-profit, Sioux has no similar territory map that has been blessed with the state's approval.  Neither §1926(b) nor any other federal law defines or creates a service area.  Rather, §1926(b) merely preserves what territorial rights a rural water system has under state law.  See <u>Sioux Center</u>, 967 F. Supp. at 1527 ("[C]ourts have routinely looked to state law as defining an association's protected service area under §1926(b).").

Looking to South Dakota law, SDCL 9-47-22 clearly gives defendants the right of first refusal to serve the customers within three miles of Watertown:

5

>If a rural water system is requested after July 1,
>1989, to provide water service to any person who
>resides within three miles of a municipality owning and
>operating a water supply system, the rural water system
>shall promptly notify such municipality of such request
>in writing. Within sixty days from the receipt of such
>notice, the municipality may elect to provide water
>service to such person. If the municipality does not so
>elect, the rural water system may provide such service.

The three mile boundary established by SDCL 9-47-22 is the only definition of Sioux's boundaries which is provided by state law. Indeed, Sioux has historically recognized the three mile area around the Watertown city limits as being territory where the City has a right of first refusal. (Doc. 34-1, Thompson 107-108; Doc. 34-7, Sioux 141-142.) In other words, until it filed this suit, even Sioux recognized and followed state law.

Since Sioux recognizes no boundaries, it is not surprising that it now disregards boundaries set by state law and conflates its service of its current customers within three miles of Watertown with a "legal right" to serve them. (See Doc. 24, pg. 17.) Sioux's argument rests upon the proximity of its pipes to various customers within the three mile zone. But, under state law, Sioux has neither a right nor an obligation to serve the customers within three miles of Watertown. "[W]here state law prohibits an association from providing service in a disputed area, the association cannot rely upon its actual provision of service, or physical ability to provide service, as trumping its

6

lack of legal authority to provide service, absent a showing of estoppel or some other impediment to the assertion of the state-law prohibition." Sioux Center at 1526. "Where an indebted association has no legal right to provide service, it is not required by [7 C.F.R. § 1942.17(n)(2)(vii)][3] to provide such service, and, logically, it also should not obtain protection from § 1926(b) for its illegal provision of service." Id. at 1526-27. As the Northern District of Iowa described, simply being able to provide the service does not get Sioux the protection of §1926(b):

> This court holds that the physical ability to serve an area is not sufficient to satisfy the statutory requirement that the association have "made service available" where there is a legal impediment to providing such service. Similarly, the court holds that providing actual service does not extend the protections of § 1926(b) to an indebted association's service of disputed territory in which the association has no legal right to provide service.

Sioux Center at 1527-28.

While Sioux serves customers within three miles of Watertown, it has no explicit legal right or obligation to serve that territory under South Dakota law. This distinction is critical. Sioux is on an entirely different footing than B-Y

---

[3] Notably, while Sioux seems to cherry-pick the customers it would like to serve, the federal regulations are drafted in a way that creates a duty on Sioux's part to provide for all persons within its supposed service area. An indebted association is authorized, indeed required, "to provide adequate service to all persons within the service area who can feasibly and legally be served." 7 C.F.R. § 1942.17(n)(2)(vii).

Water District, which had a state-approved territory and the state's blessing to serve the customers in the disputed areas around Yankton.  Because Sioux has no legal right to provide service to customers within three miles of Watertown, the protections of §1926(b) do not apply.

 **2.  Preemption does not apply.**

  To advance a preemption argument, Sioux ignores much of the analysis set forth above, especially the rule from the <u>Sioux Center</u> case that state law defines a rural water system's legal ability to serve.  Again, §1926(b) does not give Sioux or any other rural water system any territorial rights whatsoever; it merely preserves the state law rights they have.

  There are two things that are noteworthy about the <u>Sioux Center</u> decision contorted by Sioux in support of its preemption argument.  First, Sioux neglects to mention that the district court began its preemption analysis with the recognition that "state law defining the service area of an indebted association is not preempted by § 1926(b)." <u>Sioux Center</u>, 967 F.Supp at 1528-29.  This is for the basic reason that "no federal statute or regulation defines 'made service available' within the meaning of § 1926(b)." <u>Id.</u> "Therefore, there is no federal law to have preemptive effect on any state law defining an indebted association's service area." <u>Id.</u>

8

Second, the portion of the Sioux Center decision quoted on page 18 of plaintiff's brief must be read in context.  The Sioux Center court, first assuming that a rural water system had the legal right to serve, stated that preemption would apply if a municipality tried to use a state law to justify an encroachment into an area where the rural water service has a legal right to provide service.  In other words, the cited discussion came after the district court had analyzed the legal right to serve issue.

Sioux also argues that "once Sioux was federally indebted, federal law, and not state law, determined Sioux's territory."  (Doc. 24, pg. 17.)  Sioux relies on footnote 6 in Pittsburg Cty. Rural Water Dist. No. 7 v. City of McAlester, 358 F.3d 694, 716 (10th Cir. 2004), for this proposition.  This contention is dubious, for two reasons.  First, the Tenth Circuit's statement is directly counter to Sioux Center and the Courts of Appeals that have followed it.  The Tenth Circuit in Pittsburg made the statement in a footnote and without the citation to any authority for it whatsoever.  Because of the lack of any authority for the Tenth Circuit's statement, as contrasted with the wealth of authority cited by the Sioux Center court and those courts that have followed the Sioux Center court's lead, the veracity of the Tenth Circuit's footnote is doubtful.

Second, the Tenth Circuit position in Pittsburg, when it is fleshed out completely, actually does not stray far from

the Sioux Center court's position on preemption.  Sioux quotes
the Tenth Circuit's statement in Pittsburg that "[w]hen § 1926
protection attaches for a water district's service to a property
**within the water district's territory under the two-part test
from Sequoyah**[4], the water district has exclusive water service
rights over that property until the water district's loan to the
FMHA is paid off or the water district fails to make service
'available' to the property in question."  (Doc. 24, pg. 19.)
(Emphasis added.)  Once again, the reference to "territory under
the two-part test from Sequoyah" goes back to the "made service
available" test.  Under the Eighth Circuit's jurisprudence, that
test requires that Sioux show it has the legal right to serve.
Consequently, under the Tenth Circuit's analysis in Pittsburg
relied upon by Sioux, it still has to cross the same threshold of
showing that it has the legal right to serve the disputed area -
something that Sioux simply cannot do.

      The Court never reaches the preemption issue here.  If
the rural water system does not have the legal right to serve the
area, there could be no preemption, as §1926(b) would not apply
and therefore no conflict could result.  As set forth above,
Sioux not have a legal right to serve the areas around Watertown
if Watertown first chooses to provide service by virtue of SDCL

---

      [4] Referring to Sequoyah Cty. Rural Water Dist. No. 7 v. Town
of Muldrow, 191 F.3d 1192 (10th Cir. 1999).

SDCL 9-47-22.  The <u>Sioux Center</u> court's dicta quoted by Sioux, by its own terms, does not apply.  It does not apply because, if a rural water system does not have the legal right to serve the area in question, §1926(b) does not apply and cannot, therefore, conflict with anything.

### C.   SIOUX HAS NOT SHOWN A THREAT OF IRREPARABLE HARM.

Because Sioux's inability to succeed on the merits is dispositive, the Court does not need to reach the threat of irreparable harm element for injunctive relief.  But if the Court reaches this element in its analysis, it will quickly realize that it is an insurmountable roadblock to Sioux's request for injunctive relief.

Courts heavily weigh the threat of irreparable harm factor.  "[T]he movant's failure to sustain its burden of proving irreparable harm ends the inquiry 'and the denial of the injunctive request is warranted.'"  <u>Glenwood Bridge, Inc. v. City of Minneapolis</u>, 940 F.2d 367, 371 (8th Cir. 1991) (quoting <u>Gelco Corp. v. Coniston Partners</u>, 811 F.2d 414, 420 (8th Cir. 1987)).  The key word in the irreparable harm factor is "irreparable" because "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."  <u>Sampson v. Murray</u>, 415 U.S. 61, 88 (1974) (internal quotation omitted).  Sioux must "demonstrate that

irreparable injury is *likely* in the absence of an injunction."
Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 23 (2008)
(emphasis in original).

As a starting point, Sioux's parade of horribles on
pages 2-3 of its brief about not being able to repay its federal
debt and jeopardizing its ability to provide safe, affordable,
clean water completely ignores reality.  Sioux is not in finan-
cial dire straits.  Sioux's expert testified that Sioux can keep
doing what it is doing without any capital improvements to its
system and make it work:

> Q    And from what I can tell, in looking at this
>      report and the rest of what you've provided, Sioux
>      could do that as long as they didn't take on new
>      customers or have an increase in the demands being
>      made by their current customer base.
>
> A    I believe that's generally true.
>
> Q    And from your review of the financials, at least
>      at the time of this report, that provided them
>      adequate cash flow to pay their bills and operate,
>      right?
>
> A    Right.
>
> Q    So these capital improvements that are both
>      currently under contract and being planned in the
>      future are really only necessary in order to
>      expand and add water users to the system?
>
>      MR. COLE: Object to form.
>
> A    They're certainly needed to expand a significant
>      amount, --
>
> Q    (By Mr. Hieb) Um-hmm.

12

A     -- but I believe they're also needed to provide
      improved service to existing customers.

Q     Okay. But if they did nothing, incurred no more
      debt, didn't go make any of these capital
      improvements, they could adequately serve their
      existing customer base as long as there wasn't an
      increase in demand.

A     Yes.

(Doc. 34-5, Schriever 84-85.)

Further, in order for Sioux's claim to be ripe, it must
show that it faces a "certainly impending" injury.  See B-Y Water
Dist. at *11; Public Water Supply District No. 8 of Clay County,
Missouri v. City of Kearney, Missouri, 401 F.3d 930 (8th Cir.
2005) (refusing to reach issue whether water district was
entitled to injunctive relief prohibiting City from supplying
water to property owners because injury to water district was not
"certainly impending" and so the case was not ripe).  There is no
"certainly impending" injury where Sioux is concerned.

Instead, Sioux relies upon rank speculation about
defendants' supposed threat to take over Sioux's existing
customers.  Sioux has *no evidence whatsoever* that such a threat
actually exists.  In fact, Sioux's only purported "evidence" that
MU has any intentions to take over its existing customers is *its
own interpretation* of an email from MU's water superintendent
regarding a handful of customers in Kittelson's Addition.  (Doc.
24, pg. 9 ("*Sioux took this email to mean* that WMU wanted Sioux
to provide water to the four customers until such time as

13

Watertown annexed the sites and WMU chose to serve them.")
(Emphasis added.))

Speculation aside, it is a fact that MU has not served and does not currently serve customers in Kittleson's Addition. (Doc. 34-1, Thompson 74.)  It is also a fact that, although MU has made exceptions for certain customers, MU's general policy is that it **does not** hook up customers outside of the Watertown city limits.  (Doc. 34-3, Lehner 26, 35; Doc. 34-1, Thompson 98.) There are no facts which support Sioux's claim that MU plans to take over Sioux's Kittleson Addition customers or others among its 464 customers, let alone undisputed facts that would give the Court a basis to grant injunctive relief, as a matter of law.

Even assuming *arguendo* that there is some basis for a claim that MU faces an injury that is certainly impending, Sioux has made no showing that its harm would be *irreparable*. Defendants do not simply get to switch the connection and take the customers, leaving Sioux with nothing.  Rather, the protections afforded by SDCL 9-47-23 provide financial support for Sioux as to existing customers who want to switch to MU. SDCL 9-47-23 would require MU to purchase the rural water facilities in place and compensate Sioux:

> If a rural water system provides service to a person
> whom a municipality has declined to serve, pursuant to
> § 9-47-22, and the municipality thereafter elects to
> provide water service to such person, the municipality
> shall first purchase the facilities of the rural water
> system which were required and used to provide service

to such person. The purchase price shall be the present
day reproduction cost, new, of the facilities being
acquired, less depreciation computed on a thirty-year
straight-line basis, plus an amount equal to the cost
on a nonbetterment basis of constructing any necessary
facilities to reintegrate the system of the rural water
system after detaching the portion to be sold; plus as
compensation for service rights, an annual amount,
payable each year for a period of five years, equal to
the sum of five percent of the gross revenues received
from the sale of water service to such person during
the five-year period. Gross revenues received shall be
determined by applying the rate in effect by the
purchased rural water system at the time of purchase.

The operation of SDCL 9-47-23 may preclude Sioux from

suffering *any* appreciable harm if customers make the switch, let

alone irreparable harm.  But because Sioux chose not to address

irreparable harm in its motion, the Court has no facts to know

one way or the other.  Nor can the Court assess the state of

balance between the alleged harm to Sioux and the injury that

granting the injunction will inflict on other parties.

Sioux does not provide any facts to show that it would

be irreparably harmed without an injunction.  It must show this

to obtain injunctive relief.  It has fallen far short of

sustaining its burden.

## II. __SIOUX IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE ISSUE OF DEFENDANTS' ALLEGED VIOLATION OF 7 U.S.C. §1926(b) AS TO SIX PROSPECTIVE CUSTOMERS__.

The six customers Sioux lists fall within the three

mile area around Watertown.[5]  For the reasons described above,

---

[5] These include three new house sites on the west side in
Kak's Addition, and three businesses on the east side: the Jim
Aesoph property, Federal Express, and McFleeg Feeds.

15

Sioux has no legal right to serve them.  But Sioux's motion pertaining to the six prospective customers is not just undercut by its lack of a legal right to serve them.  Sioux also cannot demonstrate, as a matter of law, that it has the capacity and ability to provide such service under the "pipes in the ground" test.  Importantly, it is the rural water system's burden to prove that it satisfies the "pipes in the ground" inquiry.  See Bell Arthur Water Corp. v. Greenville Utilities Commission, 173 F.3d 517, 526 (4th Cir. 1999) (holding that, for §1926(b) to apply, an association must demonstrate as a threshold matter that it has adequate facilities within or adjacent to the area to provide service).

Sioux's motion for partial summary judgment on this issue must be denied.  Its own experts acknowledge its physical limitations, and Sioux lacks sufficient information to demonstrate its ability to serve specific customers.[6]  Sioux's entire argument is premised on the location of its pipes.  That is not the end of the inquiry.  The analysis of Sioux's capabilities which follows has been broken down by the west side of its system and the east side of its system.

---

[6] Sioux's physical limitations as a water supplier were discussed in the Brief in Support of Defendants' Motion for Summary Judgment, and that discussion is incorporated by this reference.  (Doc. 29, pp. 8-11, 17-21.)

16

A.   **SIOUX CANNOT SUPPORT THE ADDITION OF MORE CUSTOMERS ON THE WEST SIDE, WHICH WOULD INCLUDE KAK'S ADDITION.**

Sioux asserts that it is an undisputed fact that it can make service available to three new home sites in Kak's Addition. (Doc. 23, ¶51; Doc. 24, pg. 20.)  Its expert's testimony conflicts with this.

Sioux is operating at or near full capacity under peak demand conditions in the west side area.  (Doc. 34-5, Schriever 64-65.)  Kak's Addition is listed among the west side customers analyzed by Sioux's expert, Darrin Schriever.  (Doc. 34-6, pg. 3.)  Both source and distribution capacity is necessary to serve customers.  (Doc. 34-5, Schriever 80.)  Mr. Schriever testified that Sioux does not currently have adequate facilities in place to serve the potential new west side customers, as both distribution and source improvements would be needed. (Id., Schriever 28, 57.)  Even with projects currently underway, Sioux will not be increasing its source capacity:

Q    All right. The west side couldn't really be added without making some improvements.

A    That's correct.

Q    And those improvements that need to be added in order to supply any of these potential customers on the west side, are they distribution improvements, source capacity improvements, or some of both?

A    To serve all of the identified users on the west side, they would need to make both distribution and source improvements.

17

Q    Now, we know from your testimony that the project
     that is currently underway will add some
     distribution capacity to the west side, correct?

A    Correct.

Q    It doesn't add any source capacity, does it?

A    Not the currently funded project, no.

Q    Okay. So even when that project is complete, they
     still wouldn't be able to service all of these
     customers on the west side, correct?

A    Correct.

(Id., Schriever 57.)

Schriever also agreed that, if Sioux added customers on
the west side, Sioux would not be able to meet the needs of the
new customers and/or some of the existing customers until
improvements are made.  (Id., Schriever 47, 54.)  In the face of
this testimony, Sioux's claim that it can serve additional west
side customers is disputed.

**B.   SIOUX'S CLAIMED ABILITY TO SERVE FEDERAL EXPRESS,
       McFLEEG FEEDS, AND JIM AESOPH IS NOT BASED ON ANY
       CUSTOMER-SPECIFIC DATA.**

The "pipes in the ground" test is customer-specific.
Sequoyah County Rural Water District No. 7 v. Town of Muldrow,
191 F.3d 1192, 1203 (10th Cir. 1999).  In nearly all §1926(b)
litigation that examines the "pipes in the ground test," the
analysis focuses upon the ability of the rural water system to
deliver water to specific customers or areas.  As stated by the
United States Court of Appeals for the Tenth Circuit, the "pipes

18

in the ground" test is "essentially an inquiry into whether a water association has the capacity to provide water service to *a given customer*."  <u>Rural Water District No. 1 v. City of Wilson</u>, 243 F.3d 1263, 1270 (10th Cir. 2001) (emphasis added).  In making that customer-specific inquiry, courts determine whether the rural water system has adequate facilities and infrastructure to provide service within a reasonable time.  <u>Id.</u>

Further, a rural district does not have unlimited discretion.  It has not "made service available" if the rural district's method of providing service amounts to a constructive denial of service.  "For instance, failing to provide a type of service that is generally accepted in the industry, failing to comply with state law requirements such as health and sanitation codes, or providing unreasonably costly or delayed service each might amount to such a constructive denial of service."  <u>Pub. Water Supply Dist. No. 3 v. City of Leb.</u>, 605 F.3d 511, 522 n.11 (8th Cir. 2010).

Sioux makes *assumptions* about its capacity to serve the prospective customers on the east side, i.e., that it has the necessary capacity, because such users will need about the same amount of water as residential users.  But that is as far as Sioux went.  The customers identified on the east side of

19

Watertown are all businesses, not residences.[7]   (Doc. 34-5, Schriever 22.)   Sioux does not have any data about the actual usage of those entities.   (Id., Schriever 23.)   In terms of the analysis on whether Sioux can serve these entities, it is only considering domestic water supply for consumption or other related uses.   (Id., Schriever 25-26.)

        Sioux also argues that defendants' experts acknowledge Sioux's ability to serve the customers on the east side of Watertown, isolating a sentence in their report.   (Doc. 24, pg. 21.)   Sioux relegates to a footnote the *next* sentence in the Burian and Wagner Report, which states: "Recognizing that some of these users consist of unique businesses that have irregular water demand from one month to the next, however, further investigation into their water usage is necessary."   (Doc. 33-6, pg. 2.)

        Even if Sioux has a legal right to serve these customers, which defendants do not concede, it is impossible to conclude, as a matter of law, that Sioux has the capacity to meet the needs of the businesses on the east side.   Sioux simply has not provided enough information about those customers to meet its threshold burden.   Under these circumstances, Sioux's motion must be denied.

_____

        [7] Sioux's Articles of Incorporation belie the notion that its purpose is to provide commercial water service to anyone. Their articles limit their purpose to the supply of "domestic" water, and none of the east side entities are residences.

C.  **SIOUX HAS NOT ESTABLISHED THAT ITS PROVISION OF SERVICE TO THE PROSPECTIVE CUSTOMERS CAN BE DONE FOR A REASONABLE AMOUNT.**

"[C]ourts have recognized that a rural district's proposed method of providing service, if unreasonably costly or unreasonably delayed, can constitute a constructive denial of service." City of Lebanon, at 522.  Even if a rural water system has a legal right to serve an area and has the capacity and "pipes in the ground" to do so, §1926(b) protection may be lost if the rural water system's costs are excessive.  See Rural Water District No. 1, Ellsworth County, Kansas v. City of Wilson, Kansas, 243 F.3d 1263, 1271 (10th Cir. 2001); Pittsburg, at 719.  As described by the Tenth Circuit:

> Although the costs of services need not be competitive with the costs of services provided by other entities, the protection granted to rural water districts by § 1926(b) should not be construed so broadly as to authorize the imposition of any level of costs. There is some point at which costs become so high that assessing them upon the user constitutes a practical deprivation of service. Just as there are limits on how long a period of time a water district may take to provide service (i.e. a "reasonable amount of time"), so there are limits on how much it can charge for that service and still be considered to have "made [it] available."

City of Wilson, 243 F.3d at 1271 (emphasis and parentheticals in original).  Such a rule prohibits "the unattractive scenario" of water service being unavailable due to excessively high pricing by a rural water supplier in an area where competition is disallowed by § 1926(b).  Pittsburg at 719.

21

The charges for hooking onto Sioux's lines are borne by the customers. (Doc. 34-1, Thompson 84-85.) Sioux's moving papers describe the various prospective customers as being between 100-300 feet from its existing pipes. (Doc. 23, ¶¶42, 43, 44, 51.) But Sioux's moving papers do not describe the costs for the prospective customers to hook up with the Sioux line. Whether such costs are reasonable is unknown. This deficiency is yet another reason that Sioux's motion must be denied.

**III. SIOUX'S MOTION CONCERNING FIRE PROTECTION IS OVERBROAD, AS 7 C.F.R. §1780.57(d) PROVIDES A FACTOR THE COURT SHOULD CONSIDER IN DETERMINING WHETHER SIOUX CAN MAKE SERVICE AVAILABLE TO CERTAIN CUSTOMERS.**

Whether the federal regulation cited by Sioux, 7 C.F.R. § 1780.57(d), requires a rural water provide to provide fire protection to make service available to customers is an issue that has not been considered by the Eighth Circuit Court of Appeals. The language of the regulation states in plain terms that "[w]ater facilities should have sufficient capacity to provide reasonable fire protection to the extent practicable." 7 C.F.R. § 1780.57(d).

Defendants acknowledge that the Tenth Circuit and various district courts have concluded that ability to provide fire protection is not relevant to whether a rural water provider is entitled to §1926(b) protection. However, the Eighth Circuit has not ruled on this issue, and the decisions from other jurisdictions are not controlling. Defendants respectfully

22

disagree with the courts concluding that fire protection should not even be considered a factor in determining whether a rural water service has made service available.

While the cited cases have yet to go so far as to interpret 7 C.F.R. § 1780.57(d) to impose a blanket *requirement* that a rural water service must provide fire protection, defendants believe there is a more well-reasoned way the Court should look at this issue.  If the Court is to truly make a "customer specific" inquiry to determine if a water provider has made service available, it is completely logical that the ability to satisfy the fire protection needs of specific customers is at least *a factor* that must be given consideration in evaluating whether §1926(b) protection should be available.

The reason the ability to provide fire protection should be a factor goes back to the purpose behind §1926. Federal funds issued under §1926 are for truly rural uses, to "primarily serv[e] ranchers, farm tenants, farm laborers, rural businesses, and other rural residents[.]"  7 U.S.C. § 1926(a)(1). Sioux, like many rural providers, does not provide fire protection.  (Thompson 63.)  As to many rural water customers fitting within these user categories, that is not a major issue. Defendants can understand why providing fire protection to remote locations within a county could be cost-prohibitive to a rural water provider.

Also, a fair number of the cases that have considered the concept of "fire protection" have made decisions based upon arguments that a rural water provider could not supply *areas* with fire protection by providing adequate mains and hydrants.  See e.g. Rural Water Sys. No.1 v. City of Sioux Ctr., 29 F. Supp. 2d 975, 993 (N.D. Iowa 1998) (rejecting City's argument that the citizens in an annexed territory had an expectation of water service meeting City standards, including fire flow protection, which RWS # 1's system could not fulfill); Water Works Dist. No. II of Tangipahoa Parish v. City of Hammond, 1989 U.S. Dist. LEXIS 11752, 1989 WL 117849, *6 (E.D. La. 1989) (unpublished) ("Therefore, while the City will be enjoined from supplying water service to the areas as indicated in these findings and conclusions, the City shall have the right to maintain and use its water mains and pipelines for fire protection purposes."). Again, to the extent that serving outlying rural housing areas with fire protection presents a sizeable economic burden, defendants understand the rationale behind not requiring a rural water provider to make fire protection available.

The fire protection issue here is not whether Sioux has the wherewithal to reach remote areas or install appropriately sized mains or hydrants so that rural users have fire protection. Rather, the issue here is that Sioux is targeting commercial customers who do not fit the conventional "rural" mold

contemplated by §1926(b).  And Sioux wants the protection of §1926(b) as to those unconventional customers without investing the federal funds it receives in the infrastructure needed to truly serve their unique needs.

Under Sioux's version of things, a customer like Lew's Fireworks - which undoubtedly has fire protection needs that differ from ranchers, farm tenants, farm laborers, rural businesses, and other rural residents - would need service from two providers: Sioux for potable water and MU for fire protection.  Sioux believes that §1926(b) should be read to fortify its right to serve Lew's with potable water even though the arrangement makes no sense and does not, in any way, advance the goals behind §1926.

With respect to individual customers like Lew's Fireworks and others who need fire protection to operate, Sioux should not get the protection of §1926(b).  Under a customer-specific inquiry, Sioux simply cannot serve those customers' needs.  Sioux is not providing commercial customers who need fire protection with a valuable service; it is creating a situation where they have two water providers and two water bills.  This scenario does not at all square with the purpose behind §1926.  Sioux's motion relating to the fire protection issue should be denied.

## IV.   SIOUX'S MOTION CONCERNING EQUITABLE DEFENSES IS OVERBROAD TO THE EXTENT IT IS ATTEMPTING TO AVOID THE RESULTS OF ITS OWN NEGOTIATED AGREEMENTS.

Having reviewed Sioux's brief, the City does not argue with Sioux's case citations stating, in essence, that equitable defenses cannot bar the application of "public interest" statutes.[8]  Here, however, Sioux and defendants negotiated certain issues and reached agreements.  No court has held that parties cannot resolve issues arising under §1926(b).

This is particularly true as to Titan Machinery and Big Shot Fireworks.  Sioux concedes, albeit in a footnote, that its attorney wrote to the Watertown City Attorney and advised that Sioux would make no claim to serve Titan Machinery.  (Doc. 34-7, Sioux 546.)  This issue was settled, and Sioux should not now be able to work around this agreement by relying upon the bar to equitable defenses.  Likewise, Sioux continues to discuss its ability to serve Big Shot Fireworks. (Doc. 23, ¶¶41, 57.)  Again, Sioux and defendants reached an agreement relating to the provision of service to Big Shot Fireworks.  (Affidavit of Zachary W. Peterson in Opposition to Plaintiff's Motion for Summary Judgment, Exhibit A.)

---

[8] Obviously, defendants do not believe the Court even reaches this issue, because the public interest statute at issue, 7 U.S.C. §1926(b), does not apply as Sioux claims its does in this lawsuit.

26

For these reasons, defendants resist the final portion of Sioux's Motion and ask that it be denied.

### **CONCLUSION**

Sioux is not entitled to the relief requested in its Motion for all of the reasons set forth above.  Above all else, Sioux lacks a legal right to serve the customers at issue, and, therefore, cannot prevail in this ligitation.  Defendants respectfully urge the Court to deny Sioux's Motion for Partial Summary Judgment and grant Defendants' Motion for Summary Judgment.

Respectfully submitted this 5th day of December, 2016.

RICHARDSON, WYLY, WISE, SAUCK
 & HIEB, LLP


By___/s/ Zachary W. Peterson_____
      Attorneys for Defendants

One Court Street
Post Office Box 1030
Aberdeen, SD  57402-1030
Telephone No. 605-225-6310
Facsimile No. 605-225-2743
e-mail: zpeterson@rwwsh.com

## CERTIFICATE OF SERVICE

The undersigned, one of the attorneys for defendants, hereby certifies that on the 5th day of December, 2016, a true and correct copy of **DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** was served electronically through the CM/ECF Federal Court filing system on:

(jcole@zdclaw.com)
Mr. Jeffrey A. Cole
Zimmer, Duncan & Cole, LLP
Attorneys at Law
5000 South Broadband Lane, #119
Sioux Falls, SD  57108


                            /s/ Zachary W. Peterson


## CERTIFICATE OF COMPLIANCE

In accordance with D.S.D. Civ. LR 7.1(B)(1), I certify that this brief complies with the requirements set forth in the Local Rules.  This brief was prepared in Wordperfect X6, using 12-point Courier New, and contains 6,223 words.  I have relied on the word count of the word-processing program to prepare this certificate.


                            /s/ Zachary W. Peterson